THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JANE DOE, by and through her
  next friend, JULIE DOE,

      *Plaintiff*,

v.

DISTRICT OF COLUMBIA, et al.

      *Defendant*.

:
:
:
:
:
:
:
:
:
:
:
:
:
:

C.A. No. 1:18-CV-2181 (ABJ)

# PLAINTIFF'S OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## PRELIMINARY STATEMENT

Plaintiff, Julie Doe, as next friend of her minor daughter, Jane Doe, files this memorandum of points and authorities in opposition to Defendant District of Columbia and Defendant James' respective motions to dismiss her Complaint. For the reasons described more fully below, Defendants have failed to demonstrate that Ms. Doe's complaint against them is legally insufficient as to any of the claims alleged. Therefore, Defendants' motions to dismiss Plaintiff's complaint should be denied.

## LEGAL STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint."[1] To be viable, a complaint must contain "only a short and plain statement of the claim showing that

---

[1] *Smith v. Washington Post Co.*, 962 F. Supp. 2d 79, 84 (D.D.C. 2013) (citing *Browning v. Clinton*, 292 F.3d 235, 242, 352 U.S. App. D.C. 4, 11 (2002)); *accord Metro. Washington Chapter, Associated Builders & Contractors, Inc. v. District of Columbia*, 57 F. Supp. 3d 1, 13 (D.D.C. 2014) (same).

the pleader is entitled to relief. Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests."[2] "The plaintiff need not plead all of the elements of a prima facie case in a complaint, nor must the plaintiff plead facts or law that match every element of a legal theory."[3]

"[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations."[4] It "must contain only enough facts to state a claim to relief that is plausible on its face."[5] "The plausibility standard is not akin to a 'probability requirement . . . .'"[6] Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[7]

When ruling on a motion to dismiss for failure to state a claim, the court must "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)."[8] "[T]he allegations of the complaint should be construed favorably to the pleader."[9] The court must also "draw all

---

[2] *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation marks, ellipsis, and citation omitted); *accord Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681, 386 U.S. App. D.C. 144, 153 (2009).

[3] *Metro. Washington Chapter,* 57 F. Supp. 3d at 14 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14 (2002), and *Krieger v. Fadely*, 211 F.3d 134, 136, 341 U.S. App. D.C. 163, 165 (2000)).

[4] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[5] *Id.* at 570; *accord Wood v. Moss*, 134 S.Ct. 2056, 2067 (2014) (quoting *Ashcroft*, 556 U.S. at 678).

[6] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[7] *Id.* (citing *Twombly*, 550 U.S. at 556); *accord Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015).

[8] *Twombly*, 550 U.S. at 555 (citations omitted).

[9] *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *accord Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 15, 381 U.S. App. D.C. 76, 83 (2008).

reasonable inferences from those allegations in the plaintiff's favor."[10]  Further, the court "must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[11]

"Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations."[12]  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'"[13]  "A complaint survives a motion to dismiss even if there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible."[14]  "It is inevitable that the defendant's version will sometimes prove to be the true one, but that does not relieve [the] defendant[] of [its] obligation to respond to a complaint that states a plausible claim for relief, and to participate in discovery."[15]

## ARGUMENT

**I.      Plaintiff Jane Doe Has Properly Pled Her Title IX Deliberate Indifference Claim, and Defendant District's Motion to Dismiss Should Be Denied.[16]**

---

[10] *Banneker Ventures, LLC v. Graham,* 798 F.3d 1119, 1129 (D.C. Cir. 2015) (citing *Iqbal,* 556 U.S. at 678).

[11] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007).

[12] *Neitzke v. Williams,* 490 U.S. 319, 327 (1989), quoted in *Twombly,* 550 U.S. at 556.

[13] *Twombly,* 550 U.S. at 556 (quoting *Scheuer,* 416 U.S. at 236).

[14] *Graham,* 798 F.3d at 1129 (internal quotation marks, alterations, and citation omitted).

[15] *Id.*

[16] Jane Doe has not pled a Title IX claim against Defendant James, as she is not a federal fund recipient within the meaning of Title IX.  In addition, although Defendant District broadly asserts Title IX "does not govern" Jane Doe's claims (Doc. 15 at 1), the District's briefing is void of argument or analysis concerning Jane Doe's Title IX retaliation claim, which is a separate and distinct cause of action from her Title IX deliberate indifference claim.  Accordingly, Defendant District's motion to dismiss Jane Doe's retaliation claim must be denied.

Title IX of the Education Amendments of 1972 provides, in pertinent part:

> [N]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.[17]

The U.S. Supreme Court has held Title IX "unquestionably" places on a school district that receives federal funds the "duty not to discriminate on the basis of sex."[18] Federal fund recipients, like Defendant District, may be held liable for monetary damages under Title IX for deliberate indifference to student-against-student sexual harassment.[19]

This District Court recently described the elements of a Title IX case as follows:

> When a Title IX discrimination claim is based on peer sexual harassment, a funding recipient is liable in damages only if it is deliberately indifferent to peer sexual harassment of which it has "actual knowledge" and "that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." [20]

Defendant District argues Jane Doe's Title IX claim should be dismissed on two grounds. First, it contends that, because MP's brutal sexual assault against Jane Doe was a single incident, the assault, as a matter of law, was not "so severe, pervasive, and objectively offensive that it can be said to deprive [her] of access to the educational opportunities or benefits provided by the school." (Doc. 15 at 10-11.) Second, Defendant District argues it cannot be found deliberately indifferent because, after receiving the report of MP's sexual assault against Jane Doe, it took the minimal steps of interviewing Jane and providing video footage to law enforcement. (*Id.* at 11-12.) As set forth below, those arguments are fatally flawed and should be rejected.

---

[17] 20 U.S.C. § 1681(a).

[18] *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 74-75 (1992).

[19] *Davis v. MonDoe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999); *Wells v. Hense*, 235 F. Supp. 3d 1, 7 (D.D.C. 2017).

[20] *Wells,* 235 F. Supp. 3d at 7 (quoting Davis, 526 U.S. at 650).

A.    **Jane Doe Has Adequately Pled She Suffered "Severe, Pervasive, and Objectively Offensive" Sexual Harassment**

The U.S. Supreme Court in *Davis* stated:

[A] plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities. Whether gender-oriented conduct rises to the level of actionable "harassment" thus "depends on a constellation of surrounding circumstances, expectations, and relationships."[21]

The Court explained, while playground insults such as calling a child "scardy-cat" or "four eyes" likely would not qualify as "so severe, pervasive, and objectively offensive" to deny a child access to educational opportunities or benefits, "in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect." [22]

Federal courts routinely have found that a single incident of sexual assault, in and of itself, may create a hostile educational environment and effectively deprive the victim of equal access to educational opportunities or benefits, and if there is any question on that issue, it is one for a jury to decide.[23] A case cited by Defendant District in its own briefing states:

---

[21] *Davis*, 526 U.S. at 651 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

[22] *Id.* at 652-53.

[23] *See Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 n.4 (6th Cir. 2000) (affirming trial verdict against school on Title IX claim, stating "[w]ithin the context of Title IX, a student's claim of hostile environment can arise from a single incident"); *Doe v. Forest Hills Sch. Dist.*, No. 1:13-cv-428, 2015 U.S. Dist. LEXIS 175321, at *37-38 (W.D. Mich. Mar. 31, 2015) (denying defendant's summary judgment motion and holding a jury could determine single sexual assault of plaintiff met this Title IX element); *McGinnis v. Muncie Cmty. Sch. Corp.*, No. 1:11-cv-1125, 2013 U.S. Dist. LEXIS 79548, at *35-37 (S.D. Ind. June 5, 2013) (rejecting argument that a single incident of sexual assault cannot satisfy element); *Lopez v. Metro. Gov't*, 646 F. Supp. 2d 891, 913-15 (M.D. Tenn. 2009) (denying summary judgment motion and finding issue of whether one act of forced fellatio established element was a jury question); *T.Z. v. City of New York*, 634 F. Supp. 2d 263, 269-72 (E.D.N.Y. 2009) (holding a jury should decide whether one act of sexual harassment satisfied the element); *J.K. v. Ariz. Bd. of Regents*, No. CV 06-916, 2008 U.S. Dist. LEXIS 83855, at *41 (D. Ariz. Sept. 29, 2008) (denying defendant's summary judgment motion, stating it was undisputed that rape of student constituted requisite degree of sexual harassment); *M. v. Stamford Bd. of Educ.*, No. 3:05-cv-0177, 2008 U.S. Dist. LEXIS 51933, at *23-25 (D. Conn. July 7, 2008) (denying school's summary judgment motion and finding a jury "could reasonably conclude" one

5

> We do not hold that a one-time episode is per se incapable of sustaining a hostile environment claim. The frequency of the alleged harassment is a significant factor, but only one of many to be considered in determining whether the conduct was 'sufficiently severe or pervasive' that a reasonable person would find that it had rendered the environment hostile or abusive.[24]

The U.S. Department of Education ("DOE") supports the position that one incident of sexual misconduct may create a hostile education environment, stating:

> The more severe the conduct, the less the need to show a repetitive series of incidents; this is particularly true if the harassment is physical. For instance, if the conduct is more severe, e.g., attempts to grab a female student's breasts or attempts to grab any student's genital area or buttocks, it need not be as persistent to create a hostile environment. Indeed, a single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment.[25]

Federal courts have applied legal standards from Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), in determining whether one incident of sexual assault is "sufficiently severe and pervasive" for Title IX purposes.[26] The *McGinnis* court stated:

> A single act of harassment such as this may suffice in the context of a Title VII hostile environment claim, and the Defendants point to no reason why the result should be different here, regardless of environment, the impact on the victim is the same.[27]

---

student-against-student sexual assault satisfied this element); *Kelly v. Yale Univ.*, No. 3:01-CV-1591, 2003 U.S. Dist. LEXIS 4543, at *8-9 (D. Conn. Mar. 26, 2003) (denying school's summary judgment motion and holding  single sexual assault was sufficiently severe); *Doe v. Dallas Indep. Sch. Dist.*, CA 3:01-CV-1092, 2002 U.S. Dist. LEXIS 13014, at *15-17 (N.D. Tex. July 16, 2002) (denying school's 12(b)(6) motion for dismissal of Title IX claim and holding one sexual assault was "sufficiently severe one-on-one peer harassment").

[24] *Brown v. Hot, Sexy & Safer Prods.*, 68 F.3d 525, 541 n.13 (1st Cir. 1995).

[25] DOE, *Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties*, 2001 ("2001 Guidance"), at 6, available at https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.

[26] *See T.Z.*, 634 F. Supp. 2d at 269-72; *McGinnis*, 2013 U.S. Dist. LEXIS 79548, at *36-37.  Significantly, the U.S. Supreme Court in *Davis* quoted Title VII case *Oncale* specifically with respect to the "severe, pervasive, and objectively offensive" Title IX standard. *Davis*, 526 U.S. at 651 (quoting *Oncale*, 523 U.S. at 82).

[27] *McGinnis*, 2013 U.S. Dist. LEXIS 79548, at *36-37.

6

This Circuit and other courts have determined, in Title VII cases, one sufficiently egregious incident may create an actionable hostile work environment. In one such case involving race discrimination, U.S. Supreme Court Justice Kavanaugh, then a D.C. Circuit Court Judge, stated in his concurrence, "[c]ourts and commentators alike agree that a *single* physical act – such as a physical assault – can create a hostile work environment."[28] Other courts have similarly held, specifically in the context of Title VII sexual harassment.[29]

Here, as set forth in Jane Doe's Complaint, on June 13, 2017, MP dragged and forced her into a boys' bathroom stall, refused to allow her to exit, groped her buttocks and thighs, tried to shove his hands up her dress and into her underwear, and sucked and/or kissed her neck with such force he caused bruising, while Jane begged him to stop, and he warned her to be quiet. (Compl. ¶¶ 2, 14-17.) He then posted details about the incident on social media, and other students approached Jane about the incident, which caused her severe emotional distress. (*Id.* ¶ 20.) To make matters worse, RHS's highest ranking official, Defendant James, in the presence of other top-level District and school administrators and employees, described Jane Doe's report as "bullshit," said she was going the "extra mile" to ensure the "whole thing is going to blow up in her face," and intended to embarrass Jane Doe. (*Id.* ¶¶ 3, 20.)

Based on the Title IX and Title VII precedent cited above, along with DOE guidance, it is clear Jane Doe has more than adequately pled the "severe, pervasive, and objectively offensive"

---

[28] *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 579-80 (D.C. Cir. 2013) (emphasis added).

[29] *See Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir. 2013) (rejecting argument that a single incident could not amount to a Title VII violation); *Gerald v. Univ. of P.R.*, 707 F.3d 7, 18 (1st Cir. 2013) (finding single incident during which co-worker grabbed plaintiff's breasts and made sexually suggestive noises was sufficiently egregious); *Lockard v. Pizza Hut*, 162 F.3d 1062, 1072-73 (10th Cir. 1998) (holding that single incident of sexual assault, during which customer grabbed plaintiff's hair and breast, was physically threatening and humiliating behavior that created an actionable hostile work environment); *see also Fields v. Vilsack*, 207 F. Supp. 3d 80, 94 (D.D.C. 2016) (explaining that cases in which an isolated incident can create a hostile work environment typically involve "acts of serious, physical violence or sexual assault").

element of her Title IX claim.  MP's brutal sexual violence against Jane Doe, by its very nature, created a hostile educational environment for Jane at RHS and effectively denied her educational benefits and opportunities.  Defendant James, through her malevolent misconduct, then intentionally exacerbated that already unacceptably hostile environment to one where Jane Doe feared encountering not only the assailant, but also continued hateful and degrading treatment from administrators, including the top-most official at RHS, Defendant James.  The circumstances and conditions at RHS were so dangerous and detrimental that Jane Doe had to transfer out of the school for her own safety and wellbeing.

Defendant District's contentions – "[t]he June 13, 2017 incident by itself is insufficient to demonstrate 'severe and persistent' [sic] conduct", and that Jane Doe has "not pled facts that show that the school officials' actions compromised or interfered with her educational opportunities" (Doc. 15 at 10-11) – demonstrates a fundamental misunderstanding of Title IX jurisprudence.  As set forth above, it is a well-established matter of law that MP's brutal assault against Jane Doe, in and of itself, may be considered "so severe, pervasive, and objectively offensive" that it undermined and detracted from Jane Doe's educational experience, and effectively denied her equal access to Defendant District's educational resources and opportunities.  Defendant District tellingly cites no controlling or persuasive legal authority that supports its position to the contrary.

Moreover, Defendant District ignores that Defendant James stated to other administrators and employees that Jane Doe's report was "bullshit" and she intended to derail law enforcement's investigation of Jane Doe's report, embarrass Jane, and cause the situation to "blow up" in Jane's face. (Compl. ¶¶ 3, 20.) Principal James' admitted intention to harm Jane Doe, a young student

8

in James' own school who had just reported being sexually violated by another student, must qualify as "compromising" or "interfering" with Jane Doe's educational opportunities at RHS.

If there is any question on this issue, and Jane Doe strongly contends there is not based on the law and common sense, it is for a jury to decide.

## B.   Plaintiff Has Pled Defendant District Was Deliberately Indifferent

This District Court has stated:

> "Deliberate indifference" in this context exists "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Moreover, "the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." . . . Title IX does not require that a defendants' deliberate indifference lead to subsequent actionable harassment. As the First Circuit has recognized, in *Davis* itself the Supreme Court "stated that funding recipients may run afoul of Title IX not merely by 'caus[ing]' students to undergo harassment but also by 'making them liable or vulnerable' to it."[30]

This District Court and other federal courts have held that a minimalistic response to a student's report of sexual assault– such as a failure to investigate, slowness in investigating, or failing to discipline the perpetrator – may be considered "clearly unreasonable" and deliberately indifferent for Title IX purposes.[31]

---

[30] *Wells v. Hense*, 235 F. Supp. 3d 1, 7-8 (D.D.C. 2017) (citations omitted).

[31] *See, e.g., Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000); *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1244, 1248-49 (10th Cir. 1999) (holding deliberate indifference was sufficiently pled where, *inter alia*, plaintiff alleged school principal failed to investigate complaint or discipline perpetrator); *Wells*, 235 F. Supp. 3d at 9; *Forest Hills*, 2015 U.S. Dist. LEXIS 175321, at *32-33 (stating, "[d]eliberate indifference has been found in cases where school officials are slow to act or investigate"); *Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332, 369 (W.D. Penn. 2008) (stating, "[t]he reasonable response doctrine implies a duty on the part of the funding recipient, upon notice of possible sexual harassment, to promptly investigate and if necessary to take remedial action"); *Doe v. Green*, 298 F. Supp. 2d 1025, 1036 n.4 (D. Nev. 2004) (stating, "[p]ermitting a school district to avoid liability on the basis of some minimalist and ineffective response to discrimination would be inconsistent with the Supreme Court's ruling that responses which are 'clearly unreasonable' constitute deliberate indifference").

The Sixth Circuit, in *Vance*, upheld a jury's finding of deliberate indifference where a school system failed to investigate complaints regarding sexual harassment, and only talked to but did not discipline the offenders.[32] The court rejected the school defendant's argument – that it could not be found deliberately indifferent if it had done "something" upon receiving a sexual harassment complaint – and stated, "[i]f this Court were to accept [that] argument, a school district could satisfy its obligation where a student has been raped by merely investigating and absolutely nothing more. Such minimalist response is not within the contemplation of a reasonable response."[33]

> In *Wells*, this Court denied the school defendants' 12(b)(6) motion to dismiss, stating:

> If one were to accept all of the factual allegations in the complaint as true and draw all plausible inferences in plaintiffs' favor, as we must do at this stage, defendants' response to the reported incidents was to promise an investigation and appropriate consequences, but then to fail to conduct a proper investigation, to punish the perpetrators, to ensure that the victims were protected from future assaults, and to prevent the subsequent harassment by other students, all of which cause the victims to stop attending school for the remainder of the year. Since it is this version that matters, the Court cannot conclude that defendants' response to the incident was "not 'clearly unreasonable' as a matter of law."[34]

The facts here are even more egregious than those in *Wells*. Defendant District, like the school in *Wells*, failed to conduct any type of investigation, failed to punish MP (or even suggest it would do so), and failed to suggest or ensure that Jane Doe would be protected from future assaults or harassment. (Compl. ¶¶ 4-5, 26, 30.) Moreover, here, Defendant District's response to Jane Doe's report of sexual harassment extended well beyond the realm of just deliberate indifference, when Defendant James admitted her ***specific intent to harm, actively discredit, and embarrass Jane Doe***, and – astonishingly – ***negatively impact the criminal investigation of MP's***

---

[32] *Vance*, 231 F.3d at 262.

[33] *Id.* at 260.

[34] *Wells*, 235 F. Supp. 3d at 9.

10

*sexual assault against Jane*. (*Id.* ¶¶ 3, 20.) Even after Julie Doe reported Defendant James' retaliation and harassment to Superintendent Pinder, Defendant District chose to take no action. (*Id.* ¶ 29.) All of this caused Jane Doe to seek a transfer to a different school, and Defendant District had the audacity to reject her request. (*Id.* ¶¶ 28, 30.) The District waited until only seven days prior to the beginning of the 2017-18 academic year to, at long last, grant Jane's request, which caused her to agonize over the entire summer whether she would be forced to return to RHS. Accordingly, Jane Doe has more than adequately pled deliberate indifference.

Defendant District contends Plaintiff has not sufficiently pled deliberate indifference because: "the crime was immediately investigated;" "Jane Doe and Julie Doe met with school officials the day the school was notified" of MP's sexual assault; "Defendant James attempted to get statements from Jane Doe"; "the guidance counselor and [law enforcement] Officer both met with Jane Doe separately, [and] each took statements from her"; a criminal investigation was opened"; and "the school provided some video footage to the police officers involved in the criminal investigation." (Doc. 15 at 11-12.) This argument fails for several reasons.

First, just as in *Wells*, where this District Court denied the defendants' 12(b)(6) motion to dismiss, "[t]he problem for defendants is that their 'recitation of the allegations fails to accept all of the factual allegations of the complaint as true and to draw all plausible inferences in plaintiffs favor. Rather, it ignores some allegations altogether . . ."[35] Here, Defendant District similarly fails to accept *all* of the facts pled in the Complaint, including that, after June 14, 2017, when Jane and her mother met with school officials, Defendant District did not further investigate or complete a proper investigation of the sexual assault; did not report any conclusion of any such investigation to Jane Doe or Julie Doe; did not interview MP; did not institute any disciplinary

---

[35] *Wells*, 235 F. Supp. 3d at 8-9.

11

measures or proceedings against MP; did not approve Jane Doe's first request for a safety transfer; Defendant James disparaged and humiliated Jane Doe and admitted her specific intent to harm Jane and interfere with the criminal investigation of MP's sexual assault against her; and Defendant District failed to take any action after Julie Doe reported Defendant James' egregious misconduct and retaliation. (Compl. ¶¶ 3,4, 24, 26, 28-30, 53.) Accordingly, based on the above-cited legal authority, it is clear that *all* of the facts in Jane Doe's Complaint, along with all plausible inferences that may be drawn from those facts in Jane's favor, establish that she properly pled deliberate indifference.

Second, to the extent Defendant District suggests it cannot be found deliberately indifferent because "the crime was immediately investigated" by law enforcement and the school provided minimal assistance to the criminal investigation, that argument also fails. Title IX legal authority and guidance establishes that a school district has an independent duty to conduct its own investigation of a student's report of sexual harassment, and it may not refuse or fail to perform, or delay in performing, its own investigation because law enforcement is investigating the matter. Indeed, over 16 years ago, the DOE stated:

> In some instances, a complainant may allege harassing conduct that constitutes both sex discrimination and possible criminal conduct. Police investigations or reports may be useful in terms of fact gathering. However, because legal standards for criminal investigations are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly and effectively.[36]

At least two federal courts have found that a school's failure to investigate a student's report of sexual assault, based on the excuse that law enforcement was investigating the report, constitutes

---

[36] 2001 Guidance at 21.

12

evidence of deliberate indifference and does not alleviate the school of its independent investigation responsibilities.[37]

Finally, if there is any question as to whether Defendant District was deliberately indifferent to Jane Doe's report, it is a factual question for a jury that may not be decided on a 12(b)(6) motion.

## II.     Jane Doe Has Adequately Pled Her § 1983 Failure to Train Claim.

Defendant District's general argument that Jane Doe failed to plead her § 1983 claim should be disregarded given that, among other things, the District ignores the entire body of well-established jurisprudence concerning *Monell* claims based on a municipality's failure to train.  In any event, as set forth below, Jane Doe has properly pled each and every element of her claim, and Defendant District's arguments should be rejected.

Section 1983 provides a federal cause of action for violations of an individual's Constitutional or federal rights.[38]  The statute provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.[39]

---

[37] *See King v. Curtis*, No. 1:14-cv-403, 2016 U.S. Dist. LEXIS 184737, at *25-27 (W.D. Mich. Nov. 1, 2016), *adopted by* 2017 U.S. Dist. LEXIS 28429 (W.D. Mich. Mar. 1, 2017); *Forest Hills*, 2015 U.S. Dist. LEXIS 175321, at *9-11.

[38] *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997); *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980).

[39] 42 U.S.C. § 1983.

Jane Doe's §1983 claim rests on the theory of municipal liability.[40]  A plaintiff suing a

municipality, like Defendant District, under §1983 for failing to train or inadequately training

employees must show:

(1)  She was deprived of a constitutional or federal right;
(2)  "[T]he deprivation was caused by a policy or custom of the municipality"; and
(3)  "[T] he need for more or different training . . . was so obvious and the
     inadequacy so likely to result in a violation of constitutional [or federal] rights
     that policymakers can be said to have been deliberately indifferent to the
     need."[41]

The D.C. Circuit has further stated:

There are a number of ways in which a "policy" can be set by a municipality to
cause it to be liable under §1983 . . . [including] the failure of the government to
respond to a need (for example, training of employees) in such a manner as to
show "deliberate indifference" to the risk that not addressing the need will result in
constitutional violations.[42]

Deliberate indifference exists where a "municipality knew or should have known of the risk of

constitutional violations, but did not act."[43]

With respect to causation, the inadequacy in the training program "must be closely related

to the ultimate injury."[44]  In *Harris*, the U.S. Supreme Court held causation in that case would

require showing that a deficiency in police officers' training caused them to be indifferent to a

detainee's need for medical attention. [45]  The Court stated, "[p]redicting how a hypothetically

well-trained officer would have acted under the circumstances may not be an easy task for the

---

[40] *See Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

[41] *Rogala v. District of Columbia,* 161 F.3d 44, 56 (D.C. Cir. 1998) (internal citations omitted).

[42] *Baker v. District of Columbia*, 326 F.3d 1302, 1307 (D.C. Cir. 2003).

[43] *Jones v. Horne*, 634 F.3d 588, 601 (D.C. Cir. 2011).

[44] *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).

[45] *Id*. at 391.

factfinder . . . [b]ut judge and jury, doing their respective jobs, will be adequate to the task."[46]

The Court further explained, in another case:

> The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice – namely a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation – that the municipality's indifference led directly to the very consequence that was so predictable.[47]

Federal courts routinely have upheld failure to train claims much like that brought here.[48]

In *Forest Hills*, the court granted a plaintiff's motion for summary judgment on her §1983 claim

against a school defendant for its failure to train employees on Title IX and sexual harassment.[49]

Plaintiff there, a high school sophomore, was pulled into a secluded area of the school and

sexually assaulted by a fellow student.[50]  Plaintiff reported the assault to school officials, but the

school conducted only a limited investigation (which it unsuccessfully attempted to justify on the

---

[46] *Id.*

[47] *Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409-10 (1996).

[48] *See, e.g., Doe v. Hamilton Cnty. Bd. of Educ.*, No. 1:16-cv-373, 2018 U.S. Dist. LEXIS 125696, at *82 (E.D. Tenn. Aug. 6, 2018) (denying school's motion for summary judgment and stating, "if a school district employee has served a school in a capacity that often puts them in close proximity to students, and they serve in that role for any significant length of time, at least some acquaintance with Title IX and student-on-student harassment training seems to be at least minimally necessary"); *Doe v. Russell Cnty. Sch. Bd.*, 292 F. Supp. 3d 690, 711 (W.D. Va. 2018) (denying defendant's summary judgment motion and explaining, "a jury could reasonably conclude that the School Defendants' need to thoroughly train administrators, teachers, and staff on how to spot and address sexual misconduct was obvious"); *C.R. v. Novi Cmty. Sch. Dist.*, No. 14-14531, 2017 U.S. Dist. LEXIS 18394, at *46-47 (E.D. Mich. Feb. 9, 2017) (denying summary judgment motion and holding jury could decide that failing to train teacher resulted in plaintiff's sexual abuse by a fellow student); *Belcher v. Robertson Cnty.*, No. 3-13-0161, 2014 U.S. Dist. LEXIS 165238, at *32-33 (M.D. Tenn. Nov. 26, 2014) (following bench trial, finding failures in school's training allowed perpetrator to continue sexually abusing students).

[49] *Forest Hills*, 2015 U.S. Dist. LEXIS, at *52-58.

[50] *Id.* at *3.

basis that law enforcement was investigating the assault), did not suspend the perpetrator until after he pled guilty to criminal charges, did not interview witnesses, and "waited months for someone else to make a conclusion as to whether the assault happened."[51]  The court held the school's training on responding to sexual assault complaints was inadequate; administrators and employees had no Title IX training.[52]  The court also found the school's inadequate training was due to its deliberate indifference, stating:

> The U.S. Department of Education's "dear colleague" letter explains that there were more than 800 reported incidents of rape and attempted rape and 3,800 other incidents of sexual batteries at public high schools during the 2007-08 school year. Because sexual assault claims arise frequently in the public high school context, it is certainly foreseeable that the failure to train school staff on how to handle such claims would cause disastrous results.  The Department of Education has made it clear to school administrators that training and proper response to sexual assault claims are required.  Just like failing to train a police officer on when to use his or her gun, failing to train a school principal on how to investigate sexual assault allegations constitutes deliberate indifference.  It is inevitable that these situations would arise at some point, and the complex Title IX requirements virtually ensure than an investigation done without any formal training would be deficient.[53]

Finally, with respect to causation, the court explained, "Plaintiff asserts that Defendants' actions violated her rights under the equal protection clause and were the proximate cause of her emotional distress, psychological damage, and damage to her character and standing in the community."[54]  The court determined:

> Plaintiff's asserted injuries were closely related to or actually caused by the school's failure to train [the Superintendent, Assistant Superintendent, and Principal] on how to respond to allegations of sexual assault and prevent further harassment. . . . The record here reveals that additional training would have prevented Plaintiff's injuries, at least in some measure. . . . [I]f the school

---

[51] *Id.* at *32-34.

[52] *Id.* at *42-43.

[53] *Id.* at *54-55.

[54] *Id.* at *56.

administrators had been adequately trained in the optimal methods of addressing sexual assault complaints, even allowing for mistakes, Plaintiff would not have suffered the injuries she alleges.[55]

### A.    Jane Doe Has Properly Pled Defendant District Violated Her Constitutional and Federal Rights

Jane Doe's Complaint sets forth facts establishing that Defendant District violated her Equal Protection rights when it failed to equitably investigate her report of sexual assault, failed to provide her any assurance she would be protected from further harassment, and then itself harassed and retaliated against her for reporting sexual assault.[56]

Jane Doe also has pled that Defendant District violated her federal right established by Title IX to not be discriminated against on the basis of her sex as a student attending a school receiving federal funds. (Compl. ¶¶ 33, 67-78, 80.) The U.S. Supreme Court has held the following factors establish that a federal statute has created a federal "right":

> We have held that [§ 1983] safeguards certain rights conferred by federal statutes. In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*. We have traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right. First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms.
>
> Even if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983. Because our inquiry focuses on congressional intent, dismissal is proper if Congress "specifically foreclosed a remedy under § 1983." Congress may do so expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by

---

[55] *Id.* at *56-58.

[56] *See Forest Hills*, 2015 U.S. Dist. LEXIS, at *42-43, 55-58; *see also Byrd v. District of Columbia*, 538 F. Supp. 2d 170, 177-78 (D.D.C. 2008) ("the Supreme Court has held that sex discrimination may violate the Constitution").

17

creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.[57]

All of the *Blessing* requirements are met here. First, Congress intended Title IX to benefit students like Jane Doe. Indeed, the U.S. Supreme Court has stated, "[w]e have recognized, for example, that Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments Act of 1972 create individual rights because those statutes are phrased 'with an *unmistakable focus* on the benefited class.'"[58] Jane Doe, as a student attending a school that receives federal funds, is part of that "benefited class."

Second, the right protected by Title IX is not vague or amorphous. Title IX, in clear and unambiguous language, prohibits a federal fund recipient, like Defendant District, from discriminating against students on the basis of sex. Two decades of U.S. Supreme Court and DOE precedent and authority, cited below, provides information and instruction on what constitutes prohibited sex discrimination, including where, as here, a school district fails to respond to a complaint of student sexual harassment or retaliates against the complainant.

Third, the obligation on Defendant District to not discriminate against students on the basis of sex is binding and mandatory. The U.S. Supreme Court stated, "Unquestionably, Title IX placed on the [school district] the ***duty not to discriminate on the basis of sex***."[59] In another case, the Court described Title IX as written in "explicit 'right- or duty-creating language."[60]

---

[57] *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997) (emphasis in original).

[58] *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (emphasis in original).

[59] *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 74-75 (1992) (emphasis added).

[60] *Gonzaga Univ. v. Doe*, 536 U.S.273, 284 n.3 (2002)

18

Similarly, in *Gebser*, the Court described Title IX as "conditioning an offer of federal funding on a *promise* by the recipient not to discriminate."[61]

Finally, Congress has not foreclosed a remedy for violation of a student's federal right under §1983. The U.S. Supreme Court has stated, "we conclude that Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools," and held a plaintiff may bring causes of action under *both* Title IX *and* § 1983 for unlawful sex discrimination.[62]

Accordingly, despite Defendant District's contentions, Jane Doe has well-established Constitutional and federal rights that Defendant District violated, which provides the requisite predicate for her §1983 claim. Defendant District does not, and cannot, argue Jane Doe does not have such a federal right. Also, the District's contention the Fourteenth Amendment does not apply to the District of Columbia fails because it ignores U.S. Supreme Court, D.C. Circuit Court, and D.C. District Court precedent holding that the Equal Protection Clause of the Fourteenth Amendment applies to the District of Columbia through the Fifth Amendment.[63]

B.      **Jane Doe Has Properly Pled § 1983 Deliberate Indifference**

As set forth in Jane Doe's Complaint, decades of U.S. Supreme Court precedent and DOE instruction placed Defendant District on notice that sex discrimination against students is prohibited, student sexual assault and harassment constitutes sex discrimination, failing to properly respond to a student's report of sexual harassment may constitute sex discrimination, and retaliating against a student because she reports sexual assault is, in and of itself, illegal sex discrimination. (Compl. ¶¶ 34-48, 66-81.) This extensive and long-standing authority also

---

[61] *Gebser*, 524 U.S. at 286 (emphasis added).

[62] *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255-58 (2009).

[63] *See Bolling v. Sharpe*, 347 U.S. 497, 498-99 (1954); *Women Prisoners of the D.C. Dep't of Corrections v. District of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996); *Wells*, 235 F. Supp. 3d at 10 n.6.

informed Defendant District that its administrators and employees would confront student sexual harassment with regularity, given the high predictability, recurrence and prevalence of student-against-student sexual assault in schools. (*Id.*) That precedent, instruction, and authority includes the following:

- In 1998, the U.S. Supreme Court stated, "[t]he number of reported cases involving sexual harassment of students in schools confirms that harassment unfortunately is an all too common aspect of the educational experience."[64]

- In 1999, the U.S. Supreme Court determined that schools may be held liable in private Title IX actions for monetary damages when they are deliberately indifferent to student-against-student sexual misconduct and harassment.[65] The Court stated deliberate indifference may be shown when a school makes no effort to investigate student-against-student sexual harassment.[66]

- The DOE's 2001 Guidance informed all U.S. schools that "[p]reventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn."[67] The Guidance reminded schools that student-against-student sexual misconduct constitutes prohibited sexual harassment and emphasized the vital importance of training, stating, "schools need to ensure that employees are trained so that those with authority to address harassment know how to respond appropriately."[68] The DOE informed schools that appropriate response had to include a ***prompt and equitable*** procedure for resolving sexual harassment complaints.[69] The DOE also stated:

  "If a student sexually harasses another student and the harassing conduct is sufficiently serious to deny or limit the student's ability to participate in or benefit from the program, and if the school knows . . . about the harassment, the school is responsible for taking immediate effective action to eliminate the hostile environment and prevent its recurrence. . . . [I]f, upon notice, the school fails to take prompt, effective action, the school's own inaction has permitted the student to be subjected to a hostile

---

[64] *Gebser*, 524 U.S. at 292.

[65] *See Davis*, 526 U.S. at 629.

[66] *Id.* at 654.

[67] 2001 Guidance at ii.

[68] *Id.* at 13.

[69] *Id.* at 19-20.

environment that denies or limits the student's ability to participate in or benefit from the school's program on the basis of sex." [70]

- In 2005, the U.S. Supreme Court held, "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action."[71] The Court explained the vital important of ensuring schools do not retaliate against those who report sexual harassment, stating:

  "Reporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished. Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel... Without protection from retaliation, individuals who witness discrimination would likely not report it, indifference claims would be short circuited, and the underlying discrimination would go unremedied. . . Title IX's enforcement scheme also depends on individual reporting because individuals and agencies may not bring suit under the statute unless the recipient has received 'actual notice' of the discrimination. If recipients were able to avoid such notice by retaliating against all those who dare complain, the statute's enforcement scheme would be subverted."[72]

- In January 2006, the DOE issued *Dear Colleague Letter – Sexual Harassment Issues*, stating, "[u]nfortunately, a significant number of students are still subjected to sexual harassment, which can interfere with a student's education as well as his or her emotional and physical well-being."[73] The DOE reiterated schools have an obligation "to take immediate and effective steps to end sexual harassment when it occurs, prevent its recurrence, and remedy its effects." [74]

- On April 4, 2011, the DOE issued *Dear Colleague Letter: Sexual Violence*, with a "call to action" because of "deeply troubling" data regarding school sexual violence.[75] The DOE informed schools, "*[d]uring the 2007-2008 school year, there were 800 reported incidents of rape and attempted rape and 3,800 reported incidents of other*

---

[70] *Id* at 12.

[71] *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).

[72] *Id.* at 180-81.

[73] DOE, *Dear Colleague Letter – Sexual Harassment Issues*, 2006 ("2006 Letter"), at 1, available at https://www2.ed.gov/about/offices/ list/ocr/letters/sexhar-2006.pdf.

[74] *Id.*

[75] DOE, *Dear Colleague Letter: Sexual Violence*, 2011 ("2011 Letter"), at 2, available at https://www2.ed.gov/about/offices/list/ocr/ letters/colleague-201104.pdf. The Department withdrew the 2011 Letter on September 22, 2017. However, it was in place when Jane Doe reported sexual harassment to Defendant District, and the cited statistics have not changed.

*sexual batteries at public high schools*."[76]  The Letter stated, "[a] number of different acts fall into the category of sexual violence, including rape, sexual assault, sexual battery, and sexual coercion.  All such acts of sexual violence are forms of sexual harassment covered under Title IX." [77]

- The 2011 Guidance reminded schools they have an obligation to investigate reports of sexual harassment, must designate at least one employee to coordinate and comply with Title IX responsibilities, and recommended schools provide training and education to employees and students on sexual harassment and violence.[78]

- On April 24, 2013, the DOE issued *Dear Colleague Letter: Retaliation*, reminding public schools they may not retaliate against students or parents who complain to a school about a civil rights violation like sexual discrimination, and that retaliation itself is a violation of Federal law.[79]  The Letter stated:

    "The ability of individuals to oppose discriminatory practices, and to participate in [DOE Office for Civil Rights] investigations and other proceedings, is critical to ensuring equal educational opportunity in accordance with Federal civil rights laws. Discriminatory practices are often only raised and remedied when students, parents, teachers, coaches, and others can report such practices to school administrators without the fear of retaliation.  Individuals should be commended when they raise concerns about compliance with the Federal civil rights laws, not punished for doing so."[80]

(*See* Compl. ¶¶ 34-43.)

Defendant District knew, or should have known, all of the above-cited authority, instruction, and information.  Yet the District ignored not just the "risk," but the highly predictable occurrence and recurrence of student-against-student sexual assault, and that administrators and staff would be woefully unequipped to properly handle those situations – and likely violate students' federal, civil, and Constitutional rights – given their lack of training on Title IX, on properly responding to and investigating reports of student-against-student sexual

---

[76] *Id.* at 2.

[77] *Id.* at 1-2.

[78] *Id.* at 14-15.

[79] DOE, *Dear Colleague Letter Retaliation*, 2013 ("2013 Letter"), at 1, available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201304.pdf.

[80] *Id.*

assault, and – at a bare minimum – on the fact that retaliating against a student who reports sexual assault is, in and of itself, prohibited and illegal sex discrimination.  (*See* Compl. ¶¶ 46-48, 73-75, 77.)

Accordingly, Jane Doe has adequately pled deliberate indifference on her §1983 claim.

### C.    Jane Doe Has Properly Pled Causation

In assessing causation, a court "must undertake the admittedly difficult task of 'predicting how a hypothetically well-trained [person] would have acted under the circumstances.'"[81]  Based on all of the facts in the Complaint, and plausible inferences in Jane Doe's favor, Jane Doe has pled that inadequacies in Defendant District's training of administrators and other employees were closely related to the injuries she suffered, and that a well-trained administrator or employee would have known, by way of example:

- Not to retaliate against, belittle, or humiliate Jane after she reported sexual assault;

- Not to attempt to interfere with the criminal investigation into MP's sexual attack against Jane Doe;

- To complete a thorough and unbiased investigation into Jane Doe's report;

- To provide Jane and her mother conclusions from that investigation;

- To punish MP or remove him from RHS, if necessary;

- To not hesitate in granting Jane Doe a safety transfer;

- To, at the very least, respond to Julie Doe's complaint that Defendant James cruelly belittled and retaliated against her daughter.

Had Defendant District done these things, and there is no reason to believe it would not have with appropriate training, Jane Doe would not have suffered violation of her Constitutional and federal rights, and the injuries she suffered could have been greatly lessened.

---

[81] *Forest Hills*, 2015 U.S. Dist. LEXIS 175321 at *56 (quoting *Harris*, 489 U.S. at 391).

23

If there is any question on this issue, it should be left to a fact finder to determine after adequate discovery has been conducted on Jane Doe's claims.

### III.   Julie Doe provided Defendant District with sufficient notice under D.C. Code § 12-309 (2001).

Written notice of the approximate time, place, cause, and circumstances of a plaintiff's injury or damage is a statutory prerequisite of filing a common law tort action against the District of Columbia.[82]   Section 12-309 of the District of Columbia Code provides as follows:

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage.  A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section.[83]

"[A]lthough strict compliance with § 12–309's requirement that timely notice be given to the District is mandatory, greater liberality is appropriate with respect to the content of the notice."[84] "Generally stated, the purposes of § 12-309 are (1) to allow the District to investigate potential claims so that evidence may be gathered while still available, . . . (2) to enable the District to correct defective conditions, thus increasing public safety, and (3) to facilitate settlement of meritorious claims and resistance of frivolous ones."[85]

"These statutory purposes focus on fairness to the District, and not on technical

---

[82] D.C. Code § 12-309 (2001).

[83] *Id.*

[84] *Wharton v. District of Columbia*, 666 A.2d 1227, 1230 (D.C. 1995).

[85] *Hardy v. District of Columbia*, 616 A.2d 338, 340 (D.C. 1992) (citations omitted).

perfection."[86] "[T]he purpose of § 12-309 is not to help the District to evaluate known claims by requiring notice complete enough to state a formal cause of action."[87] Thus "precise exactness is not absolutely essential with respect to the details of the statement giving notice."[88] "[C]laimants should not be deprived of [their] day in court by [an] unreasonably technical and burdensome application of [the] statute, so long as notice is timely served on [a] proper official and is drafted with sufficient detail to accord [the District] a fair and reasonable opportunity to make a sufficient investigation."[89] "Put another way, § 12-309 was intended solely to assure the District the opportunity for timely access to all relevant facts about a potential claim, in order to protect the District against an unfair advantage by the eventual claimant."[90]

"On the question of whether or not a notice in fact given is sufficiently definite as to the time, place, nature, etc. of the injury, *the rule of liberal construction is generally adopted by the courts.*"[91] Furthermore, "with respect to the *content* of the notice, . . . in close cases [courts] resolve doubts in favor of finding compliance with the statute."[92] "Accordingly, notice under the statute need only furnish a reasonable guide for inspection . . . and provide an early warning to

---

[86] *Wharton*, 666 A.2d at 1231 (footnote omitted).

[87] *Washington v. District of Columbia*, 429 A.2d 1362, 1368 (D.C. 1981) (en banc); *accord Wharton*, 666 A.2d at 1231 n.3.

[88] *Hardy*, 616 A.2d at 341 (internal quotation marks and citations omitted); *accord Washington*, 429 A.2d at 1365.

[89] *Wharton*, 666 A.2d at 1231 (internal quotation marks and citation omitted).

[90] *Washington*, 429 A.2d at 1368; *accord Hardy*, 616 A.2d at 341.

[91] *Washington*, 429 A.2d at 1365 n.9 (citation omitted) (emphasis added); *accord Wharton*, 666 A.2d at 1230.

[92] *Wharton*, 666 A.2d at 1230 (citations omitted); *accord Plater v. District of Columbia Dep't of Transp.*, 530 F. Supp. 2d 101, 107 (D.D.C. 2008).

District of Columbia officials regarding litigation likely to occur in the future."[93]

Our courts have applied these principles to determine the sufficiency of notice for each of the statutory requirements. "[T]he statute's 'approximate time' requirement means [that] a claimant must give the District an approximate estimate of the time of the accident, not the precise hour of the day on which an injury is sustained, in order to satisfy § 12-309. . . . [T]he 'reasonable guide for inspection' standard, as construed in our precedents, has tolerated inaccuracies or lack of precision in the notice that did not affect its basic adequacy to permit a prompt and focused investigation."[94]

As to the rest of the requirements laid out in the D.C. Code § 12-309: Pertaining to the place of injury, "notice fully complies with the purpose of the statute when it pin-points the locale with sufficient accuracy so that an investigation starting from the notice could reasonably be expected to uncover the available information."[95]  In other words, the notice need only "furnish a reasonable guide for inspection" so that "the District in the exercise of due diligence should [be] able to locate the offending defect[.]"[96]

Likewise the "circumstances "must be detailed enough for the District to conduct a prompt, properly focused investigation of the claim."[97]  "[W]here the District is given facts that would allow it to comprehend through a reasonable investigation the circumstances underlying

---

[93] *Wharton*, 666 A.2d at 1230 (citation omitted).

[94] *Id.* at 1231 (internal quotation marks and citation omitted); *accord Washington*, 429 A.2d at 1365 n.7.

[95] *Dixon v. District of Columbia,* 168 A.2d 905, 907 (D.C. 1961) (internal quotation marks and citation omitted).

[96] *Dixon,* 168 A.2d at 907; *accord Hardy*, 616 A.2d at 340 (internal quotation marks and citation omitted).

[97] *Washington*, 429 A.2d at 1366 (footnote omitted).

the claim, the notice is sufficient."[98]

Finally, "the cause of an injury" as specified in the notice is sufficient "if it recites facts from which it could be reasonably anticipated that a claim against the District might arise."[99] "This means that the written notice or police report must disclose both the factual cause of the injury and a reasonable basis for anticipating legal action as a consequence. Such notice would suffice, therefore, if it . . . described the injuring event with sufficient detail to reveal, in itself, a basis for the District's potential liability."[100]

"[T]his jurisdiction has not required that the District be given notice of an impending suit in a single document."[101]  In fact, given "that a police report in itself can suffice to provide adequate notice to the District," even cursory notice of litigation in conjunction with a police report will be considered "sufficient to satisfy § 12-309."[102]  This is the case because notice is adequate when it "provides the District with the details necessary for it to go directly to the governmental departments involved in the injuring event and receive additional information about the basis for the claim."[103]  "Accordingly, notice under the statute need only furnish a reasonable guide for inspection . . . and provide an early warning to District of Columbia officials regarding litigation likely to occur in the future."[104]

In this case, Defendant District contests that the notice provided by Julie Doe on

---

[98] *Enders v. District of Columbia*, 4 A.3d 457, 468 (citations omitted).

[99] *Pitts*, 391 A.2d at 809; *accord Washington*, 429 A.2d at 1363, 1366.

[100] *Washington*, 429 A.2d at 1366; *accord Plater*, 530 F. Supp. 2d at 106.

[101] *Enders*, 4 A.3d at 468.

[102] *Id.* at 469.

[103] *Id.* at 469 (quoting *Allen v. District of Columbia*, 533 A.2d 1259, 1264 (D.C. 1987)).

[104] *Wharton*, 666 A.2d at 1230 (citation omitted).

December 13, 2017 is inadequate because it is "devoid of circumstances giving rise to the Plaintiffs' potential claims against the District," and does not specify the type of Jane Doe's injuries. (Def.'s Mot. to Dismiss at 15). But a review of the cases cited above indicates that in cases where the adequacy of notice has been contested by the District, the D.C. Court of Appeals has repeatedly found that notice under § 12-309 is adequate so long as the notice is timely, apprises the District of its potential liability, and enables it to initiate an early investigation into the claim.[105] Furthermore, contrary to Defendant District's contentions, alleging the type of injuries suffered by the claimant is not a statutory requisite to giving the District notice under Section 12-309.

In *Allen*, for example, the D.C. Court of Appeals reversed and remanded the trial court's dismissal of the plaintiff's malicious prosecution claim for failure to give timely and adequate notice.[106] The Court held that a letter presented by the plaintiff two months after his acquittal satisfied the "cause" prong of § 12-309 because the letter stated that it was to serve as notice pursuant to § 12-309, and further stated that "damage and injury" was caused to the plaintiff when he was arrested and continued throughout his subsequent prosecution. Thus, the Court held that "the District received ample information 'from which it could be reasonably anticipated that a claim might arise.'"[107] It is notable that the plaintiff in *Allen* never provided any details about his damages, nor did he specify any of his injuries.

The Court in *Allen* also held that the plaintiff satisfied the "circumstances" prong of § 12-309. The notice advised the District that the plaintiff was filing suit based on an alleged wrongful

---

[105] *See e.g. Allen*, 533 A.2d at 1263-1264.

[106] *Id*. at 1264.

[107] *Id*. at 1263 (quoting *Pitts*, 391 A.2d at 809).

arrest and prosecution.[108] The Court held that this information alone "enabled the District to initiate its investigation by obtaining police reports and other prosecution records concerning the criminal case."[109] By doing so, the notice "provid[ed] the District with the details necessary to go directly to the governmental departments involved in the injuring event and receive additional information about the basis for the claim."[110] Thus, the notice in *Allen,* while scant, satisfied the requirements of § 12-309.

In *Enders v. District of Columbia*, the plaintiff sent a letter to the Mayor of the District describing his intent to file claim against the District "in connection with a false arrest made [] on 1/27/2002 by an officer of the Metropolitan Police Department."[111] The letter, according to the D.C. Court of Appeals, did not mention the circumstances or place of the incident as required by § 12-309.[112] The trial court nevertheless held that the police record of the arrest contained that information, and that the notice requirements of § 12-309 were therefore met.[113] The District appealed, but the D.C. Court of Appeals affirmed the trial court's decision stating that a survey of the case law reveals that "this jurisdiction has not required that the District be given notice of an impending suit in a single document."[114] Citing various cases,[115] the Court concluded "given that

---

[108] *Id.* at 1264.

[109] *Id.*

[110] *Id.* (the Court also held that the District was required to take "into account the police reports which were available to it to assist the District in its inquiry").

[111] *Enders*, 4 A.3d at 467.

[112] *Id.*

[113] *Id.* at 467-468.

[114] *Id.* at 468.

[115] *Id.* at 468 (citing *Gaskins v. District of Columbia*, 579 A.2d 719, 722 (D.C. 1990) (notice sufficient where it identified location of fall as somewhere on 150-foot stretch of sidewalk); *Dixon*, 168 A.2d at 907

a police report in itself can suffice to provide adequate notice to the District, we hold the notice given in this case was sufficient to satisfy § 12-309."[116]

A comparison of the notice provided by Julie Doe on behalf of her minor daughter in this case to the notices provided in *Allen* and *Enders* reveals that Ms. Doe has more than satisfied the requirements of § 12-309. As stated in her declaration, attached as Exhibit 1, Julie Doe physically went to the D.C. Office of Risk Management "for the purpose of filing notice" of her intent to make a claim against the District on behalf of her daughter. (Decl. of Julie Doe, attached as Pl.'s Ex. 1). There, she completed a form that had been previously provided to her by this Office for the purpose of making a claim. (Pl.'s Ex. 1). This form is entitled "Claim Against the Government of the District of Columbia." (Pl.'s Ex. 1, A). She followed the instructions on the form, filling out her identifying information completely, the date and time of the incident, and the address of the location where it occurred (which is the address for Roosevelt High School). (Pl.'s Ex. 1, A). Where the form requested a "detailed description of the accident," she indicated "sexual assault, interference with police investigation, Title IX failure, due diligence, etc." (Pl.'s Ex. 1, A). She also indicated on the bottom of the form that "police failed to properly investigate [a] rape allegation." (Pl.'s Ex. 2). She also attached to the form a photograph of the bruise left on her daughter's neck from the assault (Pl.'s Ex. 1, B) and the business card of the detective who had been assigned to investigate the assault. (Pl.'s Ex. 1, C).

The District does not – because it cannot – take issue with the "time and place" prongs of

---

(letter sufficient where it indicated fall occurred on sidewalk rather than in gutter); *Romer v. District of Columbia*, 449 A.2d 1097, 1101 (D.C. 1982) (plaintiff did not need to include claim of loss of consortium in notice letter where investigation by District could have disclosed plaintiff's marital status and thus existence of possible claim) for the proposition that where the District is given facts that would allow it to comprehend through a reasonable investigation the circumstances underlying the claim, the notice is sufficient).

[116] *Id.* at 469.

§ 12-309. Nor does the District take issue with the timeliness of Ms. Doe's notice. In fact, it is not clear whether the District is arguing that Ms. Doe has failed to satisfy the "cause" or "circumstances" prong of § 12-309. For the sake of clarity, Ms. Doe will address both here.

Ms. Doe has clearly satisfied the "cause" prong of § 12-309 because she provided the District "facts from which it could [have] reasonably anticipated that a claim against the [it] might arise."[117] As in *Allen*, the form of the notice is important and must be considered. In *Allen*, the plaintiff stated in the letter he had written to the Mayor that his letter was intended to provide notice of a claim against the District under § 12-309. Here, Ms. Doe filed her notice with the D.C. Office of Risk Management on a District form that is specifically entitled "Claim Against the Government of the District of Columbia." (Pl.'s Ex. 2). In that form she stated that she was complaining of a sexual assault in one of the District's schools against her daughter, and interference in the investigation of that assault. (Pl.'s Ex. 2). She listed the address of Roosevelt High School, a District of Columbia public school, as the location of the incident. (Pl.'s Ex. 2). She provided as further evidence a photograph of a bruise on her daughter's neck and the business card of the investigating detective. (Pl.'s Ex. 1, B and C). Given these facts, the District can hardly complain that it could not anticipate that claims against it might arise related to the sexual assault that occurred on the grounds of one of its schools.

Ms. Doe has likewise satisfied the "circumstances" prong of § 12-309 because she provided sufficient information to enable the District to initiate an investigation into her complaints. As described above, Ms. Doe's notice clearly described the incident as a sexual assault at the address for Roosevelt High School, along with "interference with a police investigation, Title IX failure, due diligence, etc." (Pl.'s Ex. 1, A). It provided the date and

---

[117] *Pitts*, 391 A.2d at 809; *accord Washington*, 429 A.2d at 1363, 1366.

approximate time. (Pl.'s Ex. 2). And Ms. Doe even provided the business card of the detective who investigated the incident – Detectives Suggs and Alvarenga. (Pl.'s Ex. 1, C).

Had the District conducted even a cursory investigation into the incident after receiving the notice, it would have discovered that the Metropolitan Police Department did in fact investigate a sexual assault that was reported by Julie Doe that took place against her daughter at Roosevelt High School, a location classified as "public" and a "school zone" in the police report. (Pl.'s Ex. 2). It would have seen in that police report that Det. Jenny Alvarenga was listed as the responding officer, and it would have been able to read the detailed account of the assault against Jane Doe by another student at Roosevelt High School. (Pl.'s Ex. 2).

Had the District investigated the incident further by contacting the District of Columbia Public Schools (DCPS) as the governmental entity most involved with the incident, it would have learned that Ms. Doe reported the statements made by Defendant James to superintendent David Pinder, and that Ms. Doe had requested a safety transfer for her daughter as a result of the incident. (Compl. ¶¶ 29-31).

Thus, as in *Allen* and *Enders*, Ms. Doe provided the District with sufficient information 1) to anticipate that claims against it might arise related to the sexual assault of her daughter at Roosevelt High School and its subsequent handling of that assault, and 2) to initiate an investigation into the circumstances of that assault and its own liability. Its failure to conduct such an investigation after receiving notice is its own, and not the result of a deficiency in Ms. Doe's notice.

## IV.   Ms. Doe has adequately pled a claim for intentional infliction of emotional distress against the District and Ms. James.

In order to plead a claim of IIED, a plaintiff is required "to show that [defendants] engaged in (1) 'extreme and outrageous conduct' which (2) 'intentionally or recklessly' (3) caused [the

plaintiff] 'severe emotional distress.'"[118]  In their motion to dismiss, Defendants argue that Ms.

Doe has failed to "properly support her claim for IIED with facts showing 'outrageous' or

'atrocious' conduct.  (Def. District's Mot. to Dismiss at 18; Def. James' Mot. to Dismiss at 8).

"There are two primary components of extreme and outrageous conduct [the court] must

consider: (1) applicable contemporary community standards of offensiveness and decency, and

(2) the specific context in which the conduct took place, for in determining whether conduct is

extreme or outrageous, it should not be considered in a sterile setting detached from the

surroundings in which it occurred."[119]  What is considered "extreme and outrageous" depends in

large part on the prevailing norms of society:

> Generally, the case is one in which the recitation of the facts to an average member
> of the community would arouse his [or her] resentment against the actor and lead
> him or her to exclaim, "Outrageous!"[120]

"In general, it is for the trier of fact to determine, taking into account changing social

conditions and plaintiff's own susceptibility, whether the conduct was sufficient to constitute

extreme outrage."[121]  "The extreme and outrageous character of the conduct may arise from an

abuse by the actor of a position, or a relation with the other, which gives him [or her] actual or

apparent authority over the other, or power to affect his [or her] interests."[122]  "Courts carefully

scrutinize a defendant's conduct where the defendant is in a peculiar position to harass the

---

[118] *King v. Kidd*, 640 A.2d 656, 667-668 (D.C. 1993) (citing RESTATEMENT (SECOND) OF TORTS § 46 (1977)).

[119] *Id.* at 668 (internal citations omitted).

[120] RESTATEMENT (SECOND) OF TORTS § 46 cmt. d.

[121] *King*, 640 A.2d at 668 (citing *Contreras v. Crown Zellerbach Corp.*, 565 P.2d 1173, 1177 (1977)).

[122] *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. e).

plaintiff, and cause emotional distress."[123] "[T]he extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is particularly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity."[124]

The case at bar is very similar to *Drejza v. Vaccaro*.[125] In that case, the plaintiff sued a detective assigned to investigate her allegations of rape for statements made by him to her during his investigation.[126] The trial court dismissed the case on summary judgment finding that while the plaintiff's account of the defendant's statements were "obnoxious" and "boorish," as a matter of law, they were not sufficiently extreme to entitle the plaintiff to any relief.[127] The issue before the D.C. Court of Appeals was whether the detective's conduct while interviewing the plaintiff was "sufficiently severe and outrageous to entitle [the plaintiff] to a determination by a jury of the question whether she should recover damages for the intentional infliction of emotional distress."[128] "[T]aking the entire tone and flavor of the encounter into consideration," the Court concluded that "the record raised genuine issues of material fact precluding the entry of summary judgment."[129] The Court reversed and remanded the case back to the trial court.

Particularly material to the Court's decision in *Drejza* were the following circumstances that were not adequately considered by the trial judge: "[the plaintiff's] emotional state immediately following a dehumanizing sexual assault on her, [the defendant's] knowledge of her

---

[123] *Id.* (internal citations omitted).

[124] *Id.* (quoting favorably RESTATEMENT (SECOND) OF TORTS § 46 cmt. f).

[125] 650 A.2d 1308 (D.C. 1994).

[126] *Id.* at 1309-1311.

[127] *Id.* at 1308.

[128] *Id.*

[129] *Id.* at 1309.

34

susceptibility, and [the] position of authority and trust which [the defendant] occupied during his interaction with [the plaintiff]."[130]  The Court reasoned that the plaintiff's special susceptibility to injured feelings following such an assault should be dispositive because "to hold otherwise would be to trivialize the dehumanizing consequences of rape."[131]  The Court also looked to the detective's position of authority over the plaintiff: "He was an official, [the plaintiff] could reasonably suppose, who could be trusted to assist her and investigate her complaint in a professional and helpful manner."[132]  Instead, the detective "abused the authority of his office to ridicule, bully, humiliate and insult her."[133]

Like the plaintiff in *Drejza*, Jane Doe was also subject to the authority of the Defendants. Ms. Doe pled that she was a student at Roosevelt High School, a school operated by the District and where Defendant James was the principal, where she was sexually assaulted by another student. (Compl. ¶ 83).  She pled that Defendants did not impartially investigate her claims of sexual assault and instead made "outrageous defamatory and slanderous statements" to other employees or agents of the District of Columbia "with the intent of harming [her] and/or her reputation." (Compl. ¶ 84).  This allegation is factually supported by the statements made by Defendant James.  Specifically, Defendant James stated "I am going to call MPD and have a long draw out email *just so I can embarrass her...*" (Compl. ¶ 3).  She called Jane Doe's report of sexual assault "bullshit" and further ridiculed her clothing. (Compl. ¶ 3).  Despite the District's

---

[130] *Id.* at 1312.

[131] *Id.* at 1313 ("The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.  The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know.").

[132] *Id.* at 1314.

[133] *Id.* ("Outrageous conduct may consist of '[the] abuse of [a] position of authority ...'") (citing the RESTATEMENT (SECOND) OF TORTS § 46 cmt. e (1965)).

35

argument to the contrary, Defendant James not only acted outrageously, she intended to cause harm to Jane Doe by undermining the investigation of the sexual assault to MPD and to the other members of DCPS who were present during the conversation.

Also, like the detective in *Drejza*, Defendant James was in a clear position of authority over Jane Doe. Jane should have been able to trust Defendant James, her principal, "to assist her and to investigate her claim in a professional and helpful manner."[134] Instead, her report of the assault was met with derision and disbelief before it was even investigated. For the Court to rule, as Defendants urge, that these comments are merely "insults, indignities, threats, annoyances, petty oppressions or other trivialities" would be to wholly ignore the position of the parties relative to one another (principal – student), and the stated intent, or malice, of the statements themselves. Such a ruling would negatively reinforce the implicit bias contained in Defendant James' statements that victims who are brave enough to report a sexual assault to persons of authority should be met, not with compassion and care, but with skepticism. This is exactly the kind of behavior that the Court in *Drejza* sought to discourage.

## V.   Julie Doe stated a claim for relief under the theory of negligent infliction of emotional distress against both Defendant District and Defendant James.

Defendants further argue in their motions that Ms. Doe has failed to state a claim for negligent infliction of emotional distress (NIED) under the laws of the District of Columbia because she has not pled that she was in the zone of danger created by the District's negligence. (Def. District's Mot. to Dismiss at 19; Def. James' Mot. to Dismiss at 10). This argument is largely based on case law that is no longer valid.

The D.C. Court of Appeals has significantly expanded the circumstances under which a person can recover damages for negligent infliction of emotional distress so that the zone-of-

---

[134] *Id.*

36

danger test is no longer the sole basis for this type of claim.  As acknowledged by Defendant

James in her motion, in *Hedgepeth v. Whitman Walker Clinic*, the Court, sitting en banc,

unanimously held that

> a plaintiff may recover for negligent infliction of emotional distress if the plaintiff
> can show that (1) the defendant has a relationship with the plaintiff, or has
> undertaken an obligation to the plaintiff, of a nature that necessarily implicates the
> plaintiff's emotional well-being, (2) there is an especially likely risk that the
> defendant's negligence would cause serious emotional distress to the plaintiff, and
> (3) negligent actions or omissions of the defendant in breach of that obligation
> have, in fact, caused serious emotional distress to the plaintiff.[135]

The Court went on to explain that "[i]n certain cases, . . . application of the 'zone of physical

danger' rule has led to results that depart from those that would have obtained under the

'framework of traditional and accepted negligence principles' we cited in support of our decision

to adopt the rule."[136]  One such case was *Drejza*, discussed *supra*.[137]

The Court then further discussed the necessary relationship or undertaking between the

defendant and the plaintiff that can give rise to a duty to avoid causing emotional harm to the

latter.  Acknowledging that it was not creating an exhaustive list of all the undertakings or

relationships that could give rise to such a duty, the Court espoused the general principle that the

"relationship" or "undertaking" must "implicate the plaintiff's emotional well-being."[138]  One

---

[135] 22 A.3d 789, 810-11 (D.C. 2011) (en banc) (expressly modifying the holding in *Williams v. Baker*, 572 A.2d 1062 (D.C. 1990) on which the District principally relies).

[136] *Id.* at 804-05 (quoting *Williams*, 572 A.2d at 1073).

[137] *See id.* at 807-808 ("[A]nalysis of the claims that were dismissed ... in *Drejza* because the plaintiffs in those cases were not in a zone of physical danger ... would have included a further evaluation of the nature of the underlying relationship between the plaintiff[] and defendant[], along with a consideration of public policy concerns applicable in those cases") (discussing the Court's dismissal of the negligent infliction of emotional distress claim in *Drejza*).

[138] *Id.* at 812 n. 39 (describing a school-student relationship as one subset of special relationships recognized in the common law) (internal citations omitted).

such relationship is that between a school and a student, as is the case here.[139]  Given the D.C.

Court of Appeals' holding in *Hedgepeth* "that the zone of danger rule should not preclude a

plaintiff's recovery for negligently inflicted emotional distress where other factors in an existing

relationship … are more adequate to define, and also are adequate to limit, the defendant's

responsibilities," Ms. Doe has adequately pled that not only did she have such a student-school or

student-principal relationship with the Defendants, but also that the Defendants undertook to

investigate her sexual assault claims, and undertaking which they should have known created a

duty to avoid further emotional harm to Jane Doe.

Specifically, Ms. Doe pled that her daughter was a student at Roosevelt High School, a

District of Columbia public school, when this incident occurred; that she was subject to the

authority of Defendant James, as the principal, and other agents or employees of the District of

Columbia public schools; that as such, there was an especially likely risk that the mishandling of a

Jane Doe's sexual assault complaint would cause serious emotional distress to her; that after

learning of the sexual assault against Jane Doe, the District, through its agents and employees

including Defendant James, failed to adequately, appropriately and impartially investigate her

claims of sexual assault; and that Defendant James made reckless and defamatory statements

about Jane Doe to other agents or employees of the District (including police).  (Compl. ¶¶ 1, 3,

88-89).  The statements by Defendant James (Compl. ¶ 3), serve as a factual basis for the claim

that Defendants, at worst, intentionally undermined the investigation of Jane Doe's sexual assault

claim, and at best, were negligent in carrying out their duties to Jane during the investigation.

---

[139] *Id.*; *see also District of Columbia v. Royal*, 465 A.2d 367, 369 (D.C. 1983) (recognizing that the District owed a duty of care for the protection of children in its schools); RESTATEMENT (THIRD) OF TORTS § 46 cmt. d (referring to relationships where one person is in a position of power or authority over the other and therefore has greater potential to inflict emotional harm) (internal quotations omitted).

38

Ms. Doe further pled that these breaches by Defendants of their duties to Jane Doe were likely to and did cause injuries to Jane, which in turn caused her to incur medical expenses for counseling, physical and psychological pain, and impaired her educational capacity. (Compl. ¶¶ 90, 92). Such injuries which require medical treatment are considered "serious and verifiable" under the standard enunciated in *Hedgepeth*. [140] Furthermore, "serious emotional distress will be deemed especially likely where the defendant has an undertaking or relationship with the plaintiff that implicates care for emotional well-being and knows or should know that the plaintiff is unusually susceptible to suffer emotional distress,"[141] such as during an investigation of a sexual assault perpetrated against the plaintiff that recently occurred.

Defendant James argues that the D.C. Court of Appeals' decision in *Sibley v. St. Albans School*[142] precludes a determination that Jane Doe and Defendant James were in a relationship that implicated Jane's well-being. (Def. James' Mot. to Dismiss at 12). That argument takes a very limited view of the Court's rationale in *Sibley,* and is based on a misunderstanding of the holding in *Hedgepeth. Sibley* is factually distinguishable from the case at bar. It involved a claim by a student's father against his school for not permitting his son to re-enroll at the school due to non-payment of tuition.[143] The father sought to amend his complaint to seek a claim of negligent infliction of emotional distress under the *Hedgepeth*. In denying this relief, the Court stated that "without more" the relationship between a student and his school" was not enough to impose a

---

[140] *Hedgepeth*, 22 A.3d at 816 (that likelihood may be shown by evidence that professionals in the field recognize the risk of serious emotional distress).

[141] *Id.*

[142] 134 A.3d 789 (D.C. 2016).

[143] *Id.* at 798.

duty of care for a claim of negligent infliction of emotional distress.[144] Unlike Ms. Doe's complaint, the proposed complaint in *Sibley* was completely lacking in allegations "to support …that [the school] had the type of relationship with [the student] or had undertaken an obligation to [the student] that necessarily implicated his emotional well-being."[145]

As already discussed *supra*, Defendants, as a school and a principal, were in a relationship with Jane Doe, their student, that implicated care for her emotional well-being when they undertook to carry out an investigation of a sexual assault against her that occurred on the school's grounds.   It therefore should have been foreseeable to Defendants that their negligence and/or deliberate indifference in conducting this investigation would cause Jane – a minor child who had recently been sexually assaulted on school property – severe emotional distress.  Thus, Ms. Doe has also sufficiently pled the requisite relationship or undertaking, proximate cause, and damages required to state a claim for negligent infliction of emotional distress against the Defendants under *Hedgepeth*.

## VI.   Julie Doe has likewise stated a plausible claim for relief under the theory of negligent supervision against Defendant District and Defendant James.

In attempting to dismiss Julie Doe's claim of negligent supervision, Defendants seek to hold Julie Doe's claim to a heightened pleading standard of foreseeability (Def. District's Mot. to Dismiss at 20; Def. James' Mot. to Dismiss at 15).  But this is not the applicable pleading standard as the sexual assault perpetrated against Jane Doe was not committed by an unknown third-party criminal actor, but rather was committed by a fellow student on school grounds.  (See Compl. ¶¶ 1, 100).

"[The District of Columbia] has an obligation to exercise reasonable and ordinary care for

---

[144] *Id.*

[145] *Id.*

the protection of pupils to whom it provides an education."[146]  Absent intervening criminal conduct by a third-party assailant, "a defendant need not foresee the precise injury or have notice of the particular of the particular method in which the harm is brought about in order for the plaintiff to establish proximate causation."[147]  Ordinarily, "the issue of proximate cause is a proper factual question in cases involving claims of negligent supervision of students."[148]

In *District of Columbia v. Doe*, the D.C. Court of Appeals affirmed a jury verdict for the plaintiff – a minor child who was kidnapped by a third-party intruder from her elementary school and raped.[149]  Even though the Court applied the heightened foreseeability standard to this case, it held that the plaintiff was not required to show previous occurrences of the particular type of harm suffered by the plaintiff, but can "instead [show] a combination of factors which [gave] defendants an increased awareness of the danger of a particular criminal act."[150]  Thus, contrary to Defendants' contention that Ms. Doe was required to plead more than one instance of a prior crime of this particular type, or that she was required to plead that Defendants had reason to know that M.P. posed a risk of harm to Jane Doe, she is not required to show that level of specificity in order to state a cause of action under negligent supervision.

A combination of factors that made this act foreseeable to the Defendants is what Ms. Doe has pled. She pled that given the prevalence of sexual assault in school, including at least one known prior occurrence of sexual violence towards a student by other students at Roosevelt High

---

[146] *District of Columbia v. Doe*, 524 A.2d 30, 32 (D.C. 1987) (citing *Royal*, 465 A.2d at 369).

[147] *District of Columbia v. Doe*, 524 A.2d at 33.

[148] *District of Columbia v. Cassidy*, 465 A.2d 395, 399 (D.C. 1983).

[149] *District of Columbia v. Doe*, 524 A.2d at 34.

[150] *Id*. at 33.

41

School earlier in that same school year, the District "knew or should have known of the risk of sexual violence towards students at school." (Compl. ¶ 102). Despite these known risks, the District failed to provide adequate supervision over its student M.P. by failing to adequately staff classrooms, and/or deans offices, failing to adequately monitor the hallways and restrooms, and failing to monitor the security camera footage, among other claims. (Compl. ¶ 103). In support of these allegations, Ms. Doe stated that "[t]here was no teacher or staff member in the classroom, and upon information and belief, many staff and teachers had already left the building for the summer holiday as this was the last day of school for the 2016-2017 school year," and that "M.P. ran past several classrooms and dean's offices" before pulling Jane into the men's restroom and assaulting her. (Compl. ¶ 16, 17). These facts, in combination with the prior sexual assault on Roosevelt's premises earlier that year, are more than sufficient to demonstrate that Defendants should have anticipated that a student-on-student sexual assault was highly foreseeable on its inadequately staffed grounds. Thus, Ms. Doe has adequately pled a cause of action for negligent supervision against Defendants.

Defendant James argues that *Lacy v. District of Columbia*,[151] supports the imposition of heightened foreseeability on this case. However, her reliance on *Lacy* is misplaced and fails to take into account the type of negligence claim asserted in that case, versus the type of negligence claim asserted by Julie Doe in this case. The claims against the school and its personnel before the Court of Appeals in *Lacy* were claims of general negligence – not negligent supervision.[152] Indeed, there were no arguments presented on appeal that any of the personnel sued had a duty to

---

[151] 424 A.2d 317 (D.C. 1980).

[152] *Id.* (plaintiff had pleaded negligent supervision at the trial court level, but it was denied by the trial judge. Plaintiff did not appeal on that issue and so negligent supervision was not before the appellate court).

supervise the janitor in any fashion.[153]  Similarly, there were no citations in the record to any allegations by the Plaintiff whatsoever that the District of Columbia "knew or should have known" that an assault might occur, but failed to take action.[154]   In the absence of such evidence, plaintiffs are left with much weaker claims of negligence based on systemic supervisory policies, rather than what the defendants *actually knew or should have known* at the time of the assault – information which is requisite to pleading negligent supervision claims.

Here, the Court should not apply the standard of heightened foreseeability because Jane Doe was not assaulted by an unknown third-party criminal actor, but rather was assaulted by a fellow student at Roosevelt High School over whom Defendants had a supervisory responsibility. (Compl. ¶ 1, 100).  Thus, just as Defendants had a duty to protect Jane Doe, they also had a converse duty to supervise and exercise a requisite amount of control over students on its premises, including M.P.  (Compl. ¶ 100-101).  It was this failure to adequately supervise the students that resulted in the sexual assault taking place on school grounds, and thus this failure was a substantial contributing factor in the occurrence.  However, even if the Court does apply the heightened standard of foreseeability, as discussed above, Ms. Doe has met that standard in her pleading.  Thus, Ms. Doe has adequately stated a claim of negligent supervision against Defendants.

## VII.   Julie Doe's claim of negligent supervision against Defendant District is not barred by the doctrine of sovereign immunity.

Nor has Defendant District carried its burden of demonstrating that Ms. Doe's claim of negligent supervision is barred by sovereign immunity.  First, Defendant District has failed to cite any authority – because none exists – that this doctrine should be extended to a claim of negligent

---

[153] *See generally Lacy*, 424 A.2d 317.

[154] *Id.*

supervision of students by a defendant school.  To hold otherwise would be to render its "obligation to exercise reasonable and ordinary care for the protection of pupils to whom it provides an education" essentially null and void.[155]  Second, Defendant District has not demonstrated that its failure to supervise the students was a discretionary rather than a ministerial function.

"Under the common law, a municipality is immune from suit for decisions made pursuant to the exercise of discretion."[156]  "Discretionary acts are generally defined as those acts involving the formulation of policy while ministerial acts are defined as those related to the execution of policy."[157]  To determine whether a given governmental function is discretionary or ministerial, the court must first decide whether the function is a permissible exercise of policy judgment.[158]  If it is not, there is no immunity.  If it is, then the court must next consider whether "there were any specific directives withdrawing from employees the option of exercising choice" such that the actions taken by the employees were ministerial.[159]

In a case involving an injury to a child at a D.C. public school, the D.C. Circuit took up the question as to whether municipal immunity precluded recovery in tort for a school age child who fell into a depressed area adjacent to his school's playground.[160]  Holding that the District could be liable for negligence in maintaining or repairing a missing or broken railing, the Court reasoned that there was a difference between the discretionary function of providing schools to

---

[155] *Royal*, 465 A.2d at 369.

[156] *Aguehounde v. District of Columbia*, 666 A.2d 443, 448 (D.C. 1995) (citing *McKethean v. WMATA*, 588 A.2d 708, 715 (D.C. 1991); *Elgin v. District of Columbia*, 337 F.2d 152, 155 (D.C. Cir. 1964)).

[157] *Aguehounde*, 666 A.2d at 448.

[158] *Id.* at 448 (internal quotations omitted).

[159] *Id.* at 448, 451 (stating if such a specific directive exists then the action is ministerial).

44

the public, and holding the District liable for its failure in making sure that the schools were safe for the children who were required to be there.[161] The Court found the fact that the child was "affirmatively required" to be on the playground at the time of his injury determinative in its ruling.[162]

Defendant District relies on cases that are inapposite to the case at bar. In *Aguehounde v. District of Columbia*, the plaintiff filed suit against the District under the theory that the District failed to follow proper engineering standards in setting the length of time between traffic light changes, allegedly causing the collision that was the subject of the case.[163] After verdict, the trial court granted the District's motion for judgment as a matter of law on the grounds that the timing of the light is a discretionary function immune from tort liability.[164] Affirming the trial court's decision, the D.C. Court of Appeals held that setting the timing of traffic lights is a discretionary, rather than a ministerial function because it impacted not only that particular intersection, but the flow of traffic patterns in the whole city.[165]

This case does not involve the scheduling of traffic pattern; it involves supervising students on its premises and under its control. Here, Ms. Doe has pled, consistent with the law in this jurisdiction, that the District had an affirmative duty to protect Jane Doe, one of its students,

---

[160] *Elgin*, 337 F.2d at 152.

[161] *Id.* at 156-157 ("We are not persuaded, however, that the function of repairing broken guardrails imposes upon the District determinations of such delicacy and difficulty that its ability to furnish public education will be ponderably impaired by liability for neglect in failing to make such repairs.").

[162] *Id.* at 157.

[163] *Id.* at 445.

[164] *Id.*

[165] *Id.* at 447.

from being assaulted on its grounds.[166] (Compl. ¶ 100). She has also pled that the District

breached this duty to Jane Doe by, among other things, failing to supervise the assailant, failing to

adequately staff classrooms and deans offices, failing to monitor the hallways or restrooms, and

failing monitor security cameras. (Compl. ¶ 103). She finds support for these breaches in her

factual allegations that there was no teacher or staff member in the classroom where the assault

began, and that many of the staff and teachers had already left the building for the summer

holiday. (Compl. ¶ 16). Holding the District liable for failing to adequately supervise students

who are on school grounds during school hours, either through adequate staffing, monitoring, or

security, cannot be said to be a "permissible exercise of a policy judgment."[167] Thus, Ms. Doe's

claim of negligent supervision against the District is not barred by the doctrine of sovereign

immunity.

**VIII.    Julie Doe has properly stated a claim for defamation against Defendants.**

Defendants argue that Ms. Doe has not stated a claim of defamation. In their motions,

Defendants argue that Ms. Doe cannot state a claim for defamation because the statements made

by Defendant James, (as Defendant District concedes) while "mean spirited and otherwise

inappropriate" were opinions, and that Ms. Doe did not plead that these statements negatively

impacted Jane Doe's standing in the community. (Def. District's Mot. to Dismiss at 22; Def.

James' Mot. to Dismiss at 14).

To prove defamation, a plaintiff must allege the following: That a defendant made a false

or defamatory statement, without privilege, to a third party concerning the plaintiff; that the

defendant's fault in publishing the statement amounted to at least negligence; and that the

statement was actionable as a matter of law or that its publication caused special harm to the

---

[166] *Royal*, 465 A.2d at 369.

[167] *Aguehounde*, 666 A.2d at 448.

plaintiff.[168] "A statement is defamatory if it tends to injure the plaintiff in [her] trade, profession, or community standing, or lower [her] in the estimation of the community."[169] "If it appears that the statements are at least capable of a defamatory meaning, then whether they were defamatory and false are questions of fact to be resolved by the jury."[170] Moreover, the defamation is actionable if it is *per se* defamation,[171] or if it results in pecuniary harm.[172]

Ms. Doe has clearly pled a claim of defamation for the statements "published" by Defendant James to other members of the DCPS faculty and MPD concerning her daughter. (Compl. ¶¶ 93-98). These statements were intended, by their plain meaning, to undermine the veracity of Jane Doe's complaint of sexual assault to both these classes of other individuals. These third parties are members of Jane Doe's community, especially those who like Defendant James were responsible for administering Jane's education at Roosevelt High School. Particularly troubling is that Defendant James' statement that she was "going to call MPD to have a long and drawn out email just so [she could] embarrass her." (Compl. ¶ 94). This statement alone shows not only unwarranted disbelief of Jane Doe's claims on the part of Defendant James, but also actual malice. Based on the content and context of these statements, Jane Doe is entitled to a reasonable inference that that Defendant James intended to prejudice MPD's investigation of her sexual assault allegation, and to lower her status in the eyes of the other DCPS officials who were present when the statements were made. Given the express intent of Defendant James, when

---

[168] *Carter v. Hahn*, 821 A.2d 890 (D.C. 2003) (internal citations omitted).

[169] *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 877 (D.C. 1998).

[170] *Id.*

[171] *See* RESTATEMENT (SECOND) OF TORTS § 570 (1977) (listing per se slander as statements imputing criminal offense, loathsome disease, matter incompatible with business, trade or profession, serious sexual misconduct).

[172] *See* RESTATEMENT (SECOND) OF TORTS § 575 (1977).

taken as true as required at this stage of the litigation, at a bare minimum these statements are at least capable of a defamatory meaning.

Moreover, Ms. Doe also pled that the publication of these statements resulted in harm to Jane Doe, including the pecuniary harm of incurring medical expenses for her psychological treatment, impaired educational capacity, and physical and psychological distress. (Compl. ¶ 98). She is entitled to the reasonable inference, by virtue of who made these statements and to whom they were said, that these statements also negatively impacted Jane Doe's credibility and standing in the Roosevelt community. As such, Ms. Doe has clearly stated a claim for defamation against Defendants as a result of the statements made by Defendant James.

**IX.  Julie Doe's claims for defamation and intentional infliction of emotional distress on behalf of her daughter minor daughter are not barred by the statute of limitations.**

In arguing that Julie Doe's intentional tort claims on behalf of her minor daughter, Jane Doe, are barred by the one-year statute of limitations that typically governs those claims, Defendant James entirely ignores the fact that Jane Doe was a minor when this incident occurred. (Compl. ¶ 10). Under D.C. Code § 12-302 (2001), "when a person entitled to maintain an action, is, at the time the right of action accrues: (1) [is] under 18 years of age …he or his representative may bring an action within the time limited *after* the disability is removed."[173] Accordingly, Julie Doe is well within the period of limitations for raising intentional torts on behalf of her minor daughter, and any such claims cannot be barred by a statute of limitations. As such, the statute of limitations is tolled until Jane reaches 18 years of age, and these claims are not time-barred.

**X.  Julie Doe's claims against Defendant James should not be dismissed as redundant of her claims against Defendant District because Defendant James was personally**

---

[173] D.C. Code § 12-302 (2001).

48

**involved in the wrongdoing as alleged by Julie Doe.**

Defendant James also argues that the claims against her should be dismissed because they are redundant of the claims against the District to the extent that Defendant James has been sued in her official capacity.  But Defendant James has been sued in her individual capacity for her own wrongdoing.  Thus, dismissal of the claims against Ms. James as redundant would be inappropriate.

In requesting this relief, Defendant James relies upon *Jefferies v. District of Columbia*,[174] in which this Court dismissed claims against former police chief Cathy Lanier, to the extent that such claims were brought against her in her official capacity.[175]  However, a careful read of this case shows that the Court carefully distinguished between lawsuits brought against an official in his or her "official" capacity, versus his or her "individual" capacity.[176]

In *Jefferies*, the Court stated that a "plaintiff may bring a claim against [an official] if the plaintiff alleges [that the official] was directly responsible for the constitutional deprivation, or that she gave authorization or approval for such misconduct."[177]  The Court dismissed the plaintiff's claims against then Chief Lanier in her individual capacity because "[n]o facts in the Complaint specify Chief Lanier's personal involvement in the alleged wrongdoing."[178]

Here, by contrast, all of Ms. Doe's claims are directly tied to Defendant James' own wrongdoing in making defamatory statements against Jane Doe, in failing to carry out an

---

[174] 917 F. Supp. 2d 10 (D.D.C. 2013).

[175] *Id.* at 29.

[176] *Id.* at 25.

[177] *Id.* (internal citations omitted).

[178] *Id.*

49

impartial investigation into the alleged sexual assault, and in failing to supervise M.P. adequately and appropriately. (*See generally* Compl.). With regard to Ms. Doe's common law claims against Defendant James (Counts IV-VII), Ms. Doe seeks to hold Defendant District vicariously liable for this wrongful conduct on the part of Defendant James. (*See* Compl. ¶¶ 85, 97). Because Ms. Doe's claims are centered around the wrongful conduct of Defendant James, they are brought in against her in her individual capacity, and the Court should permit those claims to go forward.

Moreover, Defendant District has sought dismissal based on an argument that Ms. Doe did not require with the prerequisite of filing a lawsuit against it under D.C. Code § 12-309. Section 12-309 requires the giving of notice as a precondition to an action "against the District of Columbia."[179] It does not require the giving of notice as a precondition to an action against an employee of the District of Columbia, such as Defendant James.[180] Therefore, if the Court is inclined to dismiss the common law claims of Ms. Doe's complaint against Defendant District on the basis that she did not comply with Section 12-309, she should still be permitted to maintain her claims against Defendant James in her individual capacity since these claims arose out of her own wrongful conduct.

## CONCLUSION

For these reasons, the Court should deny Defendants' motions to dismiss Julie Doe's complaint on behalf of her minor daughter, Jane Doe.

---

[179] D.C. CODE § 12-309.

[180] *George v. Dade*, 769 A.2d 760, 770 (D.C. 2001).

Respectfully submitted

KOONZ, MCKENNEY, JOHNSON
 DEPAOLIS & LIGHTFOOT, LLP

By:    /s/ Kasey K. Murray

David M. Schloss, Bar No.: 416523
Kasey K. Murray, Bar No.: 1016186
2001 Pennsylvania Avenue, N.W.
Suite 450
Washington, D.C.  20006
(202) 659-5500
kmurray@koonz.com
*Counsel for Plaintiff*

THE FIERBERG NATIONAL LAW GROUP

By:    /s/Monica Beck

Douglas Fierberg, Bar No. 418632
Monica H. Beck
121 E. Front Street
Suite 200
Traverse City, MI 49684
(231) 933-0180
mbeck@tfnlgroup.com
*Counsel for Plaintiff*

51

52

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of November, 2018 a copy of the foregoing Plaintiff's Omnibus Memorandum of Points and Authorities in Opposition to Defendants' Motions to Dismiss was sent via CM/ECF filing to:


All counsel of record.


/s/ Kasey K. Murray
Kasey K. Murray