## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JANE DOE**, *et al.*,<br><br>            **Plaintiffs,**<br><br><br>        **v.**<br><br>**THE DISTRICT OF COLUMBIA**, *et al.*,<br><br>            **Defendants.** | **19-cv-2181 (ABJ)** |

### DEFENDANT DISTRICT OF COLUMBIA'S REPLY TO PLAINTIFF JANE DOE'S OPPOSITION TO ITS MOTION FOR SYMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

The District of Columbia (the District) submits this reply to Plaintiff Jane Doe's opposition to its motion for summary judgment. The District also opposes Jane Doe's cross-motion for summary judgment.

### INTRODUCTION

The Court should grant summary judgment to the District on all claims in Jane Doe's complaint and deny her partial motion for summary judgment. *First*, there is no strict liability under Title IX and Jane Doe has not shown that that the District's actions taken after it learned about MP's were *clearly* unreasonable. *Second,* Jane Doe has not shown that the District retaliated against her in violation of Title IX. *Third,* Jane Doe's argument that the District failed to accommodate her disability is not actionable under Title IX but is cognizable under the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. § 1415(l). But this claim fails because Jane Doe failed to exhaust her administrative remedies under the IDEA. *Fourth*, Jane Doe's Intentional Infliction of Emotional Distress claim (IIED) fails because she has not met each element of the claim in order to prevail.

*Fifth,* Jane Doe has not created any material factual disputes in need of jury resolution.

*Finally,* Jane Doe is not entitled to partial judgment as she has not proven her claim.

### FACTS

This lawsuit was filed on September 21, 2018 by Julie Doe, on behalf of Jane Doe, when she was a minor.  *See* Compl. [3].  Jane Doe is now emancipated and there are no claims asserted in the Complaint by Julie Doe.[1]  *Id.*  MP, a minor, and Jane Doe were cordial to one another while at RHS, but they were not friends.  Pl.'s Statement of Undisputed Material Fact (Pl.'s SUMF) No. 29.   Jane Doe asserts that on June 13, 2017, which was the last day of school, she was sexually assaulted, which included kissing and touching, by MP at Roosevelt High School (RHS).  *See* District's Statement of Undisputed Material Facts in Support of its Opposition to Plaintiff's Motion for Summary Judgment (Def.'s Opp'n SUMF) No. 2.  The interaction between Jane Doe and MPD in the school's hallway was captured on video; no video captured their interaction in the school's bathroom where the alleged sexual assault occurred.  Def.'s Opp'n SUMF No. 3.  On June 13, 2017, Julie Doe notified MPD about the alleged sexual assault.  Def.'s Opp'n SUMF No. 4.  Julie Doe asserts she notified David Pinder about the assault on June 13, 2017.  Def.'s Opp'n SUMF No. 5.

On June 14, 2017,  the day after the alleged sexual assault, Defendant Aqueelha James, RHS's Principal, and several administrators met with Julie Doe and Jane Doe at RHS.   Def.'s Opp'n SUMF No. 6.  Julie Doe recorded the meeting without telling the meetings' participants.  Def.'s Opp'n SUMF No. 7.  Jane Doe became upset during the

---

[1]     On June 13, 2017, Jane Doe was a freshman at Roosevelt High School.  Compl. at 1.  Five years have passed since this Complaint was filed.

meeting, and left the meeting, followed by Julie Doe.  Def.'s Opp'n SUMF No. 8.  Julie

Doe left her phone in the conference room, and the discussion between James and the

administrators were recorded.  Def.'s Opp'n SUMF No. 9.  Julie Doe and Jane Doe were

outside the conference room, but they could not hear the discussion between the

administrators.  Def.'s Opp'n SUMF No. 10.  When Julie Doe and Jane Doe arrived home,

they met with MPD about the alleged sexual assault.  Def.'s Opp'n SUMF No. 11.  During

the course of the meeting with the Does, MPD was contacted and arrived at RHS.  Def.'s

Opp'n SUMF No. 12.  They spoke briefly with Jane Doe and went to her home to complete

the investigation.  Def.'s Opp'n SUMF No. 13.

     Julie Doe shared the contents of the recording of the June 14, 2017 conversations

between James and the other administrators with Jane Doe; they both listened to the

recording together.  Def.'s Opp'n SUMF No. 14.  James was captured on audio making

disparaging remarks about Jane Doe.  Def.'s Opp'n SUMF No. 15.  Julie Doe emailed a

copy of the recording to Dr. David Pinder and others, including the media.  Def.'s Opp'n

SUMF No. 16.  The District disciplined James for the comments made during the hearing

based on the tape recorded conversation.  Def.'s Opp'n SUMF No. 17.  Both Julie Doe and

Dr. Pinder asked that Jane Doe be transferred to Wilson High School.  Def.'s Opp'n SUMF

No. 18.  Jane Doe transferred to Wilson for the 2017-2018 school year; neither she nor M.P

ever returned to RHS.  Def.'s Opp'n SUMF No. 19.

     The sexual assault allegations raised by Doe were investigated by MPD and the

District.  Def.'s Opp'n SUMF No. 20.  MPD had access to the video.  Def.'s Opp'n SUMF

No. 21.  And investigators interviewed Jane Doe, Julie Doe, and any possible witnesses.

SUMF No. 22.  The investigators were unsuccessful in attempts to interview M.P.  Def.'s

Opp'n SUMF No. 23.  The District determined that, more likely than not, MP had sexually

harassed Jane Doe.  Def.'s Opp'n SUMF No. 24.   A Letter of Resolution, dated July 17

2017, was sent to Julie Doe on behalf of Jane Doe.  Def.'s Opp'n SUMF No.  25.  A Letter

of Resolution is the written response from the District to a grievance.  Def.'s Opp'n SUMF

No. 26.  In the Letter of Resolution, sent to Julie Doe, DCPS explained its findings:  that it

was more likely than not that sexual harassment occurred.  Def.'s Opp'n SUMF No. 27.  It

offered Jane Doe an opportunity to participate in a special community service program that

would have compensated her for her time.  Def.'s Opp'n SUMF No. 28.  It also offered

support and counseling services through a youth program and offered 10 hours of

counseling through a DCPS-approved provider.  Def.'s Opp'n SUMF No. 29.

Additionally, it offered to transfer Jane Doe—at her request—to three different DCPS

schools and granted additional time for her to choose a new school.  Def.'s Opp'n SUMF

No. 30.   DCPS promised to provide additional counseling services to Jane Doe at her new

school during the next school year.  Def.'s Opp'n SUMF No. 31.  Additionally, DCPS

indicated its intent to provide Title IX training to the Roosevelt staff.  Def.'s Opp'n SUMF

No. 32  And, finally, DCPS created a safety plan for Jane Doe at her new school, which

included "full separation" from MP should Jane Doe choose to return to Roosevelt.  Def.'s

Opp'n SUMF No. 33.  On July 18, 2017, a Letter of Resolution was also sent to MP's

guardian but it was returned as undeliverable.  Def.'s Opp'n SUMF No. 34.

 Jane Doe transferred to Wilson for the 2017-2018 school year; neither she nor MP

returned to RHS.  Def.'s Opp'n SUMF No. 19.  Wilson administrators were not initially

informed about the June 13, 2017 incident.  Def.'s Opp'n SUMF No. 35. During the 2018-

2019 school year at Wilson, Jane Doe had many unexcused absences; failed history and

was removed from cheerleading because of her absences.  Def.'s Opp'n SUMF No. 36.

Jane Doe's counsel identified 47 classes that she missed for which she should have been

marked as excused rather than unexcused.  Def.'s Opp'n SUMF No. 39.   The District

reviewed the records and excused 10 days' of Jane Doe's absences that covered the 47

classes identified by the Does.  Def.'s Opp'n SUMF No. 40.   Importantly, Jane Doe

conceded that most of her absences were not excused, as only 8 out of at least 30 absences

should have been excused.  Def.'s Opp'n SUMF No. 37.

On October 24, 2018, the District gave Jane Doe assignments which she previously

missed.  Def.'s Opp'n SUMF No. 41.   When Jane Doe requested additional time to

complete the assignments, the District granted her request, giving her 10 additional school

days to complete her work.  Def.'s Opp'n SUMF No. 42.  The District later extended that

deadline again and provided up to 25 hours of tutoring to help Jane Doe complete her

missed assignments.  Def.'s Opp'n SUMF No. 43.  According to Jane Doe, at the

beginning of her junior year, she was ranked 340 out of 409 students.  Pl.'s SUMF No.

150.  But by December 2018, she was ranked as 393 out of 414 students.  Pl.'s SUMF No.

170.

Jane Doe retained Eileen Ryan as her expert in psychology to opine about Jane

Doe's PTSD, its cause, and its effects on her mental health.  Pl.'s SUMF Nos. 203-207.

And she retained Carol Shakeshaft as her expert in standard of care.  Pl.'s SUMF No. 192.

Discovery is closed and both parties have moved for summary judgment.  The District now

files its reply to Jane Doe's opposition to its motion for summary judgment, and opposes

Jane Doe's partial motion for summary judgment.

## LEGAL STANDARD

Summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is "genuine" if sufficient evidence exists such that a reasonable jury could return a verdict for the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving party bears the initial responsibility of identifying those portions of the record which demonstrate the absence of any genuine issue of material fact. *Id.* at 323; Fed. R. Civ. P. 56(c)(1)(A) (noting that the movant may cite to "depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials"). In response, the non-moving party must similarly designate specific facts in the record that reveal a genuine issue that is suitable for trial. *Celotex,* 477 U.S. at 324.

To avoid summary judgment, the non-moving party must "go beyond the pleadings and by [her] own affidavits, or by [the evidence in the record] designate specific facts showing that there is a genuine issue for trial." *Id*. (quotations omitted). The non-moving party's opposition "must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial." *Doe,* 706 F. Supp. 2d at 5. "In order to survive a summary judgment motion, a plaintiff must have more than a

scintilla of evidence to support his claims." *Freedman v. MCI Telecomm. Corp.,* 255 F.3d

840, 845 (D.C. Cir. 2001).  The non-moving party is required to point to evidence that

would permit a reasonable jury to find in his favor.  *Laningham v. United States Navy,* 813

F.2d 1236, 1242 (D.C. Cir. 1987).

**ARGUMENT**

I.      **Jane Doe's Title IX Discrimination Claim Fails As A Matter of Law.**

Jane Doe has failed to meet her burden to stave off summary judgment.  Indeed,

summary judgment in the District's favor is appropriate on Jane Doe's claims for

discrimination under Title IX.  Because there is no strict liability under Title IX, a plaintiff

must prove three elements in support of its Title IX claim: "(1) an appropriate official at the

school, *i.e.*, one with authority to institute corrective measures, (2) had actual notice of the

harassment and (3) demonstrated deliberate indifference to the harassment."  *Blue v.*

*District of Columbia*, 811 F.3d 14, 21 (D.C. Cir. 2015) (citing *Gebser v. Lago Vista Indep.*

*Sch. Dist.*, 524 U.S. 274, 290 (1998)).  As required by the *Davis* court, the harassment must

be "serious enough to have the systemic effect of denying the victim equal access to an

education program or activity."  *Davis v. Monroe County Board of Education,* 526 U.S.

629, 652 (1999).  "[A] systemic effect means that it is unlikely that a single act of one-on-

one peer harassment would meet the requisite level of systemic effect."  *Id.* at 631.  As the

*Davis* court reasoned, while "a single instance of severe one-on-one peer harassment could,

in theory, be said to have such a systemic effect, but it is unlikely that Congress would have

thought so."  *Id.* at 652.  Moreover, under *Davis,* the educational institution's response to

harassment will amount to deliberate indifference only if it is "*clearly unreasonable* in light

of the known circumstances."  *Id.* at 648.  Indeed, "a damages remedy will not lie unless an

official who at minimum has authority to address the alleged discrimination and to institute

7

corrective measures" on the school district's behalf "has actual knowledge of discrimination" and the school district had an "opportunity to rectify any violation." *Gebser*, 524 U.S. at 290.

**A.      Actual Notice About MP's Alleged Sexual Misconduct.**

Here, the parties do not dispute that the incident between MP and Jane Doe occurred on June 13, 2017, the last day of school.  Def.'s Opp'n SUMF No. 2.  And that school officials did not learn about MP's alleged conduct until after the assault had occurred.  *See* Pls.' Opp'n./Cross Mot. at 22.  The District's actions can only be measured from the time it learned about the alleged sexual misconduct and not beforehand.  Thus, the District cannot be held liable for the actual sexual assault because, as Jane Doe concedes, the District had no notice that the assault would occur.  Pl.'s Opp'n./Cross Mot. at 22.

**B.      The District's Response Was Not Clearly Unreasonable in Light of the Known Circumstances and Its Actions In Response to the Sexual Assault Allegations.**

Jane Doe's argument that the District's response to their report of sexual harassment was clearly unreasonable is misplaced and not supported by the evidence or the law.  According to Jane Doe, she has met her burden because (1) Principal James responded with a bad attitude to the initial complaint after Julie and Jane Doe left the room; (2) Principal James disbelieved Jane Doe's report; (3) the District did not "comply with the District's Grievance Policy, did not file a grievance for Jane Doe, did not connect her to the District's Title IX coordinator, and did not provide the Does with notice of any outcome of an investigation of Jane's report;" (4) the District did not punish MP; (5) "the District denied Jane Doe a 'victim transfer;'" and (5) the District did not inform the Does of Jane Doe's Title IX rights.  Pl.s' Opp'n/Cross Mot. Summ. J.

at 26-27.  These arguments ignore the actual standard under Title IX and fail to consider the circumstances known by the District about the June 13, 2017, incident and its responses in light of the knowledge it had about the incident.

*First*, Title IX looks to the totality of the circumstances, not isolated incidents, and addresses whether the school district's response to an incident of sexual misconduct was clearly unreasonable under the circumstances.  Here, the video of the June 13, 2017, incident shows MP pulling Jane Doe into the bathroom; Jane Doe reports that while inside the bathroom, MP groped her breasts and buttocks, tried to lift up her dress, and kissed her.  Pl.'s SUMF ¶ 33-34.  While concerning, this incident occurred only once and on the last day of the school year.  Because school was already out for the summer break by the time the District learned of this incident, it did not have a pervasive effect or otherwise create a hostile school environment.  *See Davis,* 526 U.S. at 631 (A plaintiff must show harassment that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victims are effectively denied equal access to an institution's resources and opportunities.)  Here, Jane Doe has not done so.

*Second,* James and other administrators met with Julie Doe and Jane Doe in person after business hours on June 14, 2017, the day after the incident.  Def.'s Opp'n SUMF No. 6.  James arranged to have MPD meet at the Does at the school before the meeting ended to interview Jane Doe.  Def.'s Opp'n SUMF No. 12.  While James made inappropriate comments outside the presence of Jane Doe, there is no showing that James delayed the investigation or otherwise negatively influenced it.  As acknowledged by Jane Doe, James spoke with Dr. Pinder and gave her characterization of the incident.  Pl.'s SUMF No. 126.  But James was not involved in the investigation and neither was Dr. Pinder.  Def.'s Opp'n

SUMF No. 27.  Instead, MPD investigated the incident and, as acknowledged by Julie Doe, had access to the video.  Def.'s Opp'n SUMF No. 21.  So despite anything James said, MPD was able to conduct its own independent investigation.  Lynice Hannah, the D.C. Public School's (DCPS) Title IX Officer, also conducted an investigation into Jane Doe's accusations and found the complaint to be credible.   Def.'s Opp'n SUMF No. 37.  The investigation consisted of interviews with Jane Doe, and her mom, Julie Doe, a review of the video, and attempts were made to interview MP.  Def.'s Opp'n SUMF No. 22-23. DCPS offered Jane Doe an opportunity to participate in a special community service program that would have compensated her for her time.  Def.'s Opp'n SUMF No. 28.  It also offered support and counseling services through a youth program and offered 10 hours of counseling through a DCPS-approved provider.  Def.'s Opp'n SUMF No. 29. Additionally, it offered to transfer Jane Doe—at her request—to three different DCPS schools and granted additional time for her to choose a new school.  Def.'s Opp'n SUMF No. 30.  DCPS also provided materials to students at Roosevelt promoting healthy relationships, Def.'s Opp'n SUMF No. 32, and it promised to provide additional counseling services to Jane Doe at her new school during the next school year.  Def.'s Opp'n SUMF No. 31.   DCPS agreed to institute Title IX training for the Roosevelt staff.  Def.'s Opp'n SUMF No. 32.  And, DCPS created a safety plan for Jane Doe at her new school, which included "full separation" from MP should Jane Doe choose to return to Roosevelt.  Def.'s Opp'n SUMF No. 33.  And no further harassment by MP occurred, as the two did not come into contact with one another during the summer, and both Jane Doe and MP attended different schools when the new school year commenced.  Given the actions taken by the

District, no juror could find that its actions were "clearly unreasonable" or that it showed deliberate indifference.

*Third,* Jane Doe's argument that the District's response "further contributed to the deprivation of [Jane Doe's] access to educational opportunities," is unfounded.  Pls.' Opp'n./Cross Mot. at 25-26.  And her reliance on the holding in *Doe v. Fairfax County School Board*, 1 F.4th 257 (4th Cir. 2021), is misplaced.  That court decided that "a school may be held liable under Title IX if its response to a single incident of severe sexual harassment, or the lack thereof, was clearly unreasonable and thereby made the plaintiff more vulnerable to future harassment or further contributed to the deprivation of the plaintiff's access to educational opportunities."  *See* Pl.'s Opp'n./Cross Mot. at 25-26 (citing *Fairfax County School Board*, 1 F.4th at 274).  The *Fairfax County* court held that a trial was necessary because the school district *did nothing* to separate the student-victim from her alleged aggressor.  In other words, "they tried to sweep the reports under the rug so as not to cause trouble for [the alleged assailant], one of their star students . . ." *Fairfax County*, 1 F.4th at 276.  Indeed, they made an "official decision . . . not to remedy the violation."  *See Gebser,* 524 U.S. at 290; *Foster v. Board of Regents of University of Michigan*, 982 F.3d 960, 968 (6th Cir. 2020).

By contrast, the District ensured Jane Doe would have no further contact with MP; it offered to transfer Jane Doe to a different school; promised that if Jane Doe stayed at Roosevelt, she would have no contact with MP; and allowed her to transfer to a new school.  Def.'s Opp'n SUMF No. 30-33.  Courts routinely find that responses similar to the District's—that is, responses that make an effort to eliminate any future harassment—satisfy Title IX.  *See Foster*, 982 F.3d at 967 (holding that taking steps to

ensure there would be no further contact between a complainant and an alleged harasser following a report of harassment was not deliberate indifference); *Johnson v. Northeast School Corporation*, 972 F.3d 905, 912 (7th Cir. 2020) (issuing a no contact order was not deliberate indifference, even where no discipline was issued); *Doe ex rel. Doe v. Dallas Independent School District*, 220 F.3d 380, 388 (5th Cir. 2000) (finding a strong verbal warning alone was sufficient); *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 168-169 (5th Cir. 2011) (finding that some separation—though not total separation—between an alleged harasser and a victim was not clearly unreasonable even where the alleged victim requested specific actions that were not taken).

*Fourth,* Jane Doe's reliance on the District's asserted omissions to support her Title IX claim is flawed. According to Jane Doe, the District did not:  1) comply with its own grievance policy, 2) file a grievance for Jane Doe, 3) connect her to the District's Title IX Coordinator, 4) provide the Does with notice of any outcome of the investigation, 5) punish MP, 6) grant her a transfer to a different school, or 7) inform Jane Doe of her Title IX rights. Pls.' Opp'n./Cross Mot. at 26-27. But Title IX focuses on what an educational institution does in response to an allegation of sexual misconduct and not on what it does not do especially if what it does addresses the sexual harassment suffered by a plaintiff. According to the record evidence here, the Title IX Coordinator was notified about the June 13, 2017 incident and performed an investigation into Jane Doe's allegations. Def.'s Opp'n SUMF No. 27. In fact, the investigator agreed that MP committed sexual misconduct and notified Julie Doe, on behalf of Jane Doe, of the findings. Def.'s Opp'n SUMF No. 27. And while Jane Doe

may not have been initially granted the transfer of her choice, Jane Doe was allowed to transfer to Wilson, the school of her choice, at the beginning of the 2017-2018 school year.  Def.'s Opp'n SUMF No. 19.  And while the District did not punish MP, it was not required to do so.  As the Supreme Court has expressly stated, a failure to discipline in such circumstances does not establish deliberate indifference.  *See Davis*, 526 U.S. at 649 ("[I]t would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims.").  *See also e.g., Goss v. Lopez*, 419 U.S. 565, 578-580 (1975) ("At the very minimum, therefore, students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing.").  Here, the investigators unsuccessfully attempted to interview MP and a letter of resolution was sent to his guardian but returned undelivered.  Def.'s Opp'n SUMF Nos. 23, 47. As such, because the District had to provide notice to MP about any discipline before it was imposed and because the District's efforts to notify MP were unsuccessful, the District's failure to discipline MP was not unreasonable.

*Fifth,* Jane Doe's claim that the District "destroy[ed] her high school education" should be rejected.  Unquestionably, missing school has an effect on a student's grades.  As even recognized by Jane Doe, she missed many days of school to attend counseling either because of:  1) the June 13, 2017 incident about which the District bears no liability, 2) James' remarks, which, as will be shown below, are not actionable against the District under Title IX; and 3) she had other unexcused absences.  *See* Pl.'s Opp'n./Cross Mot. Summ. J. at 26-27; *see also* Def.'s Opp'n SUMF No. 36-37.  And while Jane Doe claims that her ranking was near the bottom of her class, she admits that

her final grades for the year were 3 Bs, 6 Cs, and 2 Ds.  Pl.'s SUMF No. 49.  Jane Doe's conclusions that she fell from being ranked 304 out of 409 at the beginning of the school year to being ranked 393 out of 414 students in December 2018 is not supported by admissible evidence.  Pl.'s SUMF at Nos. 150, 170.  Rather, it is rank speculation which is not enough to show the District's actions caused this drop in ranking.  Indeed, no evidence has been presented in this record about the other students' situations who were ranked higher than Jane Doe to support her conclusion that the only reason why she dropped in rank is because of the District's actions.  *See* Record.  *See also Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 349 (D.C. 1987) (Mere conclusory allegations by the non-movant are insufficient to establish a genuine issue of material fact to preclude summary judgment.)   Moreover, as Jane Doe acknowledges, "…Wilson was a better school than RHS, but she struggled in different ways, explaining, 'I did not trust most of my teachers or school administrators. I had a hard time focusing on schoolwork because [I] felt sad and depressed a lot of the time, especially in my first year there.'" Pl.'s SUMF No. 142.  Given this evidence, no reasonable juror could find that her grades dropped *because* she was marked down inappropriately as absent without an excuse when she should have been marked down for excused absences.

   *Sixth*, the District's response to Jane Doe's requests for corrections to her attendance was not clearly unreasonable.  Jane Doe identified 10 days of unexcused absences to the District for which she asserts should have been marked as excused. Def.'s Opp'n SUMF Nos. 36-40.  The District responded reasonably by investigating, verifying the information, and marking the absences for those 10 days as excused. Def.'s Opp'n SUMF No. 40.  Importantly, Jane Doe, through counsel conceded that

most of her absences were not excused.  Def.'s Opp'n SUMF No. 37.  Nor was removal

of Jane Doe from the cheerleading team when she missed more than three days of

practice discriminatory within the meaning of Title IX.  Title IX does not require the

District to allow students to remain on teams when they simply cannot make practice for

whatever reason.  *See Russell v. Aid to Developmentally Disabled, Inc.*, 753 Fed. Appx.

9, 14 (2nd Cir. 2018) (unpublished) ("Applying ADD's neutral attendance policy is 'a

neutral reason for the complained of action.'") (quoting *Kirkland v. Cablevision

Systems*, 760 F.3d 223, 225 (2nd Cir. 2014)).

 *Seventh*, that the District required Jane Doe to make up for missed assignments

also is not clearly unreasonable.  Indeed, the District offered to provide tutoring to assist

Jane Doe and agreed to extend the deadlines for Jane Doe to complete her missed

assignments.  Def.'s Opp'n SUMF No. 42.  The alternative—not providing the missed

assignments—would have adversely affected Jane Doe's grades and would have been

unfair to other students who were required to complete the assignments.

 *Eighth*, the District cannot be held strictly liable for comments made to Jane Doe

about the June 13, 2017 incident.  According to Jane Doe, a security guard harassed her

but she acknowledges that the security officer was relieved of her duties.  Pl.'s SUMF

No. 161.  Far from deliberate indifference, the District, though it did not employ the

security officer, acted to ensure the harassment would not continue.  *Id.*

 *Finally,* Jane Doe's arguments about lack of Title IX training for Roosevelt

officials are misguided.  What she fails to recognize is that Title IX addresses conduct of

the educational institution in the face of sexual harassment/sexual assault claims.  When

the District received notice about the claims, it took action to ensure that Jane Doe was

protected.  And Jane Doe was not sexually attacked/harassed again by MP as the two did

not come into contact with one another during the summer and attended different

schools when the new school year began.  Def.'s Opp'n SUMF No. 19.  Thus, while

perhaps not always perfect, the District's actions were far from "clearly unreasonable."

Consequently, the District is entitled to summary judgment on Jane Doe's Title IX

discrimination claims.

## II.     Jane Doe's Title IX Retaliation Claims Fail.

### A.     The District did not Retaliate Against Jane Doe and Its Actions Were Not Clearly Unreasonable.

Jane Doe's Title IX retaliation claims fail for the same reasons her discrimination

claims fail—the District did not retaliate against her and its conduct was not clearly

unreasonable.  Title IX forbids retaliation "on the basis of sex" in education.  20 U.S.C. §

1681(a).  In *Jackson*, the Court explained that retaliation is included within the ban on

discrimination in Title IX.  *See Jackson v. Birmingham Board of Education*, 544 U.S. 167,

173-174 (2005).  Retaliation must be both intentional and must result in differential

treatment to fall within the proscriptions of Title IX.  *Id.*  And, because retaliation under

Title IX emerges from the same statutory ban on discrimination, courts consistently apply

the same standard to both retaliation and discrimination claims under Title IX.  *See*

*Jackson*, 544 U.S. at 173 ("Retaliation against a person because that person has complained

of sex discrimination is another form of intentional sex discrimination encompassed by

Title IX's private cause of action.").  Rather than engage with the District's argument on

the appropriate standard, Jane Doe merely cites opposing cases.  As Jane Doe

acknowledges, there is a circuit split and the D.C. Circuit has not ruled on the issue.  Pl.'s

Opp'n./Cross Mot. at 31-32.  But the Court need look no further than *Nassar*, the seminal

16

case on Title VII retaliation, to determine that the standards are different. *See University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 356 ("Unlike Title IX, . . . Title VII is a detailed statutory scheme.").

Jane Doe's argument that James retaliated against her based on the words used by James captured on the secret private recording without James' knowledge is not enough to hold the District liable under Title IX. Pl.'s Opp'n./Cross Mot. at 30-31. As courts have held, because there is no strict liability, the plaintiff has to show what the educational institutional did upon learning of the misconduct and that its actions were clearly unreasonable. *See Jackson*, the Court explained that retaliation is included within the ban on discrimination in Title IX. And the plaintiff must not only show that participation in protected activity, but that an adverse action was taken against the plaintiff and that the protected activity was the motivating factor for the adverse action. Here, as recognized by Jane Doe, after she sent the audio recording to Dr. David Pinder, James' supervisor, which captured James' disparaging remarks, "[t]he District formally reprimanded Principal James for her misconduct." *See* Pl.'s SUMF No. 128. And "[a]fter Dr. Pinder reviewed the video footage of the sexual assault, he requested that Jane Doe be permitted to transfer to Wilson High School." Pl.'s SUMF No. 129. Thus, no reasonable juror could find that the District's actions were clearly unreasonable in response to James' misconduct or that it took adverse actions against her because of her protected activity.

## B.   Retaliation Did Not Occur at Wilson.

To support her claim of retaliation for the experiences she had while a student at Wilson, including being marked absent for what she avers should have been excused absences, Jane Doe must meet every element of the claim. She must show that the actions

taken against her were taken because she engaged in protected activity, including complaining about sexual harassment and filing a lawsuit. *Jackson*, 544 U.S. at 173-174 ("Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination . . ."). Jane Doe has not met her burden. Indeed, as she concedes, Kimberly Martin was Wilson's principal. Pl.'s SUMF No. 133. But "[n]either Principal James nor any other RHS administrator informed Principal Martin about Jane Doe's report of sexual assault or any investigation of that report." Pl.'s SUMF No. 141. According to Jane Doe, "it was not until the beginning of the 2018-2019 academic year, Jane Doe's junior year at Wilson, that school administrators 'gleaned' from 'meetings and conversations' that Jane Doe had reported being sexually assaulted while a student at RHS." Pl.'s SUMF No. 153. In fact, according to Jane Doe, "[t]his occurred sometime after the Washington Post published an article regarding Principal James" on September 27, 2018. Pl.'s SUMF Nos. 154, 155. And Jane Doe complains that even after Principal Martin gleaned that she was sexually assaulted, "[she] did not instruct teachers that they should excuse Jane Doe's absences." Pl.'s SUMF No. 157. While Jane Doe identifies that Ward, a teacher, approached her and said "she kn[e]w what happened to her at her previous school, and told [her] she should stop using being sexually assaulted as an 'excuse,'" Jane Doe has not shown that that teacher took any action against her. *See* Pl.'s SUMF No. 160. Given the evidence that Principal Martin, nor Jane Doe's teachers, did not know about Jane Doe's sexual assault, Jane Doe has made no showing that any of the teachers retaliated against her for engaging in protected activities.

C.      **Jane Doe's Title IX Retaliation Claims Fail Even Under Title VII's Standards.**

Even applying the Title VII standard, Jane Doe's Title IX retaliation claims fail because the District took no adverse action against her.   Under Title VII's retaliation standard, a plaintiff must establish three elements: "that she made a charge or opposed" an unlawful practice, "that the [school] took a materially adverse action against her, and that the [school] took the action because of her protected conduct." *Cavalier v. Catholic University of America*, 306 F. Supp. 3d 9, 36 (D.D.C. 2018).  According to Jane Doe, the District took materially adverse actions against her when (1) Defendant James "interfered with" the MPD investigation and (2) when the District permitted Jane Doe to complete her missed assignments, marked her absent when she did attend school, and failed her from U.S. History.  Neither of these actions was materially adverse.

1.      **James's Alleged Interference with the MPD Investigation Is Not Supported by the Evidence and Is Not Actionable.**

While James indicated she disbelieved Jane Doe and made comments that offended Jane Doe, those statements, alone, do not rise to the level of a materially adverse action. Title VII is not a "general civility code" and does not protect from the "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Instead, a plaintiff must demonstrate that an alleged act of retaliation "well might have dissuaded a reasonable" person from making a charge of discrimination. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth 'a general civility code for the American

workplace.'").  The mere proposal of an adverse action does not constitute a materially

adverse action.  *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008).

Here, James' comments while unprofessional, were not materially adverse to Jane

Doe.  Just as in *Baloch*, the final decision regarding Jane Doe's complaint was made by a

different official and favored Jane Doe.  *Baloch*, 550 F.3d at 1199 ("The decision was

reassigned to another official, and Loman's ex parte communications had no actual

effects.").  The District found in Jane Doe's favor about her claims and took reasonable

measures to ensure that the sexual harassment would not occur again; and James made no

further disparaging comments about her.   And other than make the statements as captured

on the secret recording, nothing James did derailed the investigation.  Moreover, Jane

Doe's reliance on hearsay statements about what MPD Officers allegedly told Julie Doe

about what James said to them is not enough to support her claims.  Indeed, when asked at

deposition whether the officers said "that they had heard information from Ms. James, Mr.

Moss or Mr. Butler with regard to what had happened and why they didn't believe Jane,"

Julie Doe replied:

> Again, it was very much implied indirectly and directly, so I guess I would
> say yes.  They did speak to the school, and they did let us know what
> impression was that they got from the school, James.

Def.'s Opp'n SUMF No. 48.  And Julie Doe also acknowledged, "despite what James had

did, they had proof that her daughter was assaulted."  Def.'s Opp'n SUMF No. 49.  Thus,

Jane Doe cannot show that James' comments made on the audio or allegedly made to the

MPD officers, negatively affected the investigation or otherwise caused her to suffer any

adverse action.

2.   **Wilson's Actions Following the Filing of the Complaint Was Not Retaliatory Nor Did She Suffer Any Adverse Action.**

The actions Jane Doe identifies as occurring after she filed her complaint were not materially adverse either.  *First*, Jane Doe has pointed to no case law that finds that the assignment of "50 make-up assignments" is a materially adverse action.  Pls.' Opp'n./Cross Mot. at 31.  Granting Jane Doe an opportunity to complete her missed assignments was a benefit, not a punishment.  Moreover, when Jane Doe requested additional time to complete the assignments, the District granted her request.  Def.'s Opp'n SUMF No. 42. The District later extended that deadline again and provided up to 25 hours of tutoring to help Jane Doe complete her missed assignments.  Def.'s Opp'n SUMF No. 43.  On this record, no juror could find that Jane Doe suffered an adverse action because she had to make up for missed assignments.

*Second*, Jane Doe has not shown that because the District marked her as absent that she suffered an adverse action because it "denied her request for special education services, and failed her from U.S. History."  *See* Pls.' Cross Mot. at 31 ("Temporal proximity between the filing of Jane's federal complaint and the 50 make-up assignments establishes pretext . . .").  As Jane Doe admits, she could not focus on her work because she did not trust her teachers.  Pl.'s SUMF No. 142.  And Jane Doe's attendance issues predated her filing of a federal complaint.  Pl.'s SUMF No. 143 (noting that Jane Doe's absences began in the Fall of 2017, when Jane Doe first began attending Wilson); Pl.'s SUMF No. 152 (noting Jane Doe filed her complaint on September 21, 2018, more than a year after she enrolled at Wilson).  Consequently, her complaint could not have caused these issues, even if they could be considered adverse actions, which they cannot, because she filed her complaint after the issues had arisen.  *Durkin v. City of Chicago*, 341 F.3d 606, 614–15

(7th Cir. 2003) ("It is axiomatic that a plaintiff engage in statutorily protected activity *before* an employer can retaliate against her for engaging in statutorily protected activity.") (emphasis added).  And Jane Does alleges that she did not even make a request for accommodations until two months after filing this lawsuit.  *See* Pls.' SUMF No. 168.  That Jane Doe's request was even later denied suggests no causation at all.  *See Clark County School District v. Breeden*, 532 U.S 268, 273-74 (2001) (holding that action 20 months later "suggests, by itself, no causality at all" and citing with approval cases that found a 3-month delay or 4-month delay were insufficiently close in time); *Pueschel v. Chao*, 955 F.3d 163, 167 (D.C. Cir. 2020) (holding that 15 months was too long).  As shown above, Jane Doe cannot tie the actions taken by Wilson teachers against her to her complaints about the June 13, 2017 incident because there is no showing that any of her teachers knew about the sexual misconduct allegations.

*Third*, the District had legitimate nondiscriminatory reasons for its actions related to Jane Doe.  Jane Doe missed significant time from school, was allowed to make up her assignments, and a tutor was offered to assist her.  But Jane Doe nonetheless failed her U.S. History class because of her excessive absences.  Whether a defendant's proffered reason is fair or reasonable is immaterial.  The "'issue is not the correctness or desirability of the reasons offered but whether the [educational institution] honestly believes in the reason it offers.'"  *Bennett v. District of Columbia*, 6 F. Supp. 3d 67, 77 (D.D.C. 2013) (citing *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)); *see also Simpson v. Leavitt*, 557 F. Supp. 2d 118, 130 (D.D.C. 2008) (stating that it is not the "'Court's job to decide if defendant's proffered reasons were wise, fair, or correct, but rather, whether defendant honestly believed those reasons and acted in good faith upon those beliefs");

*Nwachuku v. Jackson*, 605 F. Supp. 2d 285, 290 (D.D.C. 2009), *aff'd,* 368 F. App'x 152 (D.C. Cir. 2010) (same).

Here, Jane Doe admitted that Jane Doe missed 30 days of her U.S. History class. Def.'s Opp'n SUMF No. 37-40.  According to Wilson's attendance policy, more than 30 absences required the school to fail Jane Doe in U.S. History.  *See* Wilson Attendance Policy SY 2018-2019 (available at https://tinyurl.com/3wd4urda) (last visited April 7, 2022).  Enforcement of a neutral attendance policy is not discrimination.  *See Russell*, 753 Fed. Appx. at 14 (2nd Cir. 2018) (unpublished) ("Applying ADD's neutral attendance policy is 'a neutral reason for the complained of action.'") (quoting *Kirkland*, 760 F.3d 223, 225 (2nd Cir. 2014)).  Because the District's actions were far from being retaliatory, the Court should grant summary judgment in the District's favor on Jane Doe's Title IX retaliation claims.

### III.    <u>Jane Doe's Failure to Accommodate Claim is Governed Under the IDEA.</u>

Jane Doe's claims that she did not receive adequate time for assignments, that she could not access the general education curriculum, and that the District did not alter her educational programming to accommodate her therapy appointments fall within the gambit of the Individuals with Disabilities in Education Act, 20 U.S.C. § 1400 *et seq*. (IDEA).  But before filing a complaint under any federal law seeking relief that is also available under the IDEA, a plaintiff must exhaust the administrative remedies available under the IDEA.  20 U.S.C. § 1415(l).  A plaintiff seeks relief otherwise available under the IDEA when the gravamen of the claims concerns the denial of a free appropriate public education (FAPE). *Fry v. Napoleon Community Schools*, 137 S.Ct. 743, 756 (2017).   A FAPE comprises special education and related services designed to ensure each child has an opportunity to benefit from instruction.  *Id.* at 748-749.  The primary vehicle for the provision of FAPE is

an Individualized Education Plan (IEP).  *Id.* at 749.  An IEP typically includes modifications

to the general education curriculum tailored to an individual's needs and intended to

accommodate an individual's disabilities.  34 C.F.R. § 300.320.  Because parents and

schools cannot always agree about the provision of educational services to a child, the IDEA

provides for an administrative process to resolve such disputes.  *Id.*  In short, the provision

of FAPE requires accommodating a student's disabilities in the provision of educational

services.  Indeed, *Fry* encourages courts to make two inquiries to determine when the

gravamen of a complaint relates to a FAPE: first, "could the plaintiff have brought

essentially the same claim if the alleged conduct had occurred at a public facility that was

*not* a school?" and, second, "could an *adult* at the school—say, an employer or visitor—

have pressed essentially the same grievance?"  *Fry*, 137 S.Ct. at 756.

        Here, the gravamen of Jane Doe's complaints is that after the sexual assault, she

could not "meaningfully access the general education curriculum" because the District

failed to accommodate her disabilities.  Pls.' Opp'n./Cross Mot. at 16.  Each of the injuries

Jane Doe alleges she suffered relates to the denial of a FAPE.   None of these injuries as

alleged by Jane Doe could be brought by a student at another public facility; each is an

injury only in so far as it relates to Jane Doe's education.  For example, no young person

could bring a claim that her absence from a library should be excused because she was

attending therapy or that she could not focus on the books in the library because of

depression.  And there is no analogous claim for needing more time to complete

schoolwork.  Neither could an adult in a school bring a claim about schoolwork or argue

about truancy.  Because Jane Doe's injuries for which she now seeks relief are educational

in nature, she had an obligation to exhaust her claims under the IDEA before bringing this

lawsuit.  20 U.S.C. § 1415(l).  Jane Doe's failure to do so is fatal to her claim under Title

IX as the claims are governed under the IDEA and not Title IX.

IV.   **Jane Doe's Intentional Infliction of Emotional Distress (IIED) Claim Fails as a Matter of Law.**

In the context in which James' comments were made, Jane Doe has failed to show

that James' conduct was "so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community."  *Williams v. Dist. of Columbia*, 9 A.3d 484, 494

(D.C. 2010).  *See also* Pl.'s Opp'n./Cross Mot. to Def. James's Mot. Summ. J. at 17-28.  As

the *Cavalier* court held, this is a very demanding standard that is met only infrequently.

*See Cavalier v. Catholic Univ. of Am.*, 306 F. Supp. 3d 9, 41 (D.D.C. 2018) (internal

quotations and citations omitted).  And IIED is an intentional tort; negligence is not enough

to support judgment.  *Sere v. Group Hospitalization, Inc.* 443 A.2d 33, 37 (D.C. 1982)

(requiring intentional or reckless conduct).

As Jane Doe concedes, James said, outside of her hearing,

> [S]ince I walked into this building, I immediately responded to what I
> knew was bullshit . . .  this whole thing is going to blow up in her face,
> that is why I am going to go the extra mile and call MPD because I
> am sick of her, sick and tired of her and her mom.  So I am going to
> call MPD and have a long and drawn out email just so I can embarrass
> her . . .

Pl.'s SUMF ¶ 72.  She also said, "you should see the dress that she has got on."  Pl.'s

SUMF ¶ 73.  These statements were, of course, made under conditions such that James

believed the Does would never hear them.  Pl.'s SUMF ¶ 72.  Jane Doe's reliance on

*Drejza v. Vaccaro*, 650 A.2d 1308 (D.C. 1994), to support her arguments that the District is

liable for IIED are misplaced.  *Drejza* is easily distinguishable from the facts here.  The

plaintiff in *Drejza* was a rape victim who was interviewed by a police detective following

the rape.  *Drejza*, 650 A.2d at 1309.  She accused the detective of "tossing a distraught rape

victim's undergarments at her while telling her to take her 'little panties home,' and later

joking and snickering about her lack of virginity, as reflected by her 'marital hymen.'"  *Id.*

Moreover, the *Drejza* plaintiff arrived for her interview with the defendant detective with

"bruises, swellings," "broken blood vessels around her eyes," "marks around her neck"

from the rapist's hands, and "an assortment of other pains and injuries."  *Id.* at 1309.  The

detective made the following remarks:

> 1) "You're going to send your boyfriend to jail for life for this?"
> 2) "After all, you've already had sex with him."
> 3) "After all, you invited him in late at night."
> 4) "You will have to spend the next year of your life in the courtroom."
> 5) "You're going to be in front of a jury of your peers, which in the District of Columbia is all Black. I don't know how they're going to look at you."
> 6) "You just don't know how rape laws are in the District of Columbia."
> 7) "You don't want to go to D.C. General. Just go to your private doctor later."
> 8) "Why don't you just forget about it and go home to sleep. We've got this all written down in case he ever tries it again."
> 9) Vaccaro told Plaintiff that he would track Smith down to "scare him."
> 10) Finally, Vaccaro told Plaintiff that Defendant Smith had been "pulled in" by the police that night and that Defendant Smith's sister had told him that Smith was a manic depressive and had not been taking his medication.

*Id.* at 1310 n.3.  Despite the nature of these comments, the court reasoned "we do not view

most of these statements, standing alone, as constituting tortious conduct supporting

recovery for intentional infliction of emotional distress."  *Id.* at 1310.  Instead, the court

held that a reasonable jury could find that the detective's statements, plus the plaintiff's

state of mind following a violent rape, plus the detective's knowledge of the plaintiff's unique susceptibility to psychological harm, and plus the detective's position of authority was enough to require a trial. *Id.* at 1312. Unlike the detective in *Drejza*, who made outrageous statements directly to the plaintiff, James did not make these comments directly to Jane Doe nor to her mom. Rather, these comments were made to officials during what James believed was a private conversation. And though James did not believe Jane Doe's report of sexual assault, she still contacted the police about her claims, and encouraged Maurice Butler, Jane Doe's guidance counselor, to speak with Jane Doe about her claims. Def.'s Statement of Facts in Support of its Mot. for Summ. J No. 5. Moreover, Jane Doe did not present at the June 14, 2017 meeting with the obvious and extensive physical injuries that the plaintiff had in *Drejza* when she was interviewed by the detective. And Jane Doe has not shown that James knew or believed that she was particularly susceptible to emotional harm—not to mention that James did not believe Jane Doe would ever hear her remarks. And while James shows that she was diagnosed with PTSD and allegedly suffered injuries as a result of James' statements, that by itself is not enough to stave off judgment of this claim. Because Jane Doe has not shown that the words used by James were intended to reach her or that James's conduct was outrageous, she cannot proceed on this claim. On this record, Jane Doe has not met her burden of proof and her IIED claim fails as a matter of law.

## V.     <u>Jane Doe Has Failed to Create A Material Genuine Factual Dispute in this Record in Need of Jury Resolution.</u>

In an effort to create a material genuine factual dispute in this record, Jane Doe disputes several of the District's asserted material undisputed facts. And she prepared 222 statements of facts which she believes either precludes entry of summary judgment to the

District or supports the grant of summary judgment in her favor.  They do not.  As support

for many of her statements, Jane Doe relies on hearsay within hearsay, a newly created

affidavit although she was deposed for at least 4 hours, and her retained experts who make

conclusory opinions and arguments.  None of this evidence is enough to create a material

factual dispute.  As the court in *Liberty Lobby, Inc.* explained, in order for a dispute about a

material fact to be *genuine*, there must be sufficient *admissible evidence* that a reasonable

trier of fact could find for the nonmoving party."  *See Anderson v. Liberty Lobby, Inc*., 477

U.S. 242, 248 (1986).  And "only disputes over facts that might affect the outcome of the

suit under the governing law will properly preclude the entry of summary judgment.

Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.  Here,

because the District can only be held liable for discrimination and retaliation under Title IX

if its conduct was "clearly unreasonable," facts not related to the District's actions are

irrelevant and unnecessary no matter which party raised the claim as material.  Indeed, it

matters not whether Julie Doe asked Roosevelt officials to transfer Jane Doe before the

June 13, 2017 incident because it does not address the crux of the claims before this Court,

i.e. whether the District's actions, in responding to the sexual assault allegations, were

clearly unreasonable.  And Jane Doe's reliance on hearsay within hearsay to show what

James allegedly did to thwart the investigation is not enough to create a material factual

dispute because it is inadmissible evidence. S*ee, e.g.*, *Londrigan v. Federal Bureau of*

*Investigation*, 670 F.2d 1164, 1174 (D.C. Cir. 1981) (stating that, at summary judgment,

the "requirement of personal knowledge by the affiant is unequivocal and cannot be

circumvented" and "[a]n affidavit based merely on information and belief is unacceptable")

(citing C. Wright & A. Miller, Federal Practice § 2738 (1973); J. Moore & J. Wicker,

Federal Practice ¶ 56.22(1) (1980)).  And because courts have found in favor of educational institutions who did far less than the District, the Court should find that Jane Doe has failed to show that the District's actions were clearly unreasonable.

Similarly, Jane Doe's claimed disputes about actions the District took after James' disparaging comments were uncovered are not enough to stave off judgment.  So too are her claims about actions taken after she arrived at Wilson High School, the summer after the sexual misconduct.  The asserted "disputed" evidence must be admissible and must be enough to support a finding that the District's actions were clearly unreasonable.  Jane Doe's claimed disputes are simply not enough to overcome the "undisputed evidence" that the District's conduct was not clearly unreasonable.  Similarly, because Jane Doe has not presented any disputes which go to the core issue of James' "intent" to cause her harm by her comments and her failure to show that other than those statements, James's actions after the meeting proximately caused her harm, judgment should be entered in the District's favor.  Because James was unaware that Jane Doe would ever hear her statements, no reasonable juror could find that she intended to cause her harm.  Indeed, after the meeting and before her remarks were uncovered, James sent an apologetic email to Julie Doe.  Def.'s Opp'n SUMF No. 50.  She also tasked Mr. Butler with assisting Jane Doe and notified the police about the sexual assault allegations as was consistent with her responsibilities.  Def.'s Statement of Material Facts in Support of its Mot. Summ. J. No. 6.

## VI.  <u>Jane Doe is not Entitled to Partial Summary Judgment on the Actual Notice Element of Her Title IX Claim.</u>

Under Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  And the movant must show entitlement to the relief sought.

*Id.* Here, Jane Doe asks the Court to grant summary judgment not on one of the claims raised in the Complaint but on the "actual notice element" of her Title IX deliberate indifference claim. Pl.'s Opp'n/Cross Mot. at Proposed Order. The Court should deny the motion as premature and find that Jane Doe is *not entitled* to judgment on this narrow piece of her Title IX claims.

Title IX requires a plaintiff to prove not only that the educational institution had notice of the sexual harassment as an element of the Title IX claim but that its conduct was clearly unreasonable after it received such notice. *Gebser*, 524 U.S. at 290. Here, Jane Doe can only show that *after* events occurred, she gave the District notice of those events. The Court should reject Jane Doe's argument that she has conclusively established the notice element for each allegation of the District's alleged violation of Title IX simply because the parties agree that Jane Doe reported the June 13, 2017 incident to James, Pinder, and other administrators *after* the incident occurred. Pl.'s Opp'n/Cross Mot. at 22.

Granting judgment on a piece of an element would encourage every plaintiff to move for partial summary judgment on each and every piece of a claim rather than move *in limine* to streamline a trial so as to preclude a party from arguing what has already been established in the case. That is not what is contemplated under Rule 56(a). Rather, the Court should treat Jane Doe's motion as an *in limine* motion and hold it in abeyance until after it rules on the District's motion and decides if this case should be tried. Otherwise granting Jane Doe judgment on an element of a claim would support a later finding that she is a prevailing party even if her claim ultimately fails as a matter of law. Because granting judgment to Jane Doe simply because she notified the District about her claims after they occurred is not enough to support summary judgment. Furthermore, entering judgment on

an uncontested fact—that the June 14, 2017 meeting occurred—would not narrow the issues or streamline the trial.  On this record, the Court should not enter summary judgment, finding that Jane Doe conclusively established actual notice under Title IX.

## CONCLUSION

For these reasons, the Court should grant the District's motion and enter summary judgment in its favor on Counts I, II, and IV and deny Jane Doe's partial motion for summary judgment.

Date:  April 7, 2022

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Patricia A. Oxendine*
PATRICIA A. OXENDINE
D.C. Bar No. 428132
Chief, Civil Litigation Division, Section I

*/s/ Kerslyn D. Featherstone*
KERSLYN D. FEATHERSTONE
D.C. Bar No. 478758
Senior Assistant Attorney General
AARON FINKHOUSEN
D.C. Bar No. 1010044
Assistant Attorney General
400 6th Street, N.W.
Washington, D.C. 20001
(202) 724-6600; 202) 724-7334 (direct)
(202) 741-8924; (202) 730-0492 (fax)
kerslyn.featherstone@dc.gov;
aaron.finkhousen@dc.gov

*Counsel for Defendant District of Columbia*