**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JANE DOE, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil Action No. 18-2181 (ABJ) |
| | ) |
| DISTRICT OF COLUMBIA, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## <u>MEMORANDUM OPINION</u>

On the last day of the school year in June 2017, plaintiff Jane Doe was sexually assaulted by another student at Roosevelt High School in Washington, D.C.  On September 21, 2018, her mother, Julie Doe, filed this lawsuit on her behalf, bringing multiple federal and state claims against the District of Columbia and the school principal, Aqueelha James, arising out of the assault and the school's response when it was brought to its attention.  *See* Compl. [Dkt. # 3].  In response to defense motions, the Court dismissed Counts Three, Five, Six, and Seven entirely, and Counts One and Two were dismissed against defendant James but not the District.  *See* Min. Entry (Sept. 24, 2019).  Counts One and Two, alleging violations of Title IX of the Educational Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, against the District, and Count Four, alleging intentional infliction of emotional distress by the District and James, remain.  Compl. ¶¶ 49–65, 82–86.

Both defendants have filed motions for summary judgment.  *See* Def. Aqueelha James Mot. for Summ. J.; Def.'s Mem. in Supp. [Dkt. # 65] ("James Mot."); Def. Aqueelha James Sealed Mot. for Summ. J. [Dkt. # 68]; Def. District of Columbia's Mot. for Summ. J.; Def.'s Mem. in Supp.

[Dkt. # 66] ("D.C. Mot."). Plaintiffs opposed the motions, Pl.'s Mem. in Opp. to James Mot. [Dkt. # 70] ("Pl.'s Opp. James Mot."); Pl.'s Mem. in Opp. to D.C. Mot. and in Supp. of Pl.'s Mot. for Partial Summ. J. [Dkt. # 71] ("Pl.'s Opp. D.C. Mot."), and have filed a cross-motion for partial summary judgment on the "actual knowledge" element of their Title IX deliberate indifference claim against the District of Columbia. *See* Pl.'s Mot. for Partial Summ. J. [Dkt. # 72] ("Pl.'s Mot."). The motions are fully briefed. *See* Def. Aqueelha James's Reply in Supp. of James Mot. [Dkt. # 75] ("James Reply"); Def. District of Columbia's Reply Mem. in Supp. of D.C. Mot. and Opp. to Pl.'s Cross-Mot. [Dkt. # 77] ("D.C. Reply"); Pl.'s Reply in Supp. of Pl.'s Mot. [Dkt. # 81] ("Pl.'s Reply"); Pl.'s Sur-Reply in Opp. to D.C. Mot. [Dkt. # 83] ("Pl.'s Sur-Reply"); Def. District of Columbia's Reply to Pl.'s Sur-Reply [Dkt. # 85] ("D.C. Sur-Reply").

The key events that prompted this lawsuit are undisputed: plaintiff Jane Doe was in fact sexually assaulted by a fellow student, and the principal's initial reaction was not just unprofessional, but appalling. These are wrongs that resulted in real emotional consequences for a teenaged victim. But the question before the Court now is whether, after engaging in extensive discovery, the plaintiffs have come forward with evidence to support the particular legal claims they have advanced. And they have not met their burden to show that there are triable claims under Title IX arising out of the aftermath of the assault or a tort claim for intentional infliction of emotional distress. While plaintiffs' motion with respect to one narrow issue will be granted, the defendants' motions will be granted as well, and the Court will enter judgment in the District's favor. Therefore, for the reasons to be detailed below, defendants' motions will be **GRANTED**.

## FACTUAL BACKGROUND

Plaintiff Jane Doe was a freshman at Roosevelt High School during the 2016-2017 academic year. *See* Def. District of Columbia's Statement of Undisputed Material Facts [Dkt.

# 66-1] ("D.C.'s SOF") ¶ 1; Pl.'s Resp. to Def.'s SOF [Dkt. # 71-1] ("Pl.'s Resp. SOF") ¶ 1; Def.

Aqueelha James's Statement of Undisputed Material Facts [Dkt. # 65-1] ("James SOF") ¶ 1; Pl.'s

Statement of Additional Material Facts [Dkt. # 71-2] ("Pl.'s SOF") ¶ 3; D.C.'s Resp. to Pl.'s SOF

[Dkt. # 77-13] ("D.C.'s Resp. SOF") ¶ 3.   M.P.[1] was also a student at Roosevelt High School

during that year.  D.C.'s SOF ¶ 1; Pl.'s Resp. SOF ¶ 1; James SOF ¶ 4.

### June 13, 2017 Sexual Assault Incident

On June 13, 2017, the last day of school, Jane Doe and M.P. were in a classroom at

Roosevelt High with other students waiting for their teacher to arrive and start class.  Pl.'s SOF

¶ 28; D.C.'s Resp. SOF ¶ 28.[2]  M.P. took Jane's phone charger and would not give it back.  Pl.'s

SOF ¶ 30; D.C.'s Resp. SOF ¶ 30.[3]  He left the classroom with the charger, and Jane followed him,

still asking for her property to be returned.  Pl.'s SOF ¶ 31; D.C.'s Resp. SOF ¶ 31.[4]

M.P. pulled Jane into a boys' restroom, where he pushed her into a stall.  Pl.'s SOF ¶¶ 32,

33; D.C.'s Resp. SOF ¶¶ 32, 33.[5]  While in the stall, he groped her breasts and buttocks, attempted

to lift her dress, and sucked and kissed her neck, leaving a mark.  Pl.'s SOF ¶¶ 33, 34; D.C.'s Resp.

SOF ¶¶ 33, 34.[6]  During the assault, Jane cried and yelled at M.P. to stop.  Pl.'s SOF ¶ 35; D.C.'s

---

1    The parties agreed to refer to the male perpetrator as "M.P."

2    The District does not dispute that Jane testified consistent with this statement, but states that it is not material.

3    The District does not dispute that Jane testified consistent with this statement.

4    The District does not dispute that Jane testified consistent with this statement.

5    The District does not dispute that Jane testified consistent with this statement but states that it is not material.

6    The District does not dispute that Jane testified consistent with this statement.

Resp. SOF ¶ 35.[7]  Eventually, he stopped and let her out.  Pl.'s SOF ¶ 36; D.C.'s Resp. SOF ¶ 36.[8]

Jane left the bathroom upset and visibly anxious, and she called her mother, Julie Doe, told her

that she had been assaulted, and asked to come home.  Pl.'s SOF ¶¶ 37, 38; D.C.'s Resp. SOF

¶¶ 37, 38.[9]  Her mother said she could leave, so Jane rushed home and told her mother more about

what happened.  Pl.'s SOF ¶¶ 38, 39; D.C.'s Resp. SOF ¶¶ 38, 39.[10]  Jane's mother reported the

incident to the Metropolitan Police Department ("MPD") that same day.  D.C.'s SOF ¶ 2; Pl.'s

Resp. SOF ¶ 2.

### June 14, 2017 Meeting at Roosevelt High School

The next day, on June 14, 2017, Julie Doe sent an email to the principal of Roosevelt High,

Aqueelha James, reporting that Jane had been sexually assaulted and requesting assistance.  D.C.'s

SOF ¶ 3; Pl.'s Resp. SOF ¶ 3.  Later that day, Jane and her mother attended an in-person meeting

at Roosevelt High School with Principal James, Assistant Principal Michael Moss, and Guidance

Counselor Maurice Butler.  Pl.'s SOF ¶¶ 54; 58; D.C.'s Resp. SOF ¶¶ 54; 58.  The Dean of

Students, Reginald Stevens, participated by phone.  Pl.'s SOF ¶ 58; D.C.'s Resp. SOF ¶ 58.

At the meeting, Jane reported what had occurred and the identity of the perpetrator.  Pl.'s

SOF ¶ 61; D.C.'s Resp. SOF ¶ 61.  Principal James discussed the school's protocols for next steps

and directed Assistant Principal Moss to contact the police.  D.C.'s SOF ¶¶ 6, 7; Pl.'s Resp. SOF

---

7       The District does not dispute that Jane testified consistent with this statement.

8       The District does not dispute that Jane testified consistent with this statement.

9       The District does not dispute that Dr. Pinder and Julie Doe testified consistent with these statements.

10      The District does not dispute that Jane and Julie Doe testified consistent with these statements.

¶¶ 6, 7.  At one point during the meeting, Jane got upset and left the room.  D.C.'s SOF ¶ 8; Pl.'s Resp. SOF. ¶ 8.  Julie also left the room, but she left the cell phone she had been using to record the meeting on the table.  D.C.'s SOF ¶¶ 9–10; Pl.'s Resp. SOF ¶¶ 9–10.

While Jane and her mother were in the hallway, James made several derogatory statements that were captured on Julie Doe's phone:

> [S]ince I walked into this building, I immediately responded to what I knew was bullshit . . . this whole thing is going to blow up in her face, that is why I am going to go the extra mile and call MPD because I am sick of her, sick and tired of her and her mom. So I am going to call MPD and have a long and drawn out email just so I can embarrass her . . . .

D.C.'s SOF ¶ 10; Pl.'s Resp. SOF ¶ 10; Audio Recording, Ex. 6 to D.C. Mot ("Audio Recording"). James also told Dean Stevens, "you should see the dress she has got on."  D.C.'s SOF ¶ 10; Pl.'s Resp. SOF ¶ 10; Audio Recording.  Jane and Julie Doe were outside of the conference room and did not see or hear the full discussion.  Pl.'s SOF ¶¶ 67–68;[11] Def. District of Columbia's Statement of Undisputed Material Facts in Opp.  [Dkt. # 77-1] ("D.C.'s Opp. SOF") ¶¶ 10.

There were also two police officers in the hallway, Pl.'s SOF ¶ 69; D.C.'s Resp. SOF ¶ 69, and Principal James spoke with one of them.  Pl.'s SOF ¶ 75; D.C.'s Resp. SOF ¶ 75.  The Guidance Counselor also spoke with Jane about what happened.  D.C.'s SOF ¶ 5; Pl.'s Resp. SOF ¶ 5.  Jane and her mother left the school to go home, where they met with police to discuss the incident further.  Pl.'s SOF ¶¶ 76–77; D.C.'s Resp. SOF ¶¶ 76–77.  Later that evening, the Does listened to the recording.  Pl.'s SOF ¶ 114; D.C.'s Resp. SOF ¶ 114.  As discussed further below, Julie later shared it with school and D.C. officials.  Pl.'s SOF ¶ 115; D.C.'s Resp. SOF ¶ 115.

---

11    Julie Doe testified that she "could somewhat hear what was being said in the conference room, but not 100% because she was trying to calm her daughter."  Pl.'s SOF ¶ 68, citing Dep. of Julie Doe, Ex. 4 to Pl.'s Opp. D.C. Mot. ("Julie Dep.") at 32.

### DCPS Investigation and Response

Principal James instructed Dean Stevens to conduct a "proper investigation," including gathering surveillance footage.  D.C.'s SOF ¶ 15; Pl.'s Resp. SOF ¶ 15.  After DCPS learned of the incident on June 23, 2017, the DCPS Grievance and Civil Rights teams initiated a Title IX investigation.  DCPS July 17, 2017 Letter to Julie Doe re "Letter of Response for Grievance filed," Ex. 8 to D.C. Mot. ("DCPS July 2017 Letter"); D.C.'s SOF ¶ 18; Pl.'s Resp. SOF ¶ 18.  Assistant Principal Moss worked with the DCPS investigation team to secure video footage soon after Jane Doe reported the incident.  D.C.'s SOF ¶ 17; Pl.'s Resp. SOF ¶ 17.

On July 17, 2017, DCPS completed its Title IX investigation and concluded that Jane had been sexually harassed by another student.  D.C.'s SOF ¶ 18; Pl.'s Resp. SOF ¶ 18; DCPS July 2017 Letter at 1.  DCPS reported to Jane's mother that it implemented the following corrective actions:

1. Roosevelt SHS has provided [Jane Doe] the opportunity to participate in the SYEP Latin American Youth Center Georgetown Program in which she will earn 100 community service hours and pay.

2. Roosevelt SHS has offered [Jane Doe] support and counseling services over the summer through the "Latin American Youth Center Promotores Program."

3. A phone conference was held between [Julie Doe] and Instructional Superintendent David Pinder in which he honored your request for a transfer and offered [Jane Doe] the following three schools for the 2017-18SY . . .

4. An extension to the submission deadline for DCPS application schools was granted per your request to Instructional Superintendent David Pinder.

DCPS July 2017 Letter at 1.

DCPS also "recommend[ed] the following corrective actions," including:  (1) providing materials on "healthy relationships" to all students at the beginning of the 2017-2018 school year; (2) providing ten hours of counseling services to Jane during the summer through a DCPS

provider; (3) providing Jane with counseling services throughout the 2017-2018 school year at her new school; (4) providing Title IX training for Roosevelt staff for the 2017-2018 school year; (5) offering counseling services to M.P.; (6) "Chapter 25 Discipline protocol from Roosevelt administration" for M.P.; and (7) offering a safety plan for Jane for the 2017-2018 school year and, in the event she chose to return to Roosevelt, full separation from M.P. for the entire school year. *Id.* at 1–2; D.C.'s SOF ¶¶ 19–26; Pl.'s Resp. SOF ¶¶ 19–26.   The District did not discipline M.P. because he did not return to Roosevelt High after the attack, and any attempts to reach him by mail were unsuccessful.  D.C.'s SOF ¶ 42; Pl.'s Resp. SOF ¶ 42.

The Does were not interested in touring the three transfer options Superintendent Pinder identified.   D.C.'s SOF ¶ 30; Pl.'s Resp. SOF ¶ 30.   Instead, Julie Doe requested that her daughter be transferred to Wilson High School. Pl.'s SOF ¶¶ 104–105; D.C.'s Opp. SOF ¶ 18. Superintendent Pinder worked with Drewanna Bey, the Superintendent overseeing Wilson High School, to grant Jane's request.  D.C.'s SOF ¶ 35; Pl.'s Resp. SOF ¶ 35.  Dr. Bey and Wilson's Principal, Kimberly Martin, were "receptive to the transfer."  D.C.'s SOF ¶ 36; Pl.'s Resp. SOF ¶ 36.

### DCPS Investigation into Principal James

Meanwhile, Julie Doe emailed the audio recording of the meeting to Superintendent Pinder and D.C. Mayor Muriel Bowser.  Pl.'s SOF ¶ 115; D.C.'s Resp. SOF ¶ 115.  On August 17, 2017, after Superintendent Pinder learned of James's remarks, he submitted an Incident Report to the DCPS Office of School Security, requesting a formal investigation into her conduct as well as an investigation into the security in place at the school at the time of the incident.  D.C.'s SOF ¶ 34; Pl.'s Resp. SOF ¶ 34; Ex. 13 to Pl.'s Opp. to D.C. Mot. ("Incident Report") at 5.  In the report, Pinder summarized the recorded statements and observed that Principal James's behavior was

7

"concerning for several reasons." *Id.* at 4. First, he emphasized that it is the principal's responsibility to take all allegations of misconduct seriously, and that MPD should be used to "conduct a fair and impartial investigation of the facts," and not to embarrass a student. *Id.* at 4. Superintendent Pinder also described his conversations with Principal James regarding the incident. *Id.* at 4. James had indicated to him that "there was no evidence on the video of an assault," and in fact, "that it appeared that the young man and Jane were hand-in-hand and entered the bathroom mutually." *Id.* at 4. But after he reviewed the video, Superintendent Pinder observed that "[c]learly, the young man pulled Jane in the bathroom against her will," and "it was clear that when she exited the bathroom . . . she was upset/visibly anxious." *Id.* at 4. He emphasized that the incident "should have been handled very differently by Principal James," and that her "clear distrust of Ms. Doe in the audio tape clouded her judgment and endangered student safety." *Id.* at 4. Finally, he stated that Principal James "was not transparent with [him] about the nature of this incident or her response to it," and therefore he requested a formal investigation into her conduct "in order to determine how to proceed administratively." *Id.* at 5.

DCPS investigated Principal James's conduct and issued a "Notice of Written Reprimand" on November 8, 2017, concluding that the allegations made against her were substantiated. Ex. 15 to Pl.'s Opp. to D.C. Mot. ("Written Reprimand"). The letter described that "[s]pecifically, the investigation uncovered an audio recording of [James] making inappropriate comments," and noted that James "admitted to investigators that [she] was expressing [her] frustrations and that [her] comments were unprofessional." *Id.* The Reprimand notified Principal James of her "failure to meet [her] professional duties and responsibilities" and became part of her official personnel file. *Id.* It warned that future violations "may result in further disciplinary actions." *Id.*

### Transfer to Wilson High School

Jane Doe transferred to Wilson High School for the 2017-2018 academic year, her sophomore year.  Pl.'s SOF ¶ 137; D.C.'s Resp. SOF ¶ 137.  Neither Principal James nor any other Roosevelt High administrator informed Wilson's Principal Martin about Jane's report of sexual assault or any related investigations.  Pl.'s SOF ¶ 141; D.C.'s Resp. SOF ¶ 141.  In the declaration that she filed in support of her opposition to the District's motion for summary judgment and in support of her motion for partial summary judgment, Jane testified that "Wilson was a better school than Roosevelt," but she "struggled in different ways," "did not trust most of [her] teachers or school administrators," and had a "hard timing focusing on schoolwork" because she "felt sad and depressed a lot of the time, especially in [her] first year there."  Ex. 17 to Pl.'s Opp. to D.C. Mot. ("Doe Decl.") at ¶ 7.  Jane averred that the District "began marking [her] for unexcused absences that should have been excused, or when [she] was not even absent," and marked her "previously-approved therapy appointments as unexcused," which caused her further "extreme stress, anxiety, and depression."  Doe Decl. ¶ 8.  During her sophomore year, Doe's attendance reflected 74 absences, 48 of which were "unexcused," and 82 "tardy" days.  Pl.'s SOF ¶ 146, citing Ex. 24 to Pl.'s Opp. to D.C. Mot. ("Sophomore Year Report Card") at 2018CA002181_000707–10; D.C.'s Resp. SOF ¶ 146.  Her final grades for the year were three "B's," six "C's," and two "D's."  Pl.'s SOF ¶ 149, citing Sophomore Year Report Card at 2018CA002181_000707–10; D.C.'s Resp. SOF ¶ 149.

### 2018-2019 School Year

On September 21, 2018, plaintiffs filed this action.  *See* Compl. [Dkt. # 3-1] at 1.  The Washington Post published an article about the lawsuit on September 27, 2018.  Pl.'s SOF ¶¶ 154–55, citing Peter Jamison & Perry Stein, *D.C. Principal Was Taped Mocking Student's Sex Assault*

*Claim,   Lawsuit   Says*,   Wash.   Post,   (Sept.   27,   2018,   10:00   am),
https://www.washingtonpost.com/local/dc-politics/dc-principal-was-taped-mocking-students-
sex-assault-claim-lawsuit-says/2018/09/26/59022914-c00d-11e8-9005-
5104e9616c21_story.html; D.C.'s Resp. ¶¶ SOF 154–55. At some point near the beginning of the
2018-2019 academic year, Jane's junior year, school administrators "gleaned" from "meetings and
conversations" that she had reported a sexual assault while a student at Roosevelt High. Pl.'s SOF
¶ 153; D.C.'s Resp. SOF ¶ 153[12]. The parties agree that this took place sometime after the article
appeared. Pl's SOF ¶ 154; D.C.'s Resp. SOF ¶ 154. Doe testified that at another unspecified point
during her junior year, one of her teachers, Ms. Ward, told her that she knew what had happened
to her at that previous school and that Doe "can't use that . . . as an excuse" and had to "get over
it." Dep. of Jane Doe, Ex. 11 to Pl.'s Opp. D.C. Mot. ("Jane Dep.") at 98:2–99:13.

Doe continued to have unexcused absences during the school year. Pl.'s SOF ¶ 173; D.C.'s
Opp. SOF ¶ 36. In September 2018, the District removed Doe from the high school cheerleading
team because rules did not allow anyone with three unexcused absences from practice to
participate. Pl.'s SOF ¶ 162, citing DCPS Nov. 27, 2018 Letter, Ex. 27 to Pl.'s Opp. D.C. Mot.,
("DCPS Nov. 2018 Letter") at 2018CA002181_000563; D.C.'s Resp. SOF ¶ 162. Given her
absences, the school provided Jane with 50 make-up assignments and up to 25 hours of tutoring
services to help her understand the material. Pl.'s SOF ¶ 165, citing DCPS Nov. 2018 Letter at
2018CA002181_000563; D.C.'s Resp. SOF ¶ 165.

In October 2018, Julie Doe filed a written grievance with DCPS regarding the alleged
unexcused absences, makeup assignments, removal from the cheerleading team, and alleged
harassment by a member of the Wilson High School security team. Pl.'s SOF ¶ 166; D.C.'s Resp.

---

11     The District does not dispute that Principal Martin testified consistent with this statement.

SOF ¶ 166; DCPS Nov. 2018 Letter at 2018CA002181_000563.  The grievance also raised a concern that at some point during her junior year, a security guard approached Jane and said, "oh, you're the girl from Roosevelt that was sexually assaulted."  Pl.'s SOF ¶ 161, citing Jane Dep. at 97 and DCPS Nov. 2018 Letter at 2018CA002181_000564–65; D.C.'s Resp. SOF ¶ 161.

The DCPS Comprehensive Alternative Resolution and Equity ("CARE") team conducted an investigation into the grievance and issued a response on November 27, 2018.  *See* DCPS Nov. 2018 Letter.  The CARE team found that: (1) Jane Doe's attendance "had been documented accurately";[13] (2) she required additional tutoring to understand the make-up assignments; (3) she was properly removed from the cheerleading team for violating the rules set forth in the contract she signed with the team on August 9, 2018; and (4) the security officer, who was not a DCPS employee, was replaced due to "breach of student confidentiality."  *Id.* at 2018CA002181_000564. The CARE team developed an "implementation plan" with corrective actions, including creating an attendance tracker for Jane and holding a "504 meeting," during which the Does began seeking disability and special education accommodations.    Pl.'s SOF ¶ 168, citing *id.* at 2018CA002181_000565; D.C.'s Resp. SOF ¶ 168.

On December 19, 2018, Jane appealed the outcome of the investigation.  DCPS Jan. 18, 2019 Letter, Ex. 28 to Pl.'s Opp. D.C. Mot. ("DCPS Jan. 2019 Letter") at 2018CA002181_000567. The District conducted an additional investigation and upheld the original decision, including the accuracy of Jane Doe's attendance record.  *Id.*  The District further noted that it held a "504

---

13     While the investigation letter does not state the number of unexcused absences, the parties agree that during Jane's sophomore year, the District marked her absent for 74 days, 48 of which were "unexcused."  Pl.'s SOF ¶ 146; D.C.'s Resp. SOF ¶ 146.

meeting" on November 28, 2018, and that Jane Doe's 504 plan[14] was "currently active."  *Id.* at 2018CA002181_000568.  According to an August 5, 2019 Final Eligibility Determination Report from DCPS, though, Jane's request for special education services was denied.  Ex. 39 to Pl.'s Opp. D.C. Mot. ("DCPS 2019 Final Eligibility Report") at 2018CA002181_000587.

By the end of her junior year, Jane had 106 absences, 56 of which were "unexcused."  Pl.'s SOF ¶ 173, citing Ex. 30 to Pl.'s Opp. D.C. Mot. ("Junior Year Report Card") at 2018CA002181_000729; D.C.'s Resp. SOF ¶ 173.  Her final grades included one "A," two "B's," two "C's," three "D's," and two "F's."  Pl.'s SOF ¶ 174, citing Junior Year Report Card at 2018CA002181_000729–32; D.C.'s Resp. SOF ¶ 174.  On July 8, 2019, the Does filed another grievance disputing the number of unexcused absences.  Pl.'s SOF ¶ 185; D.C.'s Resp. SOF ¶ 185. On September 13, 2019, after an investigation, the District amended ten of the absences that should have been designated as "excused" for counseling services.  Pl.'s SOF ¶ 186, citing DCPS Sept. 13, 2019 Letter, Ex. 34 to Pl.'s Opp. D.C. Mot. ("DCPS Sept. 2019 Letter") at 2018CA002181_000562; D.C.'s Resp. SOF ¶ 186.

## PROCEDURAL BACKGROUND

On September 21, 2018, plaintiffs filed a complaint consisting of seven counts, three of which survived defendants' motions to dismiss.  *See* Compl.; Min. Entry (Sept. 24, 2019).  Count One alleges that the District violated Title IX because it had "actual knowledge of M.P.'s sexual assault upon Jane Doe" as of June 14, 2017, and it responded in an unreasonable manner.  Compl. ¶¶ 50–60.  Plaintiffs point to the District's alleged "failure to adequately investigate Jane Doe's report, failure to take corrective action against M.P., failure to interview M.P., and the retaliatory

---

14    Section 504 of the Rehabilitation Act of 1973 protects qualified individuals with disabilities from discrimination under federal grants and programs. *See* 29 U.S.C. § 794.

actions and/or statements taken and/or made by Defendant James." Compl. ¶ 53. Plaintiffs further allege that the District acted with "deliberate indifference" toward Jane Doe's right "to a safe and secure education environment, thus materially impairing Doe's ability to pursue her education at Roosevelt" in violation of Title IX. Compl. ¶ 58. Count Two alleges that the District retaliated against Jane Doe for reporting M.P.'s assault to DCPS employees and agents in violation of Title IX by "denying a safety transfer; depriving her of educational opportunities and benefits and the right to a fair and impartial investigation; slandering and defaming her; and, otherwise subjecting her to a hostile education environment." Compl. ¶ 64. Count Four alleges the tort of intentional infliction of emotional distress against the District and Principal James, stating that defendants "did not impartially investigate the claims of sexual assault, and made outrageous defamatory and slanderous statements . . . with the intent of harming Jane Doe and/or her reputation." Compl. ¶¶ 82–85. They allege that this "extreme and outrageous conduct towards [Jane Doe]" caused her "physical and psychological pain." Compl. ¶ 86.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (alteration in original), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982). In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## ANALYSIS

### I.   Plaintiffs' Claim Under Title IX Fails Because the District's Response to the Sexual Assault was Not Clearly Unreasonable.

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).[15] The statute covers sexual harassment of one student by another, but the Supreme Court has held that Title IX

---

15   The District does not dispute that it is covered by Title IX.

14

authorizes damage awards in private lawsuits against recipients of federal education funding "only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).  The District has moved for summary judgment on this count, and plaintiffs have moved for partial summary judgment on the "actual knowledge" element of this claim.  The District argues that (1) it did not have actual knowledge of M.P.'s sexual misconduct because it did not have any notice of the assault before or while it was ongoing, D.C. Mot. at 9; D.C. Reply at 8; (2) plaintiffs cannot show deliberate indifference on the part of the school district, D.C. Mot. at 10–15; and (3) plaintiffs cannot show that Jane was deprived of educational opportunities.  D.C. Mot. at 15; D.C. Reply at 11.  Plaintiffs maintain that they are entitled to partial judgment on this count because the District had actual knowledge of the assault after Julie Doe reported it to administrators.  Pl.'s Opp. D.C. Mot. at 22.  They further argue that a jury could find that the District was deliberately indifferent because the school's "egregious" response denied Jane Doe access to educational opportunities.  *Id.* at 2.

The Court agrees with plaintiffs that defendant had actual knowledge of the assault shortly after it occurred, but it will grant summary judgment in favor of the District on the count as a whole because plaintiffs have not established deliberate indifference on the part of the District.

**A.  The District had actual knowledge of M.P.'s sexual misconduct.**

The District argues that plaintiffs' claims fail because it lacked actual knowledge of the sexual assault "while it was ongoing."  D.C. Mot. at 9.  Indeed, it observes, "all of her allegations are related to the District's actions after the alleged sexual harassment or assault occurred and after it became aware of the incident."  *Id.*  In moving for partial summary judgment to this element,

plaintiffs emphasize that their claim is based on the District's actions "*after* it received actual notice of M.P.'s sexual harassment against her," Pl.'s Opp. D.C. Mot. at 22 (emphasis in original), and that the District received "actual notice" when Julie Doe emailed Superintendent Pinder and Principal James about the sexual assault and met with school administrators in person. *Id.* In response, the District concedes that the parties do not dispute that the incident occurred and that school officials learned about it after it occurred, D.C. Reply at 8, but it maintains that "the District cannot be held liable for the actual sexual assault because, as Jane Doe concedes, the District had no notice that the assault would occur." *Id.*

In short, there is no dispute here. Plaintiffs are not alleging that the school acted unreasonably in failing to protect Jane before or during the assault; their claim is based solely on the District's actions after the school was placed on notice. *See* Compl. ¶ 50. And it is undisputed that the school officials learned about the incident after Julie Doe's report and at the in-person meeting, D.C. Reply at 8; D.C.'s SOF ¶¶ 3–4; Pl.'s Resp. SOF ¶¶ 3–4, giving rise to obligations under Title IX.[16] Thus, plaintiffs would be entitled to partial summary judgment on the actual notice element of their Title IX claim, but this does not end the inquiry.

### B. The District was not deliberately indifferent to the sexual assault.

To be liable under Title IX, the District must have responded to the undisputed harassment Jane experienced with deliberate indifference. Funding recipients "are deemed 'deliberately

---

16    The parties dispute whether plaintiffs can move for summary judgment as to an *element* of her claim rather than the entirety of her Title IX claim. *See* D.C. Reply at 30; Pl.'s Opp. D.C. Mot. at 1–2. Plaintiffs are correct that the District's position contravenes the plain text of Federal Rule of Civil Procedure 56(a), which provides that "[a] party may move for summary judgment, identifying each claim or defense – or the *part* of each claim or defense – on which summary judgment is sought." *See* Pl.'s Opp. D.C. Mot. at 1; Fed. R. Civ. P. 56(a) (emphasis added). In any event, this is immaterial because defendant is entitled to summary judgment on the full Title IX claim.

indifferent' to acts of student-on-student harassment only where [their] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. "This is not a mere 'reasonableness' standard," *id*. at 649, but a "high standard" that imposes liability only when a recipient's own deliberate indifference effectively "cause[d] the discrimination." *Id*. at 642–43 (internal citations omitted); *see also Stiles ex rel. D.S. v. Grainger Cnty., Tenn.*, 819 F.3d 834, 848 (6th Cir. 2016) (holding that *Davis*'s deliberate indifference standard "sets a high bar for plaintiffs to recover under Title IX"). Recipients are not required to "purg[e] their schools of actionable peer harassment," *Davis*, 526 U.S. at 648, and the Supreme Court has recognized that the deliberate indifference standard "is sufficiently flexible to account both for the level of disciplinary authority available to the [recipient] and for the potential liability arising from certain forms of disciplinary action." *Id*. at 649. The Court holds that plaintiffs cannot show that the District's response was clearly unreasonable in light of all of the known circumstances given all of the measures it took to investigate the sexual assault and the principal's remarks, as well as the corrective actions the District took to support Jane Doe and improve its training and resources for students and faculty.

Count One of Jane Doe's complaint focuses on Jane Doe's "ability to pursue her education at Roosevelt," Compl. ¶ 58, but the Court will address the District's conduct at both Roosevelt and Wilson High School, as the parties do in their pleadings in support of their motions.

**1. Roosevelt High School's response was not clearly unreasonable.**

Plaintiffs allege that the actions the District took in response to Jane's report of assault and Principal James' remarks and "likely" interference in the investigation render the District's response clearly unreasonable. Pl.'s Opp. D.C. Mot. at 25–27. Defendant points to the totality of actions the District took in response to Jane Doe's report of sexual misconduct, D.C. Reply at 9–

11, which the Court agrees presents undisputed evidence that the District's response was not clearly unreasonably as a matter of law.

The undisputed facts show that Jane and her mother met with school administrators at Roosevelt High School on the very same day that Julie Doe first reported the incident to Principal James.  D.C.'s SOF ¶ 4; Pl.'s Resp. SOF ¶ 4.  And on that day, Principal James directed Assistant Principal Moss to contact MPD, and police officers met with Jane and her mother.  D.C.'s SOF ¶ 6; Pl.'s Resp. SOF ¶ 6; Pl.'s SOF ¶¶ 76–77; D.C.'s Resp. SOF ¶¶ 76–77.  James also instructed Dean Stevens to conduct a "proper investigation," D.C.'s SOF ¶ 15; Pl.'s Resp. SOF ¶ 15, and the DCPS Grievance and Civil Rights teams initiated a Title IX investigation into the attack ten days after it was reported.  DCPS July 2017 Letter.  The District completed its Title IX investigation by July 17, 2017, and it confirmed Jane's report that she had been sexually harassed by another student.  D.C.'s SOF ¶ 18; Pl.'s Resp. SOF ¶ 18.  Given the District's actions and prompt response immediately following the report of the assault, the Court cannot find that plaintiffs have identified facts that would create an issue for the jury on the claim that the District was deliberately indifferent in its response to the report.

While plaintiffs argue that Principal James responded to Jane's report "with such bias and disbelief that she likely interfered with law enforcement's investigation and the potential criminal prosecution" of M.P., Pl.'s Opp. D.C. Mot. at 27, they have not set forth any evidence of actual interference with the investigation such that a juror could find the District's response was clearly unreasonable.  The record shows that the District also took steps to respond to and investigate Principal James's statements during the June 14, 2017 meeting once it was aware of her misconduct.  Immediately after Julie Doe emailed the audio record of the meeting to Superintendent Pinder, the District initiated a formal investigation into James's conduct as well as

the security in place at the school at the time of the incident.  D.C.'s SOF ¶ 34; Pl.'s Resp. SOF ¶ 34.  Superintendent Pinder's report described how the incident "should have been handled very differently by Principal James," and it demonstrates that he was aware of discrepancies in James's report, so any attempts on her part to interfere with the investigation through her remarks to Pinder were unsuccessful.  Incident Report at 4.  DCPS issued a "Notice of Written Reprimand" on November 8, 2017, reprimanding James for her "failure to meet [her] professional duties and responsibilities."  Written Reprimand.  While there can be no doubt that the principal's snide and dismissive comments were entirely inappropriate, plaintiffs have not come forward with evidence to show that the District's response to her statement was clearly unreasonable.  Therefore, to the extent any of plaintiffs' allegations relate to Principal James's actions or a failure to investigate her misconduct, the Court finds that the District's response to her statement was not clearly unreasonable.

Plaintiffs also argue that the District acted with "deliberate indifference" toward Jane Doe's right "to a safe and secure education environment, thus materially impairing Doe's ability to pursue her education at Roosevelt" and contributing to "the deprivation of [her] access to educational opportunities."  Compl. ¶ 58; Pl.'s Opp. D.C. Mot. at 25–26.  But the undisputed facts reveal that the District took a number of corrective actions to support Jane in her education, both immediately after the incident during her summer break and in connection with the following school year.  Roosevelt High School offered counseling services over the summer and the opportunity to participate in the SYEP Latin American Youth Center Georgetown Program.  DCPS July 2017 Letter at 1.  Notably, the District granted Julie Doe's request to extend the application deadline for other DCPS schools, and it granted her request to transfer Jane to Wilson High School in particular for the following school year.  D.C.'s SOF ¶ 35; Pl.'s Resp. SOF ¶ 35; Pl.'s SOF ¶ 104; D.C.'s

Opp. SOF ¶ 18.   DCPS also recommended providing Jane with counseling services and a safety plan for the 2017-2018 school year at her new school, distributing materials on "healthy relationships" to all students at Roosevelt High School, providing Title IX training to the Roosevelt staff, and promising full separation from M.P. for the entire school year in the event Jane chose to return to Roosevelt.   DCPS July 2017 Letter at 1–2.   This multi-pronged response was not clearly unreasonable.

Plaintiffs' attempt to reply on the Fourth Circuit's decision in *Doe v. Fairfax County School Board*, 1 F.4th 257 (4th Cir. 2021), is misplaced.   While plaintiffs argue that the actions the District took in response are "even more egregious than those in Fairfax County," Pl.'s Opp. D.C. Mot. at 26, the cases are not analogous.   In *Fairfax County*, the Fourth Circuit identified evidence in the record that could persuade a reasonable juror to find that the School Board acted with deliberate indifference in response to a high school student's allegations of sexual harassment from another student, including the fact that school officials took "no action to protect Doe or to offer emotional support to her."   *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 272.   The school officials made inappropriate jokes about the reported incident, tried to dissuade the complainant from taking any legal action, and asked accusatory questions during a later meeting, all of which could support a finding that the school "tried to sweep the reports under the rug so as not to cause trouble for [the accused perpetrator], one of their star students who went on to attend a prestigious public university."   *Id.* at 271–73.   While the principal's comments in this case were similarly inappropriate, that is where the comparison ends.   James took immediate action to ensure that the matter was investigated, and that it was addressed by both the police and DCPS.   D.C.'s SOF ¶¶ 6, 15; Pl.'s Resp. SOF ¶¶ 6, 15. There is no evidence that the District favored the assailant, and there is undisputed evidence of

its efforts to support Jane with counseling and the very transfer she requested.  D.C.'s SOF ¶ 35; Pl.'s Resp. SOF ¶ 35; DCPS July 17 Letter.

Plaintiffs further maintain that the District's response was clearly unreasonable because it failed to sanction or discipline M.P.  *See* Compl. ¶¶ 50–53.  However, Title IX "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs," *Davis*, 526 U.S. at 644, and courts must consider a school's "disciplinary authority" over a harasser in analyzing deliberate indifference.  *Id.* at 646–47.

It is undisputed that the school did not discipline M.P. because the assault took place on the last day of school, he did not return to Roosevelt High after the incident, and all of the District's attempts to reach him by mail were unsuccessful.  D.C.'s SOF ¶ 42; Pl.'s Resp. SOF ¶ 42.  This showing that the District was ultimately unable to discipline M.P. does not demonstrate that it was deliberately indifferent, particularly when it offered Jane Doe an opportunity to transfer and full separation from M.P. for the entire school year in the event they returned to school together.  D.C.'s SOF ¶ 35; Pl.'s Resp. SOF ¶ 35; DCPS July 2017 Letter at 2.  Thus, there is nothing plaintiffs can identify to show that the school's actions or omissions in effect "cause[d] the discrimination." *Davis*, 526 U.S. at 642–43 (internal citations omitted).

There is no question that plaintiff has suffered as a result of sexual misconduct.  But this is simply not a case where a school ignored her plight or "made no effort whatsoever" to investigate or prevent future harassment.  *Davis*, 526 U.S. at 654; *see also Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000) (holding that, with the exception of "talking to" offending students, there was no evidence the school took any other action); *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1244 (10th Cir. 1999) (holding that the school never informed law

enforcement, investigated claims, nor disciplined the offender).  In the present case, the District took swift steps to summon the police to investigate the sexual assault; it investigated both the attack and Principal James's remarks internally; and it offered emotional support to Jane and transferred her to the school of her choosing.  Thus, plaintiffs cannot establish that Roosevelt High School's response was clearly unreasonable.

> **2.  Wilson High School's response was not clearly unreasonable.**

To the extent plaintiffs' claims extend to school officials at Wilson High School, plaintiffs have similarly failed to come forward with evidence to show that they acted with "deliberate indifference" such that the District could be found to have effectively "cause[d] the discrimination."  *Davis*, 526 U.S. at 642–43 (internal citations omitted).  Plaintiffs maintain that the District failed to "provide, offer, recommend, or coordinate adequate health, psychological, counseling, and academic assistance and services to Jane Doe after she was sexually harassed," Compl. ¶ 59, and that its "'response' to Jane's report of sexual assault caused her to suffer extreme stress, anxiety, and depression, which in turn caused her to miss more school and made it more difficult to finish her schoolwork."  Pl.'s Opp. D.C. Mot. at 28.  But the District argues that it gave Jane the opportunity to make up the missed assignments, and it offered her tutoring services and extensions to minimize any adverse impact on her grades.  D.C. Reply at 15.  Both parties point to Jane's statements that "Wilson was a better school than Roosevelt," but she "struggled in different ways" and had a "hard timing focusing on schoolwork" because she "felt sad and depressed a lot of the time, especially in [her] first year there."  Doe Decl. at ¶ 7; D.C. Reply at 14.  Given this evidence, the District argues that "no reasonable juror could find that her grades dropped *because* she was marked down inappropriately as absent without an excuse when she should have been marked down for excused absences."  D.C. Reply at 14.

The Court agrees that plaintiffs have not adduced evidence to show that Wilson High School's response was clearly unreasonable. Wilson High School officials were not involved with either the investigation into the attack or Principal James's remarks, and for the first full academic year after Jane's transfer, it did not have any knowledge of the report of sexual assault or any related investigations. Pl.'s SOF ¶ 141; D.C.'s Resp. SOF ¶ 141. So plaintiffs have not shown indifference to information that would have warranted a response or a need for the school-wide corrective actions implemented at Roosevelt.

While the parties differ as to whether all of the absences in the amended calculation should be labelled as "unexcused," this dispute of fact is not material. There is no question that Jane was often absent, but the school looked into the matter again and again as the Does filed grievances and appeals, and while it found that the bulk of the absences had been documented accurately, it also made changes based on its review. *See* DCPS Nov. 2018 Letter; DCPS Jan. 2019 Letter; DCPS Sept. 2019 Letter. And even if plaintiffs are correct that every absence stemmed from Jane's emotional struggles, the District provided her with opportunities to make up the lost classroom time with make-up assignments, and it went a step further by offering extensions on the assignments and tutoring services. Pl.'s SOF ¶ 165; D.C.'s Resp. SOF ¶ 165. So plaintiffs have not come forward with evidence to show that the school's response to Jane's absences was clearly unreasonable or deliberately indifferent.

Finally, plaintiffs point to the fact that a security officer harassed Jane during her junior year, and that the District knew of the officer's actions. Pl.'s Opp. D.C. Mot. at 27. It is undisputed that the security guard made an inappropriate comment to Jane about the incident, as is the fact that the security officer was not a DCPS employee, and that after the school investigated the matter, the guard was replaced due to a "breach of student confidentiality." DCPS Nov. 2018 Letter at

23

2018CA002181_000564.  Once again, plaintiffs point to no evidence suggesting the presence of a pervasive harassing atmosphere that caused this to occur, and so this one stray, albeit concerning, comment does not satisfy *Davis's* "high bar for plaintiffs to recover under Title IX," *Grainger Cnty.*, 819 F.3d at 848, or create a triable issue for the jury with respect to Wilson High School's response.  For all of these reasons, the Court finds that plaintiffs have not come forward with facts to show that there is a genuine issue for trial that would defeat defendant's summary judgment motion on Count One.

The Court notes that the Supreme Court observed in *Davis*, "[i]n an appropriate case, there is no reason why courts, on a motion . . . for summary judgment . . . could not identify a response as not 'clearly unreasonable' as a matter of law."  *Davis*, 526 U.S. at 649.  The Court finds this case to be one of them, as the District's response was not clearly unreasonable to establish liability under Title IX.

## II.    Plaintiffs' Title IX Retaliation Claim Fails.

Count Two alleges that the District retaliated against Jane Doe for reporting M.P.'s assault by "denying a safety transfer; depriving her of educational opportunities and benefits and the right to a fair and impartial investigation; slandering and defaming her; and, otherwise subjecting her to a hostile education environment" in violation of Title IX.  Compl. ¶ 64.  "Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action."  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).  A plaintiff must allege that the defendant retaliated against her "*because* [s]he complain[ed] of sex discrimination."  *Id.* at 174 (emphasis in original).  While neither the Supreme Court nor the D.C. Circuit has clarified the elements of a Title IX retaliation claim, courts in this district and other circuits have analyzed such actions under the same rubric that would apply to a Title VII retaliation claim.  *Doe 1 v. George Washington Univ.*, 369 F. Supp.

3d 49, 90 (D.D.C. 2019); *Cavalier v. Cath. Univ. of Am.*, 306 F. Supp. 3d 9, 36 (D.D.C. 2018),

citing *Wells v. Hense*, 235 F. Supp. 3d 1, 9–10 (D.D.C. 2017); *see also Ollier v. Sweetwater Union

High Sch. Dist.*, 768 F.3d 843, 867 (9th Cir. 2014); *Papelino v. Albany Coll. of Pharmacy of Union

Univ.*, 633 F.3d 81, 91 (2d Cir. 2011).

Under this standard, a plaintiff must establish three elements: that she made a charge or

opposed a practice made unlawful by Title IX, that the school took a materially adverse action

against her, and that the school took the action because of her protected conduct. *Allen v. Johnson*,

795 F.3d 34, 39 (D.C. Cir. 2015) (Title VII standard). As the Supreme Court said in the Title VII

context, the law does not protect an individual from "all retaliation, but from retaliation that

produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).

A materially adverse action in the context of a retaliation claim is one that is "harmful to the point

that [such action] could well dissuade a reasonable [person] from making or supporting a charge

of discrimination." *Id.* at 57. Mere "trivial harms" will not suffice. *Id.* at 68 ("[I]t is important to

separate significant from trivial harms. Title VII, we have said, does not set forth 'a general civility

code . . . .'). Context matters, as "the significance of any given act of retaliation . . . will often

depend upon the particular circumstances." *Doe 1*, 369 F. Supp. 3d at 73, quoting *Burlington N.*,

548 U.S. at 68.

If a plaintiff cannot make a showing of material adversity, the inquiry ends there. *See

Chambers v. Dist. of Columbia*, 389 F. Supp. 3d 77, 92 (D.D.C. 2019), *aff'd Chambers v. Dist. of

Columbia*, 988 F.3d 497 (D.C. Cir. 2021) ("[A]t the summary judgment stage, [plaintiff] must

still, at a minimum, demonstrate that she suffered an adverse employment action."),

citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).

On a motion for summary judgment with respect to an actionable event, if the official can "articulate some legitimate, nondiscriminatory reason" for the decision at issue, *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (internal citation omitted), the district court no longer needs to assess whether the plaintiff made out a *prima facie* claim. *See Jones v. Bernanke*, 557 F.3d 670, 678, citing *Brady*, 520 F.3d at 494–95. Instead, the question before the court at that point would be whether plaintiff "produced evidence sufficient for a reasonable jury to find that the [official's] stated reason was not the actual reason" for the adverse action, and that the official actually retaliated against the plaintiff. *Brady*, 520 F.3d at 495. In answering this question, though, "the strength of the plaintiff's *prima facie* case, especially the existence of a causal connection, can be a significant factor" in showing a material dispute regarding retaliation. *Holmes-Martin v. Sebelius*, 693 F. Supp. 2d 141, 152 (D.D.C. 2010), citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 n.4 (D.C. Cir. 1998).

The Supreme Court has emphasized that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). To establish the requisite causal connection for a retaliation claim, a plaintiff must come forward with evidence that the official "had knowledge of [her] protected activity. . . ." *Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999) (alteration in original). A plaintiff must also show that "the adverse [ ] action took place shortly after that activity." *Id.*; *see also McIntyre v. Peters*, 460 F. Supp. 2d 125, 134 (D.D.C. 2006), citing *Laboy v. O'Neill*, No. 01-5322, 2002 WL 1050416, at *1 (D.C. Cir. Mar. 13, 2002) ("To support a retaliation claim, a plaintiff must show that the alleged discriminating official's knowledge of prior protected activity preceded the official's contemplating adverse action."); *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) ("For . . . retaliation, temporal proximity can indeed support

an inference of causation, but only where the two events are very close in time.") (internal citation

omitted).

The District does not dispute that Jane engaged in protected activity, D.C. Mot. at 18, but

it argues that it is entitled to summary judgment because plaintiffs have not demonstrated that

defendant's conduct amounted to materially adverse actions taken because of her protected

activity. D.C. Reply at 17–24. The Court agrees that plaintiffs have not shown a genuine issue of

material fact exists regarding the alleged retaliation at either Roosevelt or Wilson High School.

### A.  Roosevelt High School officials did not retaliate against Jane Doe.

Plaintiffs submit that Principal James's recorded statements and her interference with the

police investigation constitute retaliation for Jane's report of the sexual assault. Pl.'s Opp. D.C.

Mot. at 29–31. They contend that these "actions" are adverse because they "would dissuade any

freshman high school student who is a victim of sexual assault from reporting the assault to her

school principal." *Id.* at 31. Plaintiffs further argue that the fact that the District "formally

reprimanded" [James] for that misconduct" supports their retaliation claim. *Id.*[17]

The District responds that James's recorded statements alone "do not rise to the level of a

materially adverse action." D.C. Reply at 19. The District also argues that Jane Doe "cannot show

that James's comments . . . negatively affected the investigation or otherwise caused her to suffer

any adverse action" because "[t]he District found in Jane Doe's favor about her claims and took

reasonable measures to ensure that the sexual harassment would not occur again." *Id.* at 20.

---

17    Plaintiff's complaint also alleged that defendants "acted [in a manner that was] materially
adverse to Jane Doe's interests by denying a safety transfer," Compl. ¶ 64, but she did not address
that further at this stage, and the transfer was in fact granted. D.C.'s SOF ¶ 35; Pl.'s Resp. SOF
¶ 35.

The Court finds that a jury could not conclude that James's recorded statements, while undeniably inappropriate and well beneath what one would expect of a school principal, constituted the materially adverse action needed to support a retaliation claim. It also finds that there is insufficient evidence to create a triable issue for the jury on whether James in fact interfered with MPD as plaintiffs insist or on the issue of whether any statements made by James to MPD or DCPS investigators were materially adverse.

### 1. James's recorded statements did not rise to the level of "a materially adverse action."

The substance of the comments James made to other school officials when the Does stepped out of the June 14, 2017 meeting is undisputed. D.C.'s SOF ¶ 10; Pl.'s Resp. SOF ¶ 10. James announced that she "responded to what [she] knew was bullshit" and predicted that "this whole thing is going to blow in up [Doe's] face." D.C.'s SOF ¶ 10; Pl.'s Resp. SOF ¶ 10. She stated that she was "going to go the extra mile and call MPD" and "have a long and drawn out email," and confided that she was taking those steps "just so [she could] embarrass her." D.C.'s SOF ¶ 10; Pl.'s Resp. SOF ¶ 10. The Court finds James's remarks to be completely inappropriate, but her ugly remarks assessing the Does' credibility and her own motivation do not constitute a materially adverse action for purposes of a Title IX claim.

The "Supreme Court has emphasized that sporadic verbal altercations or disagreements do not qualify as adverse actions for purposes of retaliation claims." *Baloch v. Kempthorne*, 550 F.3d 1191, 1195, 1199 (D.C. Cir. 2008) (holding that four separate accounts of "profanity-laden yelling" and verbal altercations between an employer and employee "did not meet the requisite level of regularity or severity to constitute material adversity for purposes of a retaliation claim," even when the employer allegedly "threatened to have [plaintiff] arrested, led out of the building in handcuffs, and jailed."). Here too, James's recorded statements at the meeting stand alone, and

there is no evidence of the sort of pattern that would suffice.  And while she may have had all of the wrong reasons, she did the right thing, and instructed school officials to summon MPD and to initiate a DCPS investigation.  D.C.'s SOF ¶¶ 6, 15; Pl.'s Resp. SOF ¶¶ 6, 15.

### 2. Plaintiffs have not come forward with evidence to show that James's conduct prejudiced either investigation.

Plaintiffs posit that James "interfered with the police investigation of [M.P.]" and that this constituted an adverse action supporting a retaliation claim.  Pl.'s Opp. D.C. Mot. at 30–31.  The evidence adduced, though, does not support the repeated assertion that there was interference as a matter of fact, and it does not supply grounds for a jury to draw that conclusion.  And, while James may have had her own sinister motivation for bringing the Does' report to light, there is no admissible evidence to establish that James undermined the impartiality of the investigation.

On the day that the Does reported the assault, James and other officials met with Jane and Julie.  D.C.'s SOF ¶ 4; Pl.'s Resp. SOF ¶ 4.  At the meeting, James discussed the school's protocols for next steps, and she directed Assistant Principal Moss to contact MPD.  D.C.'s SOF ¶ 6; Pl.'s Resp. SOF ¶ 6.  Those officers later spoke with both Jane and Julie.  Pl.'s SOF ¶¶ 76–77; D.C.'s Resp. SOF ¶¶ 76–77.  Also, James instructed Dean Stevens to conduct a "proper investigation," initiating the DCPS Title IX investigation that ultimately concluded Jane Doe had been sexually harassed.  D.C.'s SOF ¶¶ 15, 18; Pl.'s Resp. SOF ¶¶ 15, 18; DCPS Nov. 2018 Letter.  It was this investigation that also called for corrective action, and there is no evidence that James interfered with any of it.  Rather, James's statements were distinct from the impartial investigation undertaken by DCPS, and therefore had "no actual effects" on that investigation.  *See Baloch*, 550 F.3d at 1199 (holding that employer's proposed suspension for employee did not constitute an adverse action when the employment decision was ultimately "reassigned to another official").

Plaintiffs also assert, though, that Jane and Julie Doe both "understand" that Principal James interfered with the police investigation of M.P.[18]  Pl.'s Opp. D.C. Mot. at 30, citing Pl.'s SOF ¶ 77:

> The police informed the Does that they had already spoken to the RHS Principal, treated Jane Doe as though she were lying, and indicated they were not going to arrest [M.P.] based on, among other things, "what the principal said" indicating the report of sexual assault was not something "that big." Ex. 11 (Jane Doe Dep.) at 49–51, 52–55, 72–73, 150–51; Ex. 4 (Julie Doe Dep.) at 34–35, 101–02, 107–08; Ex. 8 (Moss Dep.) at 105–07 (testifying that Principal James spoke with a police officer at the school).

Pl.'s SOF ¶ 77.  The District responds that the Does' accounts of what the police officers said to them are hearsay, so the evidence does not create a triable question of fact with respect to whether James's comments to the officers negatively affected the investigation.  D.C. Reply at 20; *see also* D.C.'s Resp. SOF ¶ 77 ("Undisputed that Jane and Julie Doe testified consistent with these self-serving statements.  But this statement should not be considered because it is based on hearsay on hearsay [sic].").

As an initial matter, the Court notes that plaintiffs' SOF ¶ 77 is vague and conclusory.  It includes terms such as "indicated," as opposed to factual recitations of what the police said, and a review of the deposition excerpts supplied by the plaintiffs does little to clarify the situation.[19]

---

18     Plaintiffs add that this "understanding [is] supported by Instructional Superintendent Dr. Pinder," Pl's Opp. D.C. Mot. at 30–31, but they do not point to an exhibit here.  Pinder's Incident Report identified false or misleading statements made to him by James that led him to request a formal investigation, but it does not include information about what James said to the police.  *See* Incident Report.

19     *See, e.g.*, Julie Dep. at 45:11–46:13, 46:16–46:18:

> Q. Why do you think Ms. James said that your daughter was crying rape?
>
> A. Well, one, actions speak much louder than words. Second, her opinion followed my daughter like a scarlet letter.  The police made that very clear that that's what the school's position was, when they came over here to my

house, and they interviewed my daughter, and they did absolutely nothing about her being sexually assaulted on that day. They were very clear about that they had spoken with the school's principal and they don't believe anything happened at the school.

Q. Do you recall exactly what the police said?

A. Specific words? Specific words at this point, no.

Q. Did the police say that they believed your daughter was crying rape?

A. Indirectly, based off of what was being implied by the school, yes. By Ms. James, yes. Again, they met with the school prior to ever speaking with me or my daughter, and they came over with a preconceived notion from what the principal over at Roosevelt was saying.

\* \* \*

Q. Do you remember what they actually said that night?

A. The specific words, no.

and at 107:16–108:12:

A. Well my daughter, she relayed to me she was upset. The officers were extremely hostile, that the officers accused her of being a liar. That they told her that they didn't believe her. They did not treat her like she was the victim. They treated her like she was the one lying on this young man.

Q. You testified earlier that you believe that it was because of what Ms. James and the others at the school had said to them. Did they say in any way that they had heard information from Ms. James or Mr. Moss or Mr. Butler with regard to what had happened and why they didn't believe Jane?

A. Again, it was very much implied indirectly and directly, so I guess I would say yes. They did speak to the school, and they did let us know what the impression was that they got from the school, James.

see also Jane Dep. at 50:12–51:10:

Q. . . . . [O]nce [the officers] got to your home, what did they do?

A. They talked to me. But while they were talking to me, the conversation went left. They kind of, like, did the same thing that the principal did. Like, it was just real insensitive and it looked like – they acted as if I was a liar.

Q. What about the conversation with them made you feel like they were treating you as though you were a liar?

A. It was just the tone of the – of the voice and, like, the things they were saying.  Like, they kept questioning everything I was telling them, and acting as if they knew something – they already knew what the answer was.

Q. Did they ever tell you that they had additional information that contradicted what you were telling them?

A. I don't recall.  Like, they said they spoke to the principal.  But other than that, like . . . [end of answer].

and at 71:11–16, 72:1–72:7, 72:12–73:11, and 73:18–73:21:

Q. When you met with the police, when you and your mom met with the police, did they indicate to you that they had spoken with Ms. James and she had somehow mentioned what type of clothing you wore?

A. They just said that they spoke with Ms. James.  They didn't get too much into it.

* * *

Q. When the police finally told you that, as you indicated previously, that they were not going to go any further with the case because they didn't want to mess up the young man's future, did they indicate that some – that anything from Ms. James influenced their decision?

A. I don't know.

* * *

Q. Did they indicate any other reason that they weren't going to proceed with the case other than the fact that they didn't want to mess up this young man's future?

A. Yes.  They said that basically, like, also based off of what the principal said that this isn't something that they're going to end up taking up, that, you know, she basically told them that it's not something that big, basically.

Q. I'm sorry.  I'm going to go back.  She said that based off what the principal told them, that it wasn't that big – it wasn't that big what?

A. Like, they wasn't going to – based off what the principal told them, and, like, everything that they told, that they're not going to – they're not going to pursue anything further.

Q. And did you seek any – did you or your mom seek from the police what they mean by what the principal told them?

A. I think my mom asked about, like, what conversation was had with them. But I don't think she got any answers about it.

\* \* \*

A. . . . I'm not sure of the response she got, but I know she didn't get – I don't think she got a clear answer about what the conversation was about. I don't know.

and at 149:6–149:18, 150:16–151:7:

Q. Ms. James did contact the police, right?

A. Yes.

Q. But you think that she said something to them that made it hard for them to believe you, is that right?

A. Yes.

Q. Did they tell you what she told them?

A. No.  I was just – I was just told that basically they talked to – they talked to her, and based off of what she was saying and stuff that there's not much that they're going to do and things like that.

\* \* \*

Q. . . . I asked if the police ever told you what Ms. James said to them about the incident.

A. Oh.  No.  They told me that basically, based on what they told – their talk with them – with her and, like, everything else, that basically it's not – they're not going to make this a bigger case or nothing like that.  Like, based on what she told them, and they made it clear that she talked to them.

33

Even if this testimony, read in the light most favorable to the plaintiffs, supports an inference that James said something to the police, we don't know what it was.

The choice of the verb "understand" in plaintiffs' Opposition ("Jane and Julie Doe both understand that Principal James interfered with the police investigation . . . .") is telling; while the Does clearly state that the police informed them that they had already spoken with James, *see, e.g.*, Julie Dep. at 34:16–34:21, and Jane Dep. at 51:8–51:9, there is no evidence in the record describing what the officers said to the plaintiffs, much less, what James said to them.  Indeed, there is no testimony that the officers ever told the plaintiffs what Principal James had said.  Rather, it appears that the plaintiffs came to their own conclusions from the fact that the officers had spoken to the principal first, and that from the start, they were distrustful and dismissive with Jane.  *See* Jane Dep. at 52:15–52:18 ("When she called the police, whatever she told the police, they came over and that's what caused them to act the way they did to me. And they said they spoke to her before.").

 The problem is, though, that even if the police did repeat to the plaintiffs something of substance that James said, and the vague information and suppositions in the depositions are some evidence of that, plaintiffs would still run up against the hearsay rule.

At the summary judgment stage, "[w]hile a nonmovant is not required to produce evidence in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence."  *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (emphasis in original).  "Sheer hearsay . . . counts for nothing on summary judgment."  *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 969 (D.C. Cir. 2016) (internal citations omitted); *see also Gleklen*, 199 F.3d at 1369 (explaining that "sheer hearsay" is not enough because one would still not be permitted to testify about it at trial).  Because the Does'

testimony about what the officers reported (or implied) that Principal James had said to them earlier is hearsay, it would be inadmissible evidence at trial, and therefore, it cannot defeat summary judgment on its own.  Plaintiffs may have been correct in their suspicion that James had poisoned the well, but at this stage of the proceedings, they are required to prove it.

And in the end, even if the Court were to accept as fact that James made disparaging statements to the police similar to those reported by Pinder, there is no evidence tying her remarks to the outcome of either the MPD or the DCPS investigation.  While the discovery period in this case lasted for two years, the police officers do not appear to have been deposed, and the record is devoid of any evidence of what MPD did or why.[20]  And the DCPS investigation went forward unimpeded and found that Jane was sexually assaulted and that corrective action was required, notwithstanding James's initial attempts to wave Superintendent Pinder off.

---

[20]     Even Julie Doe advanced more than one explanation.  *See* Julie Dep. at 40:3–40:11, 40:17–41:4:

> Q. And were charges ever filed against the perpetrator of this assault?
>
> A. No.
>
> Q. Do you know why they were not?
>
> A. I was really given multiple reasons.  One, Ms. James portrayed my daughter as a liar when she spoke with the investigators regarding the crime and really when she spoke with other DCPS officials, my daughter was crying rape.
>
> * * *
>
> A. The second reason I was given, I believe her name was Alvarenga or something, by the detective was that the – I guess according to school records the young man had moved out of the state or something.  And finally, after they saw the video of him dragging my daughter down the hallway and realized she was not crying rape, I was told, why do you want to ruin this young man's life, he's so young.

Plaintiffs' suggestion that the District's reprimand of James supports their retaliation claim is unpersuasive.  The District responded appropriately to the very troubling information it received during its investigation, but the reprimand does not automatically render James's conduct to be materially adverse to the Does.  If anything, it advances the District's case that *its* approach was reasonable.  Because James made reasonable efforts to initiate investigations in a timely fashion after Julie Doe reported the assault; plaintiffs have not come forward with admissible evidence to show that it was James, as opposed to, for instance, M.P.'s disappearance, that derailed the MPD investigation; and the DCPS investigation went forward without any impediment, James's statements did not rise to the level of an adverse action that could support a claim of retaliation.

### 3.  The District did not deny Jane Doe's transfer request.

Plaintiffs allege that the District retaliated against her by "denying a safety transfer." Compl. ¶ 64.  She did not address this issue further in opposition to the District's motion for summary judgment, and the claim has no basis because the District granted plaintiff's transfer request.  Over the summer following the incident, Superintendent Pinder provided three transfer options for Jane Doe, but Julie Doe instead requested that her daughter be transferred to Wilson High School.  Pl.'s SOF ¶¶ 104–05; D.C.'s Opp. SOF ¶ 18.  Pinder then worked to grant the request with other school officials who were "receptive to the transfer," and Jane transferred to Wilson High School in time to begin the 2017-2018 academic year at a new school.  D.C.'s SOF ¶ 36; Pl.'s Resp. SOF ¶ 36; Pl.'s SOF ¶ 137, citing Jane Dep. at 97; D.C.'s Resp. SOF ¶ 137.

Because plaintiffs have not demonstrated that Roosevelt High School took any materially adverse actions, the Court finds that plaintiffs have not shown that there is a genuine issue of material fact for the jury regarding alleged retaliation at Roosevelt High School.

### B. Wilson High School officials did not retaliate against Jane Doe.

Plaintiffs next argue that the District retaliated against Jane after she filed her complaint on September 21, 2018. *See* Compl.; Pl.'s Opp. D.C. Mot. at 31. She contends that because the school (1) issued 50 make-up assignments on October 22, 2018 that she had to complete in two days to avoid a failing grade, (2) denied her request for special education services, and (3) gave her a failing grade in U.S. history due to her absences, a jury could find that the District "wanted to make an example of Jane Doe." Pl.'s Opp. D.C. Mot. At 31. The District responds that providing makeup assignments was not a materially adverse action, but a benefit to the student. D.C. Reply at 21. It also argues that even if these were adverse actions, plaintiff has failed to establish a causal connection between the filing of the complaint and these circumstances because her attendance issues at Wilson predated the filing of the complaint. *Id.* In addition, the District had "legitimate nondiscriminatory reasons for its actions related to Jane Doe" because she missed significant time from school. *Id.* at 22. With respect to her requests for accommodations, the District argues that because Jane Doe did not make her request until two months after filing this lawsuit, the "even later" denial suggests that there was "no causation at all." *Id.*

The Court agrees that plaintiffs have not come forward with evidence to support a triable claim that Wilson High School officials retaliated against Jane. Following plaintiff's many absences, the District provided her with the opportunity to make up missed assignments and offered tutoring services to help Jane understand the material. Pl.'s SOF ¶ 165; D.C.'s Opp. SOF ¶¶ 41–43. Such actions would hardly "dissuade[ ] a reasonable [person] from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68.

Even if some of the consequences of Jane's absences can be characterized as adverse, such as failing U.S. history, she cannot establish the causation needed to sustain a retaliation claim. Plaintiff's attendance issues began during her 2017-2018 sophomore year, well before she filed

her complaint in September 2018, and they continued into the early part of her junior year.  Pl.'s SOF ¶¶ 146, 173; D.C.'s Resp. SOF ¶¶ 146, 173.  But the record shows that Wilson High School administrators and teachers were not aware of Jane's report of sexual assault or any related investigations until some unspecified point in time after the September 27, 2018 Washington Post article had been published.  Pl.'s SOF ¶ 154; D.C.'s Resp. ¶ SOF 154.  Moreover, the District came forward with a legitimate nondiscriminatory reason for its actions related to Jane, as she had missed significant time from school.  D.C. Reply at 22.  Because of her absences, the District had to assign her make-up assignments, and eventually failed her in U.S. history.  *Id.*

To the extent plaintiff contends that the denial of her request for special education services reflects retaliation,[21] she similarly cannot establish the requisite causation because the evidence of temporal proximity is weak.  The District issued its final denial on August 5, 2019, over two years

---

21      The parties dispute whether plaintiffs have raised a failure to accommodate claim governed under the Individuals with Disabilities in Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"), and whether plaintiffs have therefore failed to exhaust their administrative remedies.  *See* D.C. Reply at 23–25; Pl.'s Sur-Reply at 1.  The District argues that plaintiffs' claims relate to the denial of a "free appropriate public education" ("FAPE"); the "gravamen of Jane Doe's complaints concerning Wilson High School is that after the sexual assault, she could not 'meaningfully access the general education curriculum' because the District failed to accommodate her disabilities," and therefore, in the District's view, she was required to exhaust the administrative remedies available under the IDEA before bringing a claim.  D.C. Reply at 23–25, citing Pl.'s Opp. D.C. Mot. at 16.  Plaintiffs respond that the District has waived this affirmative defense, and that regardless, she was not required to exhaust administrative remedies under the IDEA because "she has never alleged that the District violated her IDEA rights, and the gravamen of her Title IX claims is sexual discrimination that denied her educational opportunities and benefits."  Pl.'s Sur-Reply at 1 (emphasis in original).

To the extent plaintiffs seek to appeal the denial of a request for special education services, *see* DCPS 2019 Final Eligibility Report, or a 504 plan, they were required to seek such relief through the proper administrative process, which they did not.  But here, plaintiffs are seeking relief under Title IX, not the IDEA or the Rehabilitation Act, and they claim that the District denied Jane's request for special education services *in retaliation* for filing the complaint.  The Court therefore does not need to resolve the exhaustion issue given the lack of temporal proximity or any other evidence pointing to the necessary but-for causation for their retaliation claim to survive.

after the reported assault and nearly a year after plaintiffs filed their complaint.  *See* DCPS 2019 Final Eligibility Report.  A period of eleven months between the protected activity and the adverse action is not generally recognized in this circuit to give rise to an inference of causation.  *See Allen v. Napolitano*, 774 F. Supp. 2d 186, 201 n.2 (D.D.C. 2011) ("In the D.C. Circuit, courts have held that alleged retaliatory acts must occur within three or four months of the protected activity . . . .") (collecting cases); *see also Willingham v. Gonzales*, 391 F. Supp. 2d 52, 61–62 (D.D.C. 2005) (finding that a three-month period was sufficient but a six-month period was too long).

In sum, plaintiffs have failed to produce evidence that would enable a jury to conclude that Jane Doe suffered adverse actions at Wilson High School because of her protected conduct.  The Court will grant summary judgment for the District on the retaliation claims.

## III.    Plaintiffs' Intentional Infliction of Emotional Distress Claim Fails.

In Count Four, plaintiffs bring a claim of intentional infliction of emotional distress (IIED) against Principal James and the District.  Compl. ¶¶ 82–86.  They allege that defendants "did not impartially investigate the claims of sexual assault, and made outrageous defamatory and slanderous statements . . . with the intent of harming Jane Doe and/or her reputation," which caused Jane to suffer physical and psychological pain.  Compl. ¶¶ 84–86.  Defendants have moved for summary judgment on this count.  D.C. Mot. at 21; James Mot. at 1.  Defendant James argues that the recorded statements are inadmissible in court because she was "secretly recorded. . . in violation of federal law."[22]  James Mot. at 1, citing 18 U.S.C. §§ 1211, 1215.  In addition, James asserts that plaintiffs cannot establish any of the elements of their IIED claim because her comments were not directed at Jane, her conduct was not extreme and outrageous, and she did not

---

22    Because the admissibility of the recorded statements is not relevant to plaintiffs' IIED claim, the Court need not address this issue.

cause Jane extreme emotional distress. *Id.* at 11, 15, 22. The District argues that James's conduct "does not rise to the level of severe and outrageous conduct necessary to support a claim [of IIED]" and that plaintiff's report was investigated by "impartial District employees." D.C. Mot. at 1, 20.

Plaintiffs focus on defendant James's conduct only, and argue that even though Jane and Julie Doe were not in the room, the "demeaning and ridiculing" nature of her statements and her actions following the statements indicate that James "did act intentionally to harm Jane." Pl.'s Opp. James Mot. at 3. Plaintiffs further argue that James's behavior rose to the requisite level of outrageousness when James "deliberately undermined" Jane Doe's report of an assault by "jeopardizing and biasing the police investigation." Pl.'s Opp. James Mot. at 4. While the Court agrees that James's remarks were completely inappropriate, it will grant summary judgment in favor of defendants because the evidence does not support a finding that James's statements were made with the intent to cause emotional harm or in reckless disregard of that risk.

A claim of intentional infliction of emotional distress must be predicated upon "(1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) cause[d] the plaintiff severe emotional distress." *Halcomb v. Woods*, 610 F. Supp. 2d 77, 80 (D.D.C. 2009), citing *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002). "To establish the required degree of outrageousness [to sustain an IIED claim], the plaintiff must allege conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Kerrigan v. Britches of Georgetowne*, 705 A.2d 624, 628 (D.C. 1997) (internal citations and quotation marks omitted).

Defendants argue that the statements captured on Julie Doe's cell phone did not intentionally or recklessly cause emotional distress to Jane because James made the statements

after Jane and Julie had left the room.  James Mot. at 23; D.C. Reply at 27.  A showing of intentional conduct involves a "desire[ ] to inflict severe emotional distress" with the knowledge that "such distress is certain, or substantially certain," to occur as a result, and reckless behavior involves a "deliberate disregard of a high degree of probability that the emotional distress will follow."  Restatement (Second) of Torts § 46, cmt. i (Am. L. Inst. 1965).  The Court agrees that James's conduct fails to suffice under either standard.

The undisputed evidence shows that James's recorded statements were not intentionally directed toward Jane.  James was unwittingly recorded after Jane and Julie Doe had left the room, and Jane did not hear the statements from the hallway.  Pl.'s SOF ¶¶ 67–68, 114; D.C.'s Opp. SOF ¶¶ 10, 14.  The statements allegedly made to the police officers were also not made to Jane, which makes them a questionable predicate for this claim.  But in any event, the Court has already detailed the reasons why hearsay evidence about what James said to the police – to the extent it even exists – cannot carry the day in response to a motion for summary judgment, so the Court need not go on to determine whether that conversation was sufficiently outrageous to meet the necessary standard.

Because there was no way for James to have known that plaintiff would hear the recorded remarks at any point, her conduct did not demonstrate either a "desire to inflict severe emotional distress" upon Jane, or a "deliberate disregard of a high degree of probability that the emotional distress will follow."  Restatement (Second) of Torts § 46, cmt. i (Am. L. Inst. 1965).  Thus, plaintiffs have failed to come forward with evidence to establish the necessary element that James's statements were intended to cause, or in deliberate disregard of, the risk of emotional distress.

Because plaintiffs have failed to show that James's conduct was intentional or reckless with respect to its impact on Jane, the Court need not reach the question of whether the conduct was sufficiently atrocious or intolerable or whether it caused plaintiff the severe emotional distress required for an IIED claim.  The Court grants summary judgment in favor of defendants as to Count Four.

## CONCLUSION

For the reasons stated above, plaintiffs' cross-motion for partial summary judgment [Dkt. # 72] will be **GRANTED**, and defendants' motions for summary judgment [Dkt. # 65, Dkt. # 66, and Dkt. # 68] will be **GRANTED** on all three counts.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 14, 2023